UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-61582-CIV-COHN-SELTZER

STACEY MATTOCKS, an individual

       Plaintiff,

v.

BLACK ENTERTAINMENT TELEVISION, LLC
a District of Columbia limited liability company,

       Defendant.

_____/

## AMENDED COMPLAINT

Plaintiff, Stacey Mattocks, by and through undersigned counsel, files this Amended Complaint against Defendant, Black Entertainment Television, and states as follows:

## JURISDICTION, VENUE & THE PARTIES

1.      This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1338 because the amount in controversy is in excess of $75,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different states.

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.      Plaintiff, Stacey Mattocks ("Mattocks"), resides in Broward County, Florida is over the age of eighteen, and is otherwise *sui juris*.

4.      Defendant, Black Entertainment Television ("BET"), is a Washington, D.C. corporation with its principle address located in Washington, D.C.

5.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of Florida because (1) Defendant is registered to do business in this State; (2) Defendant conducted business in this judicial district; (3)  Defendant committed tortious acts in this judicial district;

and (4) Plaintiff's copyright rights have been established and lie within this judicial district.

6.     All conditions precedent to bringing this action have occurred, been performed, or been waived.

## GENERAL ALLEGATIONS

7.     In 2008, Mattocks created a Facebook fan page (the "FB Page") for the television show, "The Game" (the "Show"), which originally aired on the CW Television Network ("CW").

8.     In May, 2009, CW canceled the Show. Nevertheless, Mattocks continued to aggressively promote the Show on the FB Page in hopes that a network would eventually pick it up and return it to air.

9.     Mattocks' efforts generated substantial interest in the Show from Facebook users.

10.     In or about April, 2010, due in large part to Mattocks' growing FB Page, which at the time had over 750,000 "Likes,"[1] Black Entertainment Network ("BET") picked up the Show and began to produce new episodes for air in January, 2011.

11.     By October, 2010, the FB Page had approximately 1.3 million "Likes." Recognizing the impact that Mattocks was having on the Show's popularity, BET reached out to Mattocks and asked if she would post various links and promotional stories about the Show on the FB Page to help create excitement and "buzz" in advance of the Show's premier on January 11, 2011. Mattocks agreed to help with the Show's promotion.

12.     Mattocks continued to develop the FB Page in her sole discretion and the FB Page grew at approximately 100,000 "Likes" per week.

13.     In or about November, 2010, in recognition of Mattocks' hard work on the FB Page and its value to BET, BET agreed to pay Mattocks $30 per hour to work as a social media

---

[1] A "Like" on Facebook is equivalent to a customer's public endorsement of a product.

"freelancer."

14.     However, BET was searching for a more "permanent" way to capitalize on the FB Page and Mattocks' efforts. Therefore, on December 15, 2010, BET submitted a proposed contract to Mattocks that would have paid her a maximum of $85,000.00 over a one year period. Mattocks declined this offer because it was unreasonably low, would have stripped her of all rights to the FB Page, and, moreover, could have been terminated at any point by BET, with or without cause.

15.     Undeterred by Mattock's refusal to sell the page, BET "wine-and-dined" Mattocks in the weeks and days leading up to the Show's premier. For example, BET flew Mattocks out to Los Angeles, California for promotional interviews, "red-carpet treatment," and a screening of the Show's premiere.

16.     When the Show premiered on January 11, 2011, the FB Page had approximately 3.3 million "Likes." The premiere was the top ad-supported scripted series premiere in cable history and was viewed by 7.7 million viewers. The Show also generated the highest amount of social media buzz of all other prime-time television shows.

17.     In newspaper and magazine articles, Mattocks was credited by BET executives for playing a critical role in reviving interest in the Show and making it a massive success with viewers.

18.     Due to substantial impact that the FB Page had on the popularity of the Show, BET again inquired whether Mattocks would transfer ownership of her FB Page to BET. Mattocks again declined.

19.     Suddenly, on or about February 8, 2011, Facebook disabled Mattocks' Facebook account, including the FB Page.

20.     BET subsequently contacted Facebook to inform them that a "mistake" had been made and that the FB Page should be restored.

