UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-61582-CIV-COHN-SELTZER

STACEY MATTOCKS, an individual

       Plaintiff,

v.

BLACK ENTERTAINMENT TELEVISION, LLC
a District of Columbia limited liability company,

       Defendant.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff, Stacey Mattocks ("Mattocks"), files her Response in Opposition to Defendant, Black Entertainment Television's ("BET"), Motion to Dismiss Amended Complaint [DE 6], and states as follows:

### Introduction

This case arises out of BET's successful attempt to manipulate Mattocks, the creator of an immensely popular Facebook Fan Page (the "FB Page") for a television show called The Game (the "Show"), into giving it control of the FB Page in order to prosper from her efforts. BET's unlawful and unjustified actions in terminating its agreement with Mattocks and instructing Facebook to remove the FB Page after the Page generated over 6.7 million Facebook "Likes," and then subsequently converting those "Likes" to its own Facebook Page for the Show, form the basis for four claims against BET: (1) tortious interference; (2) breach of contract; (3) breach of duty of good faith and fair dealing; and (4) conversion.

BET has moved to dismiss each of these causes of action, asserting that Mattocks has failed to state a claim upon which relief may be granted. However, as will be discussed below,

not only does each of BET's arguments fail as a matter of fact, but critically, they all fail as a matter of law, since each involves questions of fact and are therefore inappropriate for the basis of a motion to dismiss.

## Memorandum of Law

### A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 8(a), Plaintiffs are required only to give a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). When considering a motion to dismiss, the "plaintiff's allegations must be accepted as true and viewed in the light most favorable to the plaintiff." *In re Se. Banking Corp.*, 855 F. Supp. 353, 358 (S.D. Fla. 1994). Under this standard, "the movant sustains a very high burden." *Id.* (citing *Jackam v. Hospital Corporation of America Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986). Indeed, motions to dismiss are viewed with disfavor and are rarely granted. *See Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Wood v. Cellco P'ship*, 8:06CV687 T27TBM, 2007 WL 917300 (M.D. Fla. 2007).

Under this standard, it is respectfully submitted that BET's Motion must fail.

### a. *Plaintiff States a Claim for Tortious Interference*

BET claims that it was justified in removing the FB Page because it did so to protect its own financial interests and its intellectual property. As such, BET argues that its conduct is not actionable as tortious interference. However, BET ignores that Mattocks has pled that BET engaged in a series of acts that demonstrate it acted solely with malice, ill-will, and/or spite in removing the FB Page, and that there was no other justification for removing the FB Page in light of the mutually beneficial relationship the parties had enjoyed.

"Intentional interference requires both the intent to damage the business relationship and a lack of justification for doing so." *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 391 F. Supp. 2d 1148, 1165 (S.D. Fla. 2005). However, it is "enough for the interference to have been motivated by malice." *Id.* Malice can be proven by showing "a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill will, or other bad motive." *In re Maxxim Med. Group, Inc.*, 434 B.R. 660, 689 (Bankr. M.D. Fla. 2010). Moreover, whether a party's interference was justified requires a "balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important." *Heavener, Ogier Services, Inc. v. R. W. Florida Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982) (citing Restatement 2d, Torts § 767 and comments). *See also Baycare Health Sys., Inc. v. Med. Sav. Ins. Co.*, 8:07-CV-1222-T-27TGW, 2008 WL 792061 (M.D. Fla. 2008).

In her Complaint, Mattocks describes in detail BET's attempts to acquire the fruits of Mattocks' labor (i.e. the FB Page) and, once rebuffed, BET's malicious scheme to obtain control of the FB Page resulting in the elimination of Mattocks. BET was keenly aware of the significant value Mattocks created for the Show through the FB Page and thus it sought to acquire that value using any means necessary.

After Mattocks refused to sell the FB Page to BET, Mattocks alleges that BET orchestrated the removal of Mattocks' Facebook account on or about February 8, 2011 in order to convince Mattocks to grant BET administrative access to the FB Page in case Mattocks' account was ever "mistakenly" disabled again. *See* Amended Complaint at ¶¶ 19-25. Mattocks

