UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-cv-61582-JIC

STACEY MATTOCKS, an individual

       Plaintiff,

v.

BLACK ENTERTAINMENT TELEVISION, LLC
a District of Columbia limited liability company,

       Defendant.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, Stacey Mattocks, by and through undersigned counsel, files this Second Amended Complaint against Defendant, Black Entertainment Television, and states as follows:

## JURISDICTION, VENUE & THE PARTIES

1.      This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1338 because the amount in controversy is in excess of $75,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different states.

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.      Plaintiff, Stacey Mattocks ("Mattocks"), resides in Broward County, Florida is over the age of eighteen, and is otherwise *sui juris*.

4.      Defendant, Black Entertainment Television ("BET"), is a Washington, D.C. corporation with its principle address located in Washington, D.C.

5.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of Florida because (1) Defendant is registered to do business in this State; (2) Defendant conducted business in this judicial district; (3)  Defendant committed tortious acts in this judicial district;

and (4) Plaintiff's copyright rights have been established and lie within this judicial district.

6.      All conditions precedent to bringing this action have occurred, been performed, or been waived.

## GENERAL ALLEGATIONS

7.      In 2008, Mattocks created a Facebook fan page (the "FB Page") for the television show, "The Game" (the "Show"), which originally aired on the CW Television Network ("CW").

8.      In May, 2009, CW canceled the Show. Nevertheless, Mattocks continued to aggressively promote the Show on the FB Page in hopes that a network would eventually pick it up and return it to air.

9.      Mattocks' efforts generated substantial interest in the Show from Facebook users.

10.     In or about April, 2010, due in large part to Mattocks' growing FB Page, which at the time had over 750,000 "Likes,"[1] Black Entertainment Network ("BET") picked up the Show and began to produce new episodes for air in January, 2011.

11.     By October, 2010, the FB Page had approximately 1.3 million "Likes." Recognizing the impact that Mattocks was having on the Show's popularity, BET reached out to Mattocks and asked if she would post various links and promotional stories about the Show on the FB Page to help create excitement and "buzz" in advance of the Show's premier on January 11, 2011. Mattocks agreed to help with the Show's promotion.

12.     Mattocks continued to develop the FB Page in her sole discretion and the FB Page grew at approximately 100,000 "Likes" per week.

13.     In or about November, 2010, in recognition of Mattocks' hard work on the FB Page and its value to BET, BET agreed to pay Mattocks $30 per hour to work as a social media

---

[1] A "Like" on Facebook is equivalent to a customer's public endorsement of a product.

"freelancer."

14.      However, BET was searching for a more "permanent" way to capitalize on the FB Page and Mattocks' efforts. Therefore, on December 15, 2010, BET submitted a proposed contract to Mattocks that would have paid her a maximum of $85,000.00 over a one year period. Mattocks declined this offer because it was unreasonably low, would have stripped her of all rights to the FB Page, and, moreover, could have been terminated at any point by BET, with or without cause.

15.      Undeterred by Mattock's refusal to sell the page, BET "wine-and-dined" Mattocks in the weeks and days leading up to the Show's premier. For example, BET flew Mattocks out to Los Angeles, California for promotional interviews, "red-carpet treatment," and a screening of the Show's premiere.

16.      When the Show premiered on January 11, 2011, the FB Page had approximately 3.3 million "Likes." The premiere was the top ad-supported scripted series premiere in cable history and was viewed by 7.7 million viewers. The Show also generated the highest amount of social media buzz of all other prime-time television shows.

17.      In newspaper and magazine articles, Mattocks was credited by BET executives for playing a critical role in reviving interest in the Show and making it a massive success with viewers.

18.      Due to substantial impact that the FB Page had on the popularity of the Show, BET again inquired whether Mattocks would transfer ownership of her FB Page to BET. Mattocks again declined.

19.      Suddenly, on or about February 8, 2011, Facebook disabled Mattocks' Facebook account, including the FB Page.

20.     BET subsequently contacted Facebook to inform them that a "mistake" had been made and that the FB Page should be restored.

21.     The following day, Facebook restored Mattocks' account.

22.     On February 10, 2011, just two days after Facebook "mistakenly" disabled Mattocks' account, BET requested that Mattocks provide them with "Administrative Access" to her FB Page, such that BET would be able to post articles, links, videos, etc. to the FB Page, in case Mattocks' account was ever "mistakenly" disabled again.

23.     This request turned into a Letter Agreement, which was provided to Mattocks on or about February 10, 2011. The Letter Agreement provided:

> "This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion."