21.     The following day, Facebook restored Mattocks' account.

22.     On February 10, 2011, just two days after Facebook "mistakenly" disabled Mattocks' account, BET requested that Mattocks provide them with "Administrative Access" to her FB Page, such that BET would be able to post articles, links, videos, etc. to the FB Page, in case Mattocks' account was ever "mistakenly" disabled again.

23.     This request turned into a Letter Agreement, which was provided to Mattocks on or about February 10, 2011. The Letter Agreement provided:

> "This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that <u>BET will not change the administrative rights to the Page to exclude you from the Page</u>. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion."

Emphasis added.

24.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that the FB Page would always remain active and available to the Show's fans. A copy of the Letter Agreement is attached as Exhibit "A."[2]

25.     Shortly thereafter, Mattocks granted BET Administrative Access.

26.     Building on her social media efforts for the Show, in or around March, 2011, Mattocks created a Twitter account dedicated to the Show. Through the Twitter account, Mattocks posted all of the Facebook links as an additional way to generate traffic for BET. Mattocks' Twitter account rapidly amassed fans of the Show.

---

[2] Mattocks is not in possession of the executed Letter Agreement and BET never provided Mattocks with a copy of same.

27.     By June 2011, the FB Page had approximately 5 million "Likes."

28.     In or about December 2011, Mattocks noticed that BET had suddenly created its own Facebook page for the Show in an apparent attempt to unfairly compete with Mattocks' FB Page. However, despite BET's efforts, its newly created Facebook Page was unable to generate a substantial following.

29.     In January 2012, recognizing that it could not drive social media traffic to the same extent as Mattocks, and hoping to dupe Mattocks, BET verbally offered to acquire all rights to Mattocks' FB Page and Twitter account for the Show for the low price of $15,000.00.[3]

30.     Based on a study that had recently been performed that valued certain businesses' Facebook pages,[4] Mattocks' countered with an offer of $1,200,000.00.

31.     On or about March, 2012, BET rejected Mattocks' offer and instead stated that it would be proposing a different business arrangement.

32.     Still trying to capitalize on Mattocks' marketing abilities and popularity, on or about June 18, 2012, BET presented Mattocks with a proposed contract for a three year term whereby BET would pay Mattocks $4,166.66 per month. However, the maximum compensation Mattocks could earn during the three year term was set at $50,000.00. In return, Mattocks would serve as a Social Media Specialist for BET's scripted programming and would be required to write posts, filter content, engage with fans, etc. on all social media platforms and would relinquish all right to the FB Page and Twitter account to BET.[5]

33.     On or about June 21, 2012, Mattocks responded to BET's offer and expressed concerns over compensation, ownership of intellectual property, and the proposed job

---

[3] At this point, the FB Page had in excess of 5.9 million "Likes."
[4] These studies were performed in or around 2010 by the social media specialist company, Vitrue. For example, Vitrue valued the following companies based on the number of "Likes": Starbucks: $20.7 million (nearly 8 million "Likes"); Coke: $4.6 million (5.5 million "Likes"); Skittles: ($7.7 million (4.4 million "Likes")
[5] At this point, the FB Page had over 6.6 million "Likes."

responsibilities and stated that until such time as the parties could reach an amicable and mutually beneficial agreement, she would demote BET's Administrative Access[6] to the FB Page.

34.     Thereafter, Mattocks demoted BET's Administrative Access status from "Manager" to "Moderator." She did not, however, ever revoke BET's Administrative Access and BET could still respond to and delete user comments, send messages to followers, and create advertisements.

35.     Nevertheless, on or about August 27, 2012, BET sent Mattocks a letter purporting to terminate the Letter Agreement, stating that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page. Accordingly, the Letter Agreement is hereby terminated effective immediately." A copy of the August 27, 2012 letter is attached as Exhibit "B."

36.     BET also purported to rescind any intellectual property rights previously granted to Mattocks and ordered her to cease and desist from using all BET intellectual property.[7]

37.     Thereafter, upon information and belief, BET immediately contacted Facebook and instructed Facebook to remove the FB Page, without first providing Mattocks notice.

38.     Within a few days of BET's August 27, 2012 letter, Facebook removed the FB Page from its site without notice to Mattocks.