was then manipulated into executing a Letter Agreement with BET, which granted BET administrative access to the FB Page. *Id.* Thereafter, Mattocks exponentially grew the FB Page (as well as a Twitter account Mattocks created for the Show). *Id.* at ¶¶ 26-27. At the same time, a Facebook Page for the Show created by BET failed to generate any substantial following. *Id.* at ¶¶ 26-28. Recognizing that it could not drive social media traffic to the same extent as Mattocks, BET made several unacceptable proposals to acquire the FB Page (as well as the Twitter account). *Id.* at ¶¶ 29-32. Eventually, Mattocks expressed her concerns over BET's acquisition attempts due to issues concerning compensation, ownership of intellectual property, and proposed job responsibilities. She stated that until such time as the parties could reach an amicable and mutually beneficial agreement, she would lower BET's administrative access to the FB Page. *Id.* at ¶¶ 33-34. Thereafter, Mattocks lowered BET's administrative access status from "Manager" to "Moderator." *Id.* at ¶ 34. She did not, however, ever revoke BET's administrative access, and BET could still respond to and delete user comments, send messages to followers, and create advertisements. Critically, at no point did Mattocks ever refuse or deny BET's requests to post any videos, links, or comments. Thus, BET was still able to update the content on the FB Page whenever and however it wished.

Nevertheless, BET seized upon what it perceived as an opportunity by sending Mattocks a letter purporting to terminate the Letter Agreement and thereafter instructing Facebook to remove the FB Page. *Id.* at ¶¶ 35-36. Almost immediately thereafter, BET's Facebook Page for the Show, which previously had approximately 900 "Likes," suddenly had amassed approximately 6.2 million "Likes." *Id.* at ¶¶ 40. Thus, it appears that BET converted the "Likes" from the FB Page to its own Facebook Page, thereby, achieving its malicious plan to capitalize upon Mattocks' efforts.

BET's assertion that it was justified in interfering with Mattocks' contractual relationship with Facebook in order to protect its financial interests is belied by the relationship between Mattocks and BET prior to the removal of the FB Page. In or around October, 2010, BET reached out to Mattocks and asked if she would post various links and promotional stories about the Show on the FB Page to help create excitement and "buzz" in advance of the Show's premier on January 11, 2011. *Id.* at ¶ 11. Mattocks agreed to help with the Show's promotion. *Id.* For the remainder of the parties' relationship, which concluded when the FB Page was removed, BET and Mattocks enjoyed a symbiotic relationship whereby Mattocks would post stories, links, videos, and comments on the FB Page at the same time BET would send its own content for Mattocks to post as well. BET never posted content on its own, even after it was granted administrative access. Furthermore, at no point in the parties' relationship did Mattocks ever refuse or otherwise deny any of BET's requests to post content or otherwise prevent BET from posting content.

Both parties unquestionably benefitted from this relationship. Mattocks was able to do what she loved while gaining financially from it.  BET enjoyed the all of the direct and indirect benefits of having the Show become one of the highest rated shows on cable. As such, BET's claims that it caused the FB Page to be taken down in order to protect its financial interests and intellectual property stand in stark contrast to the reality that BET had absolutely no reason to believe that Mattocks would harm BET or its intellectual property, or otherwise compromise BET's financial interests.

In light of Mattocks' well-pled allegations, which allege that BET acted maliciously and unjustifiably in shutting down the FB Page in order to capitalize on Mattocks' years of efforts in developing the FB Page and generating interest in a show that otherwise might never have been

renewed, BET's arguments fail. Moreover, whether BET was justified in interfering with Mattocks' contract with Facebook is inappropriate for determination based upon a motion to dismiss since this issue requires examination of evidence outside of the four corners of the complaint (e.g., evidence surrounding the February removal of Mattocks' Facebook account and evidence concerning the origin of the "Likes" on BET's Facebook Page for the Show, among other things). *See Baycare Health Sys., Inc.*, 2008 WL 792061 at *6 (holding whether interference was justified was inappropriate for determination on a motion to dismiss because it required examination of evidence outside the four corners of the complaint).

Undoubtedly, this determination is an issue of fact to be determined by a jury. *See, e.g., Monco Enterprises, Inc. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. 1st DCA 1996) ("The question of whether an action is privileged is a jury question."); *Hosp. Corp. of Lake Worth v. Romaguera*, 511 So. 2d 559, 561 (Fla. 4th DCA 1986) ("Florida case law clearly holds that the question of whether or not an interference is justified is normally a jury question.").

In light of the foregoing, BET's argument to dismiss Mattocks' claim for tortious interference must be rejected.

### b. *Plaintiff States a Claim for Breach of Contract*

#### i. *BET's Removal of the FB Page Constitutes a Breach*

BET seeks to excuse its contractual breach by arguing that although it orchestrated the removal of the FB Page, thereby eliminating all of Mattocks' rights in the FB Page, it did not technically change the administrative rights to exclude Mattocks from the FB Page, and thus, no breach occurred. BET's argument is nonsensical and contrary to the intent of the Letter Agreement.