Emphasis added.

24.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that the FB Page would always remain active and available to the Show's fans. A copy of the Letter Agreement is attached as Exhibit "A."[2]

25.     Shortly thereafter, Mattocks granted BET Administrative Access.

26.     Building on her social media efforts for the Show, in or around March, 2011, Mattocks created a Twitter account dedicated to the Show. Through the Twitter account, Mattocks posted all of the Facebook links as an additional way to generate traffic for BET. Mattocks' Twitter account rapidly amassed fans of the Show.

---

[2] Mattocks is not in possession of the executed Letter Agreement and BET never provided Mattocks with a copy of same.

27.     By June 2011, the FB Page had approximately 5 million "Likes."

28.     In or about December 2011, Mattocks noticed that BET had suddenly created its own Facebook page for the Show in an apparent attempt to unfairly compete with Mattocks' FB Page. However, despite BET's efforts, its newly created Facebook Page was unable to generate a substantial following.

29.     In January 2012, recognizing that it could not drive social media traffic to the same extent as Mattocks, and hoping to dupe Mattocks, BET verbally offered to acquire all rights to Mattocks' FB Page and Twitter account for the Show for the low price of $15,000.00.[3]

30.     Based on a study that had recently been performed that valued certain businesses' Facebook pages,[4] Mattocks' countered with an offer of $1,200,000.00.

31.     On or about March, 2012, BET rejected Mattocks' offer and instead stated that it would be proposing a different business arrangement.

32.     Still trying to capitalize on Mattocks' marketing abilities and popularity, on or about June 18, 2012, BET presented Mattocks with a proposed contract for a three year term whereby BET would pay Mattocks $4,166.66 per month. However, the maximum compensation Mattocks could earn during the three year term was set at $50,000.00. In return, Mattocks would serve as a Social Media Specialist for BET's scripted programming and would be required to write posts, filter content, engage with fans, etc. on all social media platforms and would relinquish all right to the FB Page and Twitter account to BET.[5]

33.     On or about June 21, 2012, Mattocks responded to BET's offer and expressed concerns over compensation, ownership of intellectual property, and the proposed job

---

[3] At this point, the FB Page had in excess of 5.9 million "Likes."
[4] These studies were performed in or around 2010 by the social media specialist company, Vitrue. For example, Vitrue valued the following companies based on the number of "Likes": Starbucks: $20.7 million (nearly 8 million "Likes"); Coke: $4.6 million (5.5 million "Likes"); Skittles: ($7.7 million (4.4 million "Likes")
[5] At this point, the FB Page had over 6.6 million "Likes."

responsibilities and stated that until such time as the parties could reach an amicable and mutually beneficial agreement, she would demote BET's Administrative Access[6] to the FB Page.

34.    Thereafter, Mattocks demoted BET's Administrative Access status from "Manager" to "Moderator." She did not, however, ever revoke BET's Administrative Access and BET could still respond to and delete user comments, send messages to followers, and create advertisements.

35.    Nevertheless, on or about August 27, 2012, BET sent Mattocks a letter purporting to terminate the Letter Agreement, stating that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page. Accordingly, the Letter Agreement is hereby terminated effective immediately." A copy of the August 27, 2012 letter is attached as Exhibit "B."

36.    BET also purported to rescind any intellectual property rights previously granted to Mattocks and ordered her to cease and desist from using all BET intellectual property.[7]

37.    Thereafter, upon information and belief, BET immediately contacted Facebook and instructed Facebook to remove the FB Page, without first providing Mattocks notice.

38.    Within a few days of BET's August 27, 2012 letter, Facebook removed the FB Page from its site without notice to Mattocks.

39.    At the time the FB was taken down, it had accumulated 6.78 million "Likes."

40.    On the same day the FB Page was removed, Mattocks' Twitter account was suspended.

41.    By August 31, 2012, BET's Facebook page for the Show, which previously had

---

[6] On or about May, 2012, Facebook introduced five levels of page administrative access: (1) Manager, (2) Content Creator, (3) Moderator, (4) Advertiser, and (5) Insights Analyst.
[7] At this point, the FB Page had approximately 7.7 million "Likes."

approximately 900 "Likes," suddenly had amassed an alleged 6.2 million "Likes."