39.     On the same day the FB Page was removed, Mattocks' Twitter account was suspended.

40.     By August 31, 2012, BET's Facebook page for the Show, which previously had approximately 900 "Likes," suddenly had amassed an alleged 6.2 million "Likes."

---

[6] On or about May, 2012, Facebook introduced five levels of page administrative access: (1) Manager, (2) Content Creator, (3) Moderator, (4) Advertiser, and (5) Insights Analyst.
[7] At this point, the FB Page had approximately 7.7 million "Likes."

**Mattocks' Revenue Streams**

*Sulia*

*Revenue generated from the FB Page and Twitter*

41.     In or about August, 2011, Sulia, a subject-based social network, contacted Mattocks and asked her to help build up its social networking site. Mattocks signed an agreement with Sulia, which paid Mattocks approximately $2,000 to $3,000 per week based on how many users were directed to Sulia from links that Mattocks posted on the FB Page and Twitter.

*Revenue generated from Mattocks' personal website*

42.     On or about August 24, 2010, in an effort to further promote the Show for BET, Mattocks created her own website dedicated to the Show and other shows on BET, as well as news and current events of interest to BET's audience. Mattocks estimates that approximately 25% of Mattocks' website was dedicated to the Show.[8]

43.     On this page, Mattocks posted links to the FB Page, which would direct users to Sulia, which would also direct users to BET.com. Essentially, Mattocks' personal webpage was a vehicle for driving traffic to Sulia and BET.com.

44.     In addition to her weekly payments from the FB Page and Twitter, Sulia also paid Mattocks between $300 - $500 per post/story, which was calculated based on the number of viewers who viewed the Sulia page, as well the number of people who clicked on the Sulia link. Mattocks averaged approximately 10 – 20 posts per week.

45.     However, when the FB Page was wrongfully taken down, Mattocks stopped posting about the Show because she no longer had the popular FB Page to link to. Therefore, she stopped receiving payments from Sulia.

---

[8] The other approximate 75% was dedicated to other television shows on BET.com and news/current events of interest to BET's audience.

*Google AdSense*

46.     Beginning in or about December, 2010, Mattocks received monthly income from Google AdSense, a targeted advertisement program operated by Google that allows advertisers to purchase certain keywords such that when a user searches those selected keywords, the advertiser's advertisement appears for the user to click.

47.     In Mattocks' case, Mattocks selected a variety of keywords for advertisers to purchase. Then, when users searched for those keywords purchased by advertisers, the advertiser's advertisement would appear on Mattock's webpage.

48.     When the FB Page was taken down, Mattocks stopped posting about the Show and the advertising dollars decreased significantly.

*Amazon.com*

49.     Beginning in or about October, 2011, Mattocks began posting links to Amazon.com ("Amazon") on the FB Page, which sold DVDs of the Show.

50.     Amazon paid Mattocks based on how many users clicked on the links and how many users purchased DVDs from its website.

51.     Mattocks has retained the undersigned counsel to represent her interests in this matter and is obligated to pay all reasonable attorney's fees and costs incurred in the pursuit of the claims set forth herein.

**COUNT I – TORTIOUS INTERFERENCE**

52.     Plaintiff re-alleges paragraphs 1 through 51 as if fully set forth herein.

53.     Mattocks and Facebook had a contractual relationship by virtue of Facebook's Statement of Rights and Responsibilities, which provides: "…this Statement is an agreement between you and Facebook, Inc." A copy of Facebook's Rights and Responsibilities is attached

as Exhibit "C."

54.     BET was aware of the contractual relationship between Mattocks and Facebook.

55.     By directing Facebook to remove the FB Page under false pretenses, BET intentionally and unjustifiably interfered with the contract between Mattocks and Facebook.

56.     Mattocks has been damaged as a direct result of BET's unjustified interference.

WHEREFORE, Mattocks demands judgment against BET for damages for its tortious interference, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to the FB Page, and such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT

57.     Plaintiff re-alleges paragraphs 1 through 51 as if fully set forth herein.

58.     On or about February 12, 2011, Mattocks executed a Letter Agreement with BET, which provided:

> "This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion"

59.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that that the FB Page would always remain active and available to the Show's fans.