When "construing the language of a contract, courts are to be mindful that the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009) (citation omitted). *See also Conway v. Conway*, 111 So. 3d 925 (Fla. 1st DCA 2013).

Whether BET changed the administrative rights to exclude Mattocks from the FB Page or BET caused the take down of the FB Page is immaterial, as the end goal was the same; that is, Mattocks losing all rights to the FB Page. Stated another way, that BET caused Mattocks to lose all rights in the FB Page by causing the FB Page to be removed rather than changing her administrative rights does not relieve BET of liability. The intended meaning and purpose of the Letter Agreement was to grant BET administrative access to the FB Page, but also to provide Mattocks with the security that BET could not simply steal the FB Page from her. Yet, this is precisely what occurred and BET's actions violated the very spirit and purpose of the Letter Agreement.

      ii.    *BET Retained Ability to Update Content in its "Sole Discretion"*

BET next argues that Mattocks committed a prior breach of the Letter Agreement by demoting BET's administrative access and as a consequence, BET could not update the FB Page in its "sole discretion." Consequently, BET argues that it was relieved from fulfilling its contractual obligations.

BET ignores that at no time during the parties' relationship did BET ever update the FB Page in its "sole discretion." The only method used by BET to update the FB Page was sending content to Mattocks for her to post. Moreover, at no time did Mattocks ever refuse BET's requests to update any content or make any changes to the FB Page. BET elected, in its sole discretion, to post content through Mattocks. Therefore, even though BET's administrative

access was demoted, it never lost the ability to update the content on the FB Page in its sole discretion. Contrary to BET's representations in its August 27, 2012 letter purporting to terminate the parties' relationship, nothing about the parties' relationship changed after Mattocks demoted BET's administrative access. In fact, despite BET's contention, nowhere in the Letter Agreement was Mattocks obligated to provide BET with "full" administrative rights. Mattocks was merely obligated to provide BET with administrative access and Mattocks undoubtedly complied with that obligation.

At worst, the term "sole discretion" is ambiguous and requires this Court to examine the conduct of the parties to ascertain their intent. Under Florida law, "[i]ntent of parties to an instrument is of prime importance, and it is generally presumed parties intend what they sign, but parties' conduct may render intent questionable." *Heath v. First Nat. Bank in Milton*, 213 So. 2d 883 (Fla. 1st DCA 1968). *See also E. Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 437 (S.D. Fla. 1975) ("[t]he practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent"); *L & H Const. Co., Inc. v. Circle Redmont, Inc.*, 55 So. 3d 630 (Fla. 5th DCA 2011) (holding the parties' conduct through course of dealings is considered in determining the meaning of the agreement). Additionally, where an agreement involves repeated occasions for performance with knowledge of the performance and opportunity for either party to object, any course of performance accepted without objection is given great weight in the interpretation of the agreement. Restatement (Second) of Contracts § 202 (1981).

As explained above, throughout the parties' relationship, whenever BET sought to update content on the FB Page (which occurred several times per week while the show was on air, and

approximately once a week when off the air), it would send Mattocks various links, videos, articles, etc. with the request that Mattocks post same to the FB Page. Mattocks promptly uploaded the content to the FB Page on each and every occasion. BET never objected to this arrangement, and, in fact, preferred to have Mattocks update the content, seemingly due to her acumen in developing Facebook pages and generating fan interest.

Therefore, the course of dealing between BET and Mattocks shows that the intent of the "sole discretion" language was to permit BET to update the FB Page at any time with whatever content it desired. That the actual ministerial upload of the content was done through Mattocks does not change this interpretation.

Again, however, at a minimum, whether BET or Mattocks breached the Letter Agreement is, in part, a question of fact to be determined by a jury. *See, e.g., Haiman v. Gundersheimer*, 177 So. 199, 201 (Fla. 1937) ("[i]t is a question of law for the court to determine what would constitute a breach of the contract and then a question of fact for the jury to determine as to whether or not that thing which would constitute a breach of the contract has occurred."); *Ness Racquet Club, LLC v. Ocean Four 2108, LLC*, 88 So. 3d 200, 203 (Fla. 3d DCA 2011) (holding determination of a breach of a contract is a question of fact).

Therefore, BET's argument that Mattocks committed a prior breach of the Letter Agreement that excused BET's continued performance fails at the motion to dismiss stage.

      ***c. Plaintiff States a Claim for Breach of Duty of Good Faith and Fair Dealing***

BET's attempt to dismiss Mattocks' claim for BET's breach of good faith and fair dealing fails for the same reason as its argument to dismiss Mattocks' claim for breach of contract. The notion that BET did not breach the Letter Agreement because it orchestrated the removal of the FB Page rather than usurping Mattocks' administrative access does not form the

basis of a legally-supportable defense of its decision to eliminate Mattocks' rights to the FB Page. In fact, the doctrine of the duty of good faith and fair dealing was created to impose liability on a party for doing precisely what BET has done.