<b><u>Mattocks' Revenue Streams</u></b>

<i><u>Sulia</u></i>

<i>Revenue generated from the FB Page and Twitter</i>

42.     In or about August, 2011, Sulia, a subject-based social network, contacted Mattocks and asked her to help build up its social networking site. Mattocks signed an agreement with Sulia, which paid Mattocks approximately $2,000 to $3,000 per week based on how many users were directed to Sulia from links that Mattocks posted on the FB Page and Twitter.

<i>Revenue generated from Mattocks' personal website</i>

43.     On or about August 24, 2010, in an effort to further promote the Show for BET, Mattocks created her own website dedicated to the Show and other shows on BET, as well as news and current events of interest to BET's audience. Mattocks estimates that approximately 25% of Mattocks' website was dedicated to the Show.[8]

44.     On this page, Mattocks posted links to the FB Page, which would direct users to Sulia, which would also direct users to BET.com. Essentially, Mattocks' personal webpage was a vehicle for driving traffic to Sulia and BET.com.

45.     In addition to her weekly payments from the FB Page and Twitter, Sulia also paid Mattocks between $300 - $500 per post/story, which was calculated based on the number of viewers who viewed the Sulia page, as well the number of people who clicked on the Sulia link. Mattocks averaged approximately 10 – 20 posts per week.

46.     However, when the FB Page was wrongfully taken down, Mattocks stopped posting about the Show because she no longer had the popular FB Page to link to. Therefore, she

---

[8] The other approximate 75% was dedicated to other television shows on BET.com and news/current events of interest to BET's audience.

stopped receiving payments from Sulia.

*Google AdSense*

47.     Beginning in or about December, 2010, Mattocks received monthly income from Google AdSense, a targeted advertisement program operated by Google that allows advertisers to purchase certain keywords such that when a user searches those selected keywords, the advertiser's advertisement appears for the user to click.

48.     In Mattocks' case, Mattocks selected a variety of keywords for advertisers to purchase. Then, when users searched for those keywords purchased by advertisers, the advertiser's advertisement would appear on Mattock's webpage.

49.     When the FB Page was taken down, Mattocks stopped posting about the Show and the advertising dollars decreased significantly.

*Amazon.com*

50.     Beginning in or about October, 2011, Mattocks began posting links to Amazon.com ("Amazon") on the FB Page, which sold DVDs of the Show.

51.     Amazon paid Mattocks based on how many users clicked on the links and how many users purchased DVDs from its website.

52.     Mattocks has retained the undersigned counsel to represent her interests in this matter and is obligated to pay all reasonable attorney's fees and costs incurred in the pursuit of the claims set forth herein.

## COUNT I – TORTIOUS INTERFERENCE

53.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

54.     Mattocks and Facebook had a contractual relationship by virtue of Facebook's Statement of Rights and Responsibilities, which provides: "…this Statement is an agreement

between you and Facebook, Inc." A copy of Facebook's Rights and Responsibilities is attached as Exhibit "C."

55.     BET was aware of the contractual relationship between Mattocks and Facebook.

56.     By directing Facebook to remove the FB Page under false pretenses, BET intentionally and unjustifiably interfered with the contract between Mattocks and Facebook.

57.     Mattocks has been damaged as a direct result of BET's unjustified interference.

WHEREFORE, Mattocks demands judgment against BET for damages for its tortious interference, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to the FB Page, and such other and further relief as this Court deems just and proper.

## COUNT II – TORTIOUS INTERFERENCE

58.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

59.     Mattocks and Facebook had a contractual relationship by virtue of Twitter's Terms of Service. A copy of Twitter's Terms of Service is attached as Exhibit "D."

60.     BET was aware of the contractual relationship between Mattocks and Twitter.

61.     By directing Twitter to remove the Mattocks' Twitter account under false pretenses, BET intentionally and unjustifiably interfered with the contract between Mattocks and Twitter.

62.     Mattocks has been damaged as a direct result of BET's unjustified interference.

WHEREFORE, Mattocks demands judgment against BET for damages for its tortious interference, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Twitter to restore Mattocks' rights to the Twitter Account, and such other and further relief as this Court deems just and

proper.

## COUNT III – BREACH OF CONTRACT

63.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

64.     On or about February 12, 2011, Mattocks executed a Letter Agreement with BET, which provided:

> "This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion"

65.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that that the FB Page would always remain active and available to the Show's fans.

66.     Mattocks fully performed her obligations under the Letter Agreement by granting BET Administrative Access and by permitting BET  to update the content on the FB Page.