60.     Mattocks fully performed her obligations under the Letter Agreement by granting BET Administrative Access and by permitting BET  to update the content on the FB Page.

61.     In June 2012, following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks demoted BET's Administrative Access status from "Manager"

to "Moderator." Critically, however, she did not revoke BET's Administrative Access and BET could still update content on the FB Page by responding to and delete user comments, sending messages to followers, and creating advertisements.

62.     Nevertheless, on or about August 27, 2012, BET sent a letter to Mattocks and falsely alleged that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page," and accordingly, purported to terminate the Letter Agreement.

63.     Almost immediately thereafter, upon information and belief, BET instructed Facebook to remove the FB Page without providing Mattocks any notice. Facebook promptly complied and removed the page without any notice to Mattocks.

64.     By causing the removal of the FB Page, BET breached the Letter Agreement by excluding Mattocks from the FB Page.

65.     As detailed more fully above, as a direct result of BET's actions, Mattocks has been damaged.

WHEREFORE, Mattocks demands judgment against BET for damages for breach of contract, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to the FB Page, and such other and further relief as this Court deems just and proper.

### COUNT III – BREACH OF GOOD FAITH AND FAIR DEALING

66.     Plaintiff re-alleges paragraphs 1 through 51 as if fully set forth herein.

67.     On or about February 12, 2011, Mattocks executed a Letter Agreement with BET, which provided:

"This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion"

68.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that that the FB Page would always remain active and available to the Show's fans.

69.     Mattocks fully performed her obligations under the Letter Agreement by granting BET Administrative Access and by permitting BET  to update the content on the FB Page.

70.     In June 2012, following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks demoted BET's Administrative Access status from "Manager" to "Moderator." Critically, however, she did not revoke BET's Administrative Access and BET could still update content on the FB Page by responding to and delete user comments, sending messages to followers, and creating advertisements.

71.     Nevertheless, on or about August 27, 2012, BET sent a letter to Mattocks and falsely alleged that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page," and accordingly, purported to terminate the Letter Agreement.

72.     Almost immediately thereafter, upon information and belief, BET instructed Facebook to remove the FB Page without providing Mattocks any notice. Facebook promptly complied and removed the page without any notice to Mattocks.

73.     By causing the removal of the FB Page, BET breached the Letter Agreement by excluding Mattocks from the FB Page

74.     By causing the removal of the FB Page without providing Mattocks notice or an opportunity to cure her alleged breaches, BET breached its duty of good faith and fair dealing to Mattocks.

75.     As detailed more fully above, as a direct result of BET's actions, Mattocks has been damaged.

WHEREFORE, Mattocks demands judgment against BET for damages for breach of contract, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to the FB Page, and such other and further relief as this Court deems just and proper.

### COUNT IV – CONVERSION

76.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

77.     Through Mattocks' efforts, the FB Page for the Show had accumulated 6.78 million "Likes" at the time it was taken down in late August 2012.

78.     The value of the FB Page was generated in large part due to the substantial interest in the FB Page and significant number of "Likes" Mattocks had garnered for the FB Page.

79.     The substantial interest in the FB Page and the significant number of "Likes" generated by Mattocks provided her with business opportunities with Sulia, Google, and Amazon, among others. Therefore, the "Likes" constituted a business interest for Mattocks.

80.     Upon information and belief, in late August 2012, BET instructed Facebook to take down the FB Page and take the "Likes" from the FB Page and transfer them to BET's Facebook Page for the Show.

81.     By August 31, 2012, BET's Facebook page for the Show, which previously had approximately 900 "Likes," suddenly had amassed an alleged 6.2 million "Likes."

82.     BET's willfully took these actions with malice and wonton disregard of the rights of Mattocks.

WHEREFORE, Mattocks demands judgment against BET for damages for conversion, including punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Stacey Mattocks, hereby demands a trial by jury of all issues so triable as a matter of law.

Dated this 4th day of October, 2013.