The doctrine of good faith and fair dealing usually applies when a "question is not resolved by the terms of the contract or when one party may make a discretionary decision without defined standards." *Townhouses of Highland Beach Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 504 F. Supp. 2d 1307, 1310 (S.D. Fla. 2007); *see also Shibata v. Lim*, 133 F. Supp. 2d 1311 (M.D. Fla. 2000). The "covenant imposes limits upon one contracting party's ability to negatively impact the contract's value to the other contracting party." *Id.* "Compliance with implied covenant of good faith requires that party's actions be consistent with the agreed common purpose and the justified expectations of the other part." *Allapattah Services, Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1300 (S.D. Fla. 1999).

The Letter Agreement permitted Mattocks to continue to use BET's intellectual property in exchange for Mattocks granting BET administrative access to the FB Page. While the Letter Agreement provided that BET would not change the administrative rights to exclude Mattocks from the FB Page, there was no language addressing the possibility of the complete removal of the FB Page. As such, the extent of BET's ability to strip Mattocks of the FB Page under the Letter Agreement was not resolved by any specific contractual language. However, the intended meaning and purpose of the Letter Agreement was to grant BET administrative access to the FB Page, but also to provide Mattocks with the security that BET could not simply steal the FB Page from her. Therefore, BET was obligated to act in good faith with regard to its end of the bargain (i.e. not to remove Mattocks from the FB Page) and it breached that duty by acting in bad faith when it orchestrated the removal of the FB Page.

Accordingly, contrary to BET's assertion, its breach of its duty of good faith and fair dealing is directly tied to contractual language. That BET did not notify Mattocks prior to its decision to orchestrate the removal of the FB Page or provide an opportunity to cure simply speaks to BET's bad faith motive in manipulating Mattocks into executing the Letter Agreement; *to wit*, to acquire the FB Page and the goodwill Mattocks had generated, regardless of Mattocks' rights.

BET also argues that Mattocks cannot contend that the removal of the FB Page did not comport with her reasonable contractual expectations. In light of the facts asserted herein which demonstrate that Mattocks did not breach the Letter Agreement, it is patently unreasonable for BET to argue that Mattocks' should have known that BET was going to instruct Facebook to remove the FB Page.

Therefore, BET's argument that Mattocks has failed to state a claim for breach of good faith and fair dealing must be rejected.

### d. *Plaintiff States a Claim for Conversion*

BET moves to dismiss Plaintiff's claim for conversion by arguing that a Facebook "Like" is not the proper subject of a conversion claim. While Plaintiff acknowledges that this is an issue of first impression, it is respectfully submitted that under existing case law, a Facebook "Like" is an intangible business interest that is the proper subject of a conversion claim. At the very least, it would seem that since this is an issue of first impression, this determination is inappropriate at the motion to dismiss stage.

#### i. *Plaintiff Has a Property Right in the Facebook "Likes"*

In Florida, it is well-established that an action for tortious conversion will lie for the wrongful taking of intangible business interests. *See Joe Hand Promotions, Inc. v. Hart*, 11-

80971-CIV, 2012 WL 1289731 (S.D. Fla. 2012); *Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC,* No. 8: 10–cv–2680–T–33TBM, 2012 WL 33150, at *3 (M.D. Fla. Jan.6, 2012); *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1252 (M.D. Fla. 2002); *In re Estate of Corbin,* 391 So.2d 731, 732-733 (Fla. 3d 1980). Florida also recognizes business reputation, at least to the extent it approximates goodwill, as a property interest under the United States Constitution, and provides people with the "legal guarantees of present enjoyment of goodwill, *i.e.* the value inhering in the favorable consideration of customers arising from a business' reputation as being well established and well conducted." *WAM Properties, Inc. v. Desoto County, Florida*, 758 F. Supp. 1468, 1471-72 (M.D. Fla. 1991) (citation omitted). *See also In re Corbin's Estate*, 391 So. 2d at 733 (holding the recovery for conversion extends to the good will of a business); *Benihana of Tokoyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 728 (D. Del. 2011) (applying Florida law) (same).

A Facebook "Like" is akin to a customer's endorsement of a product. With tangible goods and services, the more endorsements a particular good or service has, the more valuable it becomes due to that good or service's increased goodwill. Similarly the more "Likes" a Facebook page has, the more valuable it becomes due to the page's increased goodwill. As such, a Facebook "Like" is an intangible property interest akin to business goodwill, which is a protectable property interest.