67.     In June 2012, following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks demoted BET's Administrative Access status from "Manager" to "Moderator." Critically, however, she did not revoke BET's Administrative Access and BET could still update content on the FB Page by responding to and delete user comments, sending messages to followers, and creating advertisements.

68.     Nevertheless, on or about August 27, 2012, BET sent a letter to Mattocks and falsely alleged that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page," and accordingly, purported to terminate the Letter Agreement.

69.     Almost immediately thereafter, upon information and belief, BET instructed Facebook to remove the FB Page without providing Mattocks any notice. Facebook promptly complied and removed the page without any notice to Mattocks.

70.     By causing the removal of the FB Page, BET breached the Letter Agreement by excluding Mattocks from the FB Page.

71.     As detailed more fully above, as a direct result of BET's actions, Mattocks has been damaged.

WHEREFORE, Mattocks demands judgment against BET for damages for breach of contract, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to the FB Page, and such other and further relief as this Court deems just and proper.

### COUNT IV – BREACH OF GOOD FAITH AND FAIR DEALING

72.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

73.     On or about February 12, 2011, Mattocks executed a Letter Agreement with BET, which provided:

> "This letter confirms our agreement that you will provide BET with administrative access to the Facebook page for The Game and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion"

74.     Fearing that her account could be randomly disabled in the future, on or about February 12, 2011, Mattocks executed the Letter Agreement to ensure that that the FB Page would always remain active and available to the Show's fans.

75.     Mattocks fully performed her obligations under the Letter Agreement by granting BET Administrative Access and by permitting BET to update the content on the FB Page.

76.     In June 2012, following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks demoted BET's Administrative Access status from "Manager" to "Moderator." Critically, however, she did not revoke BET's Administrative Access and BET could still update content on the FB Page by responding to and delete user comments, sending messages to followers, and creating advertisements.

77.     Nevertheless, on or about August 27, 2012, BET sent a letter to Mattocks and falsely alleged that Mattocks' "actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to the Game FB Page," and accordingly, purported to terminate the Letter Agreement.

78.     Almost immediately thereafter, upon information and belief, BET instructed Facebook to remove the FB Page without providing Mattocks any notice. Facebook promptly complied and removed the page without any notice to Mattocks.

79.     By causing the removal of the FB Page, BET breached the Letter Agreement by excluding Mattocks from the FB Page

80.     By causing the removal of the FB Page without providing Mattocks notice or an opportunity to cure her alleged breaches, BET breached its duty of good faith and fair dealing to Mattocks.

81.     As detailed more fully above, as a direct result of BET's actions, Mattocks has been damaged.

WHEREFORE, Mattocks demands judgment against BET for damages for breach of contract, including consequential damages, punitive damages (upon a proper showing pursuant to § 768.72, Fla. Stat.), interest, a court order instructing Facebook to restore Mattocks' rights to

the FB Page, and such other and further relief as this Court deems just and proper.

## COUNT V – CONVERSION

82.     Plaintiff re-alleges paragraphs 1 through 52 as if fully set forth herein.

83.     Through Mattocks' efforts, the FB Page for the Show had accumulated 6.78 million "Likes" at the time it was taken down in late August 2012.

84.     The value of the FB Page was generated in large part due to the substantial interest in the FB Page and significant number of "Likes" Mattocks had garnered for the FB Page.

85.     The substantial interest in the FB Page and the significant number of "Likes" generated by Mattocks provided her with business opportunities with Sulia, Google, and Amazon, among others. Therefore, the "Likes" constituted a business interest for Mattocks.

86.     Upon information and belief, in late August 2012, BET instructed Facebook to take down the FB Page and take the "Likes" from the FB Page and transfer them to BET's Facebook Page for the Show.

87.     By August 31, 2012, BET's Facebook page for the Show, which previously had approximately 900 "Likes," suddenly had amassed an alleged 6.2 million "Likes."

88.     BET's willfully took these actions with malice and wonton disregard of the rights of Mattocks.

WHEREFORE, Mattocks demands judgment against BET for damages for conversion, including punitive damages, interest, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Stacey Mattocks, hereby demands a trial by jury of all issues so triable as a

matter of law.

Dated this 13th day of March, 2014.

Respectfully Submitted,

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475

By:   ***/s/ Alexander D. Brown***
Alexander D. Brown, Esq.
Fla. Bar No. 752665
adb@trippscott.com
Peter G. Herman, Esq.
Fla. Bar. No. 353991
pgh@trippscott.com
Adam S. Goldman, Esq.
Fla. Bar No. 86761
asg@trippscott.com