Respectfully Submitted,

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475

By:  ***/s/ Alexander D. Brown***
Alexander D. Brown, Esq.
Fla. Bar No. 752665
adb@trippscott.com
Peter G. Herman, Esq.
Fla. Bar. No. 353991
pgh@trippscott.com
Adam S. Goldman, Esq.
Fla. Bar No. 86761
asg@trippscott.com



February 10, 2011

**<u>Via Email</u>**
Stacey Mattocks
8560 North Sherman Circle #406
Miramar, FL 33025

Dear Ms. Mattocks,

This letter confirms our agreement that you will provide BET Interactive, LLC ("BET") with administrative access to the Facebook page (the "Page") for "The Game" and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion.

Please acknowledge your agreement to the above-referenced terms by signing below.

Warm Regards,


Martez Moore
EVP, Digital Operations


Acknowledged and Agreed to by:

_____
Stacey Mattocks


Date: _____





August 27, 2012

*via email and overnight mail*
Stacey Mattocks
8560 N. Sherman Circle, #406
Miramar, Florida 33025

Re:  Breach of Letter Agreement for The Game's Facebook Page

Dear Ms. Mattocks,

We regret to inform you that your actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game (the "Game FB Page") materially breaches the letter agreement ("Letter Agreement") between us, dated February 12, 2011 which granted BET rights to the Game FB Page.  Accordingly, the Letter Agreement is hereby terminated effective immediately.

Further, BET hereby rescinds any and all rights that may have been previously granted to you directly, implicitly or otherwise, to use BET intellectual property ("BET Material").  You are respectfully directed to cease and desist from using all BET Material in any and all media immediately and further advised that BET expressly reserves its various rights and remedies as copyright and trademark owner in connection with willful infringement of our intellectual property.

In the event that you would like to explore a new arrangement with BET, we are, of course, open to the possibility of working with you in the future, provided that, we come to a good faith agreement that meets the needs of both parties.  If you have any questions regarding this matter, please feel free to contact me at 202.608.2873.

Sincerely,

Tia Carter-Jenkins
VP, Business & Legal Affairs

cc: Darrell Walker, Esq., EVP & General Counsel
    Martez Moore, EVP, Digital Media
    Jocelyn Cooley, SVP, Human Resources
    Monique Ware, VP, Digital Marketing

EXHIBIT

B

Email or Phone | Password | Log in

☑ Keep me logged in    Forgot your password?

Sign Up

# Statement of Rights and Responsibilities

This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls. Please note that Section 17 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: December 11, 2012.

### Statement of Rights and Responsibilities

This Statement of Rights and Responsibilities ("Statement," "Terms," or "SRR") derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement, as updated from time to time in accordance with Section 14 below. Additionally, you will find resources at the end of this document that help you understand how Facebook works.

1. **Privacy**

   Your privacy is very important to us. We designed our Data Use Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information.  We encourage you to read the Data Use Policy, and to use it to help you make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:

   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you.  We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information.  (To learn more about Platform, including how you can control what information other people may share with applications, read our Data Use Policy and Platform Page.)
   4. When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).
   5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

3. **Safety**

   We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to keep Facebook safe, which includes the following commitments by you:

   1. You will not post unauthorized commercial communications (such as spam) on Facebook.
   2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our prior permission.
   3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
   4. You will not upload viruses or other malicious code.
   5. You will not solicit login information or access an account belonging to someone else.
   6. You will not bully, intimidate, or harass any user.
   7. You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
   8. You will not develop or operate a third-party application containing alcohol-related, dating or other mature content (including advertisements) without

**EXHIBIT**
C

appropriate age-based restrictions.

9. You will follow our Promotions Guidelines and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.

10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.

11. You will not do anything that could disable, overburden, or impair the proper working or appearance of Facebook, such as a denial of service attack or interference with page rendering or other Facebook functionality.

12. You will not facilitate or encourage any violations of this Statement or our policies.

## 4. Registration and Account Security

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.

2. You will not create more than one personal account.

3. If we disable your account, you will not create another one without our permission.

4. You will not use your personal timeline primarily for your own commercial gain, and will use a Facebook Page for such purposes.

5. You will not use Facebook if you are under 13.

6. You will not use Facebook if you are a convicted sex offender.

7. You will keep your contact information accurate and up-to-date.

8. You will not share your password (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.

9. You will not transfer your account (including any Page or application you administer) to anyone without first getting our written permission.

10. If you select a username or similar identifier for your account or Page, we reserve the right to remove or reclaim it if we believe it is appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

## 5. Protecting Other People's Rights

We respect other people's rights, and expect you to do the same.