This view is supported by the facts of this case. Without any significant following, the FB Page would not be appealing to advertisers, such as Google or, Amazon, and Sulia, a subject-based social network.  They would not pay Mattocks to drive traffic to their websites. Mattocks' ability to create business opportunities from the FB Page is directly tied to the popularity of the FB Page to Facebook users. The more "Likes" the FB Page has, the greater the goodwill and the

greater appeal the FB Page has to advertisers and companies such as Sulia. Thus, the amount of goodwill (i.e. the number of "Likes") that Mattocks has generated over several years constitutes a protectable business interest.

## ii. Formal Demand and Refusal Not Required

Mattocks was not required to make a formal demand on BET for the return of the "Likes" because such a demand would have been futile since (1) BET would not have returned the "Likes" (even if it could), and (2) Mattocks no longer had access to the FB Page on which to post the "Likes." Under these circumstances, no demand is required by Florida law. *See Shelby Mut. Ins. Co. of Shelby, Ohio v. Crain Press, Inc.*, 481 So. 2d 501, 503 (Fla. 2d DCA 1985) ("a demand and refusal are unnecessary where it would be futile and the act preventing a return results in a depriving of possession and, thus, equates to a conversion."); *see also IberiaBank v. Coconut 41, LLC*, 2:11-CV-321-FTM-29, 2013 WL 6061883 (M.D. Fla. 2013) (holding under Florida law, the generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made; but while a demand and refusal constitute evidence that a conversion has occurred, it is unnecessary to prove a demand and refusal where the conversion can be otherwise shown); *In re U.S. Sugar Corp. Litig.*, 669 F. Supp. 2d 1301, 1329 (S.D. Fla. 2009) ("[w]hile demand by the rightful owner serves as actual notice of the rights of the bereaved party to the recipient, demand and refusal are not required elements for a conversion claim."); *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1161 (Fla. 3d DCA 1984) (same); *Goodrich v. Malowney*, 157 So. 2d 829, 832 (Fla. 2d DCA 1963) (same).

Therefore, the fact that Mattocks did not make a formal demand for the return of the "Likes" has no bearing on her claim for conversion.

Nevertheless, BET argues that the traditional cause of action for conversion, which requires the taking of tangible property, dictate that Mattocks has not pled a proper claim of conversion since the subject of the conversion at issue concerns somewhat more intangible property, i.e. a Facebook "Like." However, in *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 291-92, 864 N.E.2d 1272 (2007), the New York Court of Appeals determined that a claim for conversion of electronic data was cognizable and explained that it was time for courts to adopt a more modern approach to claims for conversion in light of new and evolving areas of technology:

> "[I]t is the strength of the common law to respond, albeit cautiously and intelligently, to the demands of commonsense justice in an evolving society…[t]hat time has arrived. The expansion of conversion to encompass a different class of property, such as shares of stock, was motivated by society's growing dependence on intangibles. It cannot be seriously disputed that society's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities. Indeed, this opinion was drafted in electronic form, stored in a computer's memory and disseminated to the Judges of this Court via e-mail. We cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper or quill on parchment. A document stored on a computer hard drive has the same value as a paper document kept in a file cabinet…[i]n light of these considerations, we believe that the tort of conversion must keep pace with the contemporary realities of widespread computer use."

*Id.* at 291-92.

The very same concepts apply to the instant matter. Society has become, and is increasingly becoming, overwhelmingly enveloped in social media. Traditional notions of the law must adapt and change with this evolving technology, which inevitably implicate new legal concepts of individual creation and intangible property.  With this understanding, it is respectfully submitted that a claim for conversion of Facebook "Likes" is appropriate. At a

minimum, as an issue of first impression that requires expert analysis and testimony, this issue is inappropriate for determination at the motion to dismiss stage.

                                                  Respectfully Submitted,

                                                  TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475

By:   */s/ Alexander D. Brown*
Alexander D. Brown, Esq.
Fla. Bar No. 752665
adb@trippscott.com
Peter G. Herman, Esq.
Fla. Bar. No. 353991
pgh@trippscott.com
Adam S. Goldman, Esq.
Fla. Bar No. 86761
asg@trippscott.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via EC/CMF this 6th day of December, 2013, to the attorneys on the below Service List.

                                                  By: */s/ Peter G. Herman*
Peter G. Herman, Esq.

### SERVICE LIST

Karen L. Stetson, Esq.
Gray Robinson, P.A.
1221 Brickell Avenue Suite 1600
Miami, FL 33131
Karen.Stetson@gray-robinson.com
*Counsel for Defendant*