1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.

2. We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.

3. We provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.

4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.

5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.

6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Book and Wall), or any confusingly similar marks, except as expressly permitted by our Brand Usage Guidelines or with our prior written permission.

7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.

8. You will not post anyone's identification documents or sensitive financial information on Facebook.

9. You will not tag users or send email invitations to non-users without their consent. Facebook offers social reporting tools to enable users to provide feedback about tagging.

## 6. Mobile and Other Devices

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging fees, will still apply.

2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.

3. You provide consent and all rights necessary to enable users to sync (including through an application) their devices with any information that is visible to them on Facebook.

## 7. Payments

If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.

## 8. Special Provisions Applicable to Social Plugins

If you include our Social Plugins, such as the Share or Like buttons on your website, the following additional terms apply to you:

1. We give you permission to use Facebook's Social Plugins so that users can post links or content from your website on Facebook.

2. You give us permission to use and allow others to use such links and content on Facebook.

3. You will not place a Social Plugin on any page containing content that would violate this Statement if posted on Facebook.

## 9. Special Provisions Applicable to Developers/Operators of Applications and Websites

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:

1. You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.

2. Your access to and use of data you receive from Facebook, will be limited as follows:

   1. You will only request data you need to operate your application.

   2. You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.

   3. You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.

   4. You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.

   5. You will not include data you receive from us concerning a user in any advertising creative.

   6. You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.

   7. You will not sell user data.  If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.

   8. We can require you to delete user data if you use it in a way that we determine is inconsistent with users' expectations.

   9. We can limit your access to data.

   10. You will comply with all other restrictions contained in our Facebook Platform Policies.

3. You will not give us information that you independently collect from a user or a user's content without that user's consent.

4. You will make it easy for users to remove or disconnect from your application.

5. You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.

6. You will provide customer support for your application.

7. You will not show third party ads or web search boxes on www.facebook.com.

8. We give you all rights necessary to use the code, APIs, data, and tools you receive from us.

9. You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.

10. You will not misrepresent your relationship with Facebook to others.

11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.

7/21/13

12. We can issue a press release describing our relationship with you.

13. You will comply with all applicable laws. In particular you will (if applicable):

   1. have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.

   2. comply with the Video Privacy Protection Act (VPPA), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook. You represent that any disclosure to us will not be incidental to the ordinary course of your business.

14. We do not guarantee that Platform will always be free.

15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, timelines, and user action stories.

16. You give us the right to link to or frame your application, and place content, including ads, around your application.

17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).

18. To ensure your application is safe for users, we can audit it.

19. We can create applications that offer similar features and services to, or otherwise compete with, your application.


**.0. About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver ads and commercial content that are valuable to our users and advertisers. In order to help us do that, you agree to the following:

1. You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.

2. We do not give your content or information to advertisers without your consent.

3. You understand that we may not always identify paid services and communications as such.


**.1. Special Provisions Applicable to Advertisers**

You can target your desired audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising portal (Order):

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.

2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.

3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.

4. Your ads will comply with our Advertising Guidelines.

5. We will determine the size, placement, and positioning of your ads.

6. We do not guarantee the activity that your ads will receive, such as the number of clicks your ads will get.

7. We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running. You are responsible for paying for all ads that run.

9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.

10. We can use your ads and related content and information for marketing or promotional purposes.

11. You will not issue any press release or make public statements about your relationship with Facebook without our prior written permission.

12. We may reject or remove any ad for any reason.

13. If you are placing ads on someone else's behalf, you must have permission to place those ads, including the following:

   1. You warrant that you have the legal authority to bind the advertiser to this Statement.

2.  You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

## .2.  Special Provisions Applicable to Pages

If you create or administer a Page on Facebook, or run a promotion or an offer from your Page, you agree to our Pages Terms.

## .3.  Special Provisions Applicable to Software

1.  If you download our software, such as a stand-alone software product or a browser plugin, you agree that from time to time, the software may download upgrades, updates and additional features from us in order to improve, enhance and further develop the software.

2.  You will not modify, create derivative works of, decompile or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license or we give you express written permission.

## .4.  Amendments

1.  Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will provide you with seven (7) days notice (for example, by posting the change on the Facebook Site Governance Page) and an opportunity to comment on changes to this Statement.  You can also visit our Facebook Site Governance Page and "like" the Page to get updates about changes to this Statement.

2.  If we make changes to policies referenced in or incorporated by this Statement, we may provide notice on the Site Governance Page.

3.  Your continued use of Facebook following changes to our terms constitutes your acceptance of our amended terms.

## .5.  Termination

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 15-19.

## .6.  Disputes

1.  You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You may also delete your account or disable your application at any time. In all County, California for the purpose of litigating all such claims.

2.  If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim. Although we provide rules for user conduct, we do not control or direct users' actions on Facebook and are not responsible for the content or information users transmit or share on Facebook. We are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook. We are not responsible for the conduct, whether online or offline, of any user of Facebook.

3.  WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE

7/21/13

LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## .7. Special Provisions Applicable to Users Outside the United States

We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users and non-users who interact with Facebook outside the United States:

1. You consent to having your personal data transferred to and processed in the United States.

2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website.

3. Certain specific terms that apply only for German users are available here.

## .8. Definitions

1. By "Facebook" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the Like button, the Share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.

2. By "Platform" we mean a set of APIs and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.

3. By "information" we mean facts and other information about you, including actions taken by users and non-users who interact with Facebook.

4. By "content" we mean anything you or other users post on Facebook that would not be included in the definition of information.

5. By "data" or "user data" or "user's data" we mean any data, including a user's content or information that you or third parties can retrieve from Facebook or provide to Facebook through Platform.

6. By "post" we mean post on Facebook or otherwise make available by using Facebook.

7. By "use" we mean use, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.

8. By "active registered user" we mean a user who has logged into Facebook at least once in the previous 30 days.

9. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us. If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.

## .9. Other

1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc. Otherwise, this Statement is an agreement between you and Facebook Ireland Limited.  References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.

2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.

3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.

4. If we fail to enforce any of this Statement, it will not be considered a waiver.

5. Any amendment to or waiver of this Statement must be made in writing and signed by us.

6. You will not transfer any of your rights or obligations under this Statement to anyone else without our consent.

7. All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

8. Nothing in this Statement shall prevent us from complying with the law.

9. This Statement does not confer any third party beneficiary rights.

10. We reserve all rights not expressly granted to you.

11. You will comply with all applicable laws when using or accessing Facebook.

7/21/13

**You may also want to review the following documents, which provide additional information about your use of Facebook:**

- Data Use Policy: The Data Use Policy contains information to help you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made on or through Facebook.
- Platform Page: This page helps you better understand what happens when you add a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that apply if you offer contests, sweepstakes, and other types of promotions on Facebook.
- Facebook Brand Resources: These guidelines outline the policies that apply to use of Facebook trademarks, logos and screenshots.
- How to Report Claims of Intellectual Property Infringement
- Pages Terms: These guidelines apply to your use of Facebook Pages.
- Community Standards: These guidelines outline our expectations regarding the content you post to Facebook and your activity on Facebook.

To access the Statement of Rights and Responsibilities in several different languages, change the language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version.

| Mobile | Find Friends | Badges | People | Pages | Places | Apps | Games | Music |
| About | Create Ad | Create Page | Developers | Careers | Privacy | Cookies | Terms | Help |

Facebook © 2013 · English (US)

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## TXu 1-836-966

Effective date of registration:

July 19, 2012

---

## Title

Title of Work: "The Game" Facebook pages

## Completion/Publication

Year of Completion: 2012

## Author

Author: Stacey Mattocks

Author Created: text, photograph(s), compilation created by author named on application

Citizen of: United States        Domiciled in: United States

## Copyright claimant

Copyright Claimant: Stacey Mattocks

8560 N. Sherman Circle, #406, Miramar, FL, 33025, United States

## Limitation of copyright claim

Material excluded from this claim: photographs

New material included in claim: text, photograph(s), compilation created by author named on application

## Certification

Name: Mark D. Bowen, Esq.

Date: July 19, 2012

Applicant's Tracking Number: 11961.6601

---

Correspondence: Yes



EXHIBIT
D