# Stacey Mattocks V. Black Entertainment Television, LLC

# Expert Report of Guy Hagen Presented April 15, 2014

*Submitted to:*
Karen Stetson
GrayRobinson, PA
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Counsel for Defendant

*Submitted by:*
Guy Hagen
Tucker/Hall
201 North Franklin Avenue, Suite 2760
Tampa, FL 33602



EXHIBIT A

# Table of Contents

**Introduction** ................................................................................Error! Bookmark not defined.

**Assignment** ................................................................................Error! Bookmark not defined.

**Compensation** ...........................................................................Error! Bookmark not defined.

**Expert Witness Experience** ......................................................Error! Bookmark not defined.

**Qualifications** ...........................................................................Error! Bookmark not defined.
   *Education* ...............................................................................*Error! Bookmark not defined.*
   *Publications and Research* .....................................................*Error! Bookmark not defined.*
   *Professional Works and Recognition* .....................................*Error! Bookmark not defined.*
   *Affiliations* ..............................................................................*Error! Bookmark not defined.*
   *Professional Experience* ........................................................*Error! Bookmark not defined.*

**Basis for Analysis** .....................................................................Error! Bookmark not defined.

**Background** ..............................................................................Error! Bookmark not defined.
   *What is Facebook?* .................................................................*Error! Bookmark not defined.*
   *Why is Facebook significant for businesses?* .........................*Error! Bookmark not defined.*
   *How does the Facebook reporting process work?* ..................*Error! Bookmark not defined.*
   *What is Facebook s notification policy for violations?* ...........*Error! Bookmark not defined.*

**Expert Observations** ................................................................Error! Bookmark not defined.
   *Who "owns" Facebook fans?* ..................................................*Error! Bookmark not defined.*
   *Is there precedent for an employee, fan, or other Facebook page administrator to retain ownership of an "official" fan page and its community of fans by stripping all references to a brand's intellectual property?* ...................................*Error! Bookmark not defined.*
   *Were the actions of Facebook and Black Entertainment Television in merging "The Game" page managed by Stacey Mattocks consistent with Facebook's policy, terms, and past examples?* ...............................................................................*Error! Bookmark not defined.*
   *Summary of Opinions* ............................................................*Error! Bookmark not defined.*

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

## Introduction

I was retained by GrayRobinson on behalf of Black Entertainment Television LLC to provide expert witness services in regards to litigation by Stacey Mattocks and Black Entertainment Television LLC.

The opinions and analyses provided in this report are based upon the information provided to me as of April 14, 2014, and upon my professional experience including more than 25 years working in the digital technology industry, as founder and owner of a digital research and strategy consulting firm, and as Vice President and Shareholder of Tucker/Hall, where I lead the agency's technology practice area and direct all of Tucker/Hall's clients' matters regarding social media, the Internet, mobile and other technologies. Tucker/Hall is a national public relations and communications consulting firm based in Tampa, Florida. We specialize in strategic communications, crisis management and public affairs. Since our founding in 1990, we have grown to become one of the largest public relations/public affairs firms in Florida, and my position has allowed me to work with Fortune 500 companies and clients in nonprofit, corporate, and government sectors.

In this report, I have been asked to testify regarding the actions of Facebook and Black Entertainment Television LLC in the deletion and migration of a fan page created and co-managed by Stacey Mattocks. In summary I offer the general opinion that these actions are consistent with Facebook's published policies and terms, with Facebook's recent actions in similar cases (by my professional experienced and published cases), and with actions by other major social media sites such as Twitter.

## Assignment

My assigned objectives for this report included:

- Provide a foundational description of Facebook.
- Review the history of actions by Facebook and Black Entertainment Television LLC in relation to the current litigation, and observe whether these actions are consistent with Facebook practice and terms of service.

## Compensation

For preparation of this report, and all time spent in court and in support of the aforementioned litigation matters, my time is billed at the Tucker/Hall standard rate of $275/hour. My compensation is not dependent upon the outcome of the litigation.

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

## Expert Witness Experience

I have no prior court testimony regarding the aforementioned litigation matters, and have not served as an expert witness in any prior litigation.

## Qualifications

I have a 25 year background in digital technologies, Internet research and consulting, and social media analysis.

## Education

I have a Bachelors of Arts degree from the University of Minnesota, with a dual major in Computer Science and Anthropology. I have a Masters of Arts degree from the University of South Florida in Applied Anthropology, where my focus specialties were applied research methodologies and social network analysis. Social network analysis is a formal interdisciplinary science that is over 30 years old, and based upon the fields of applied linear algebra, combinatric mathematics, graph theory, and social sciences. My Masters thesis (focusing on technology transfer and social network analysis) was published more than 10 years before the rise of Internet-based social media platforms such as Twitter and Facebook.

## Publications and Research

I have more than a dozen published articles in academic peer-reviewed journals covering a variety of topics. Some my publications most relevant to this matter include:

- A graduate academic textbook chapter regarding electronic ethnography: "Doing Cultural Anthropology," 1st and 2nd Edition. M. Angrosino, Waveland Press (2006).

- An early refereed article on electronic focus groups: "An Experimental Internet Delphi, Florida Water Alternatives…" in Florida Scientist Vol. 59 #3 (1996).

In addition to peer-reviewed publications, I have authored a number of white papers and articles focusing on social media analytics and social network analysis applications.

I am regularly engaged as a speaker on the intersection of strategic communications, measurement, and digital technologies. I am a TEDx alumnus, with a TEDx Talk focusing on "the Future of Social Intel" (TEDx is a popular national expert speaker series that focuses on the intersection of technology, entertainment, design, and society).

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

## Professional Works and Recognition

My professional work has resulted in the development of several unique technologies that have received widespread recognition. Between 1997 and 2006, I developed and distributed a social network analysis utility named "Network Insight" that has been used by researchers worldwide, and has been by the Army Human Terrain Team to support troops in Afghanistan. I developed some of the earliest Twitter analytics sites, including Twinfluence.com and Twitseeker.com, which were featured on Mashable and were frequented by over 50,000 visitors monthly. I continue to develop new communications technologies, including WatchFire, a scalable online audience response measurement technology for mock jury trials, political messages, and television advertising.

I currently have more than 17,000 Twitter followers, and more than 2,500 LinkedIn contacts (all generated organically, without ads).

## Affiliations

Some of my relevant professional and academic affiliations include:
- International Network for Social Network Analysis, (INSNA, 1995-Present).
- Technical Lead and Member, PROI Worldwide Americas Crisis Group (2012-Present). PROI Worldwide is the globe's largest network of independent public relations agencies.
- Core Team Member, Florida High Tech Corridor Council (1996-Present).
- Board Member, BarCamp Tampa Bay / TechNova (2013-Present). BarCamp is a national self-organizing conference series for programmers, social media experts and entrepreneurs; annually our organization supports more than 1,000 attendees.
- Member, International Association of Business Communicators (2012-2013).

I also serve as a mentor for USF CONNECT, a business and startup incubator, where I provide expert counsel regarding digital strategy and marketing topics.

## Professional Experience

My professional history spans 25 years of technology consulting, research, and entrepreneurial experience. I co-founded a technology startup in 1990, managed a federal technology venture investment fund, directed a university technology program conducting high profile industry research in several technology sectors including medical instrumentation, lasers and photonics, microelectronics, and information technology. For ten years, I founded and ran a Florida research consulting firm that specialized in providing market and technology research consulting services for some of the largest companies and organizations in Florida and the US. My professional work has resulted in dozens of publications, invited presentations before numerous professional, academic, and scientific organizations, and invited presentations before representatives of the former Soviet Socialist governments and members of the White House Office of Technology Assessment.

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

In 2011 I joined Tucker/Hall as Vice President, Shareholder, and digital technologies practice area leader. In this role I provide strategic direction on all client matters regarding social media and digital aspects of crisis management, marketing, and public affairs. These have included many major brands in sensitive and confidential situations affecting their reputation, intellectual property assets, brand and marketing assets including social networks, Internet domains, websites, and the intersection between employee and employer in social media. I regularly serve as consulting "chief technology officer (CTO)" for our clients, where I provide C-level strategic review and advice to integrate internal and external (vendor) technology staff to support top-level company mission and objectives.

## Basis for Analysis

The opinions I've presented in this report are based upon the following documents which I've reviewed:

- Communications among BET staff, Stacey Mattocks, and Facebook staff, provided by defense counsel
- Case Number 13-cv-61582-JIC Document 46, US District Court, Southern District of Florida; Stacey Mattocks (Plaintiff) v. Black Entertainment Television LLC (Defendant) – Second Complaint
- Case Number 13-61582-CIV-Cohn-Seltzer, Deposition of Stacey Mattocks dated March 17 2014; Stacey Mattocks (Plaintiff) v. Black Entertainment Television LLC (Defendant), with exhibits
- Facebook Terms and Policies (as of April 1, 2014)
- Facebook Statement of Rights and Responsibilities Update (March 15, 2012)[1]

My opinions are also based upon my professional experience serving more than a dozen confidential client situations regarding ownership and management of Facebook and Twitter social media accounts and pages for corporate and government clients, particularly drawn from relevant examples in the areas of:

- Gaining Facebook page administrative control, regarding a business page controlled solely by an officer undergoing criminal prosecution;
- Gaining administrative control of a Facebook business page controlled by a prior employee;
- Gaining administrative control of inactive Facebook and Twitter accounts based on trademark and copyright registration of a new company;
- Merging or deleting spurious business pages created by employees, fans, or automated Facebook policies;

---

[1] https://www.facebook.com/note.php?note_id=10151420037600301

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

- Deleting conflicting fan or other business pages based on intellectual property conflict;
- Intellectual property strategy consulting regarding brand use by opponents in political / government / public affairs matters;
- Strategic counsel, development, and review of corporate social media policies, particularly those regarding executive brands, CEO blogs, and employee social media accounts;
- Intellectual property and reputation advisory services regarding pages created by dissatisfied customers or employees;
- Strategic counsel regarding management of social media accounts, content, and conversation management for purposes of crisis situation management, litigation support, or for marketing;
- Hostile acquisition of top level internet domains and other digital assets based upon demonstrated application of national trademark and intellectual properties and legal action;
- Social media strategy during major corporate crises;
- Strategic advice regarding brand and social media assets during mergers / acquisitions and brand changes.

Please note that details regarding the aforementioned examples may not be divulged due to contractual confidentiality obligations with Tucker/Hall clients and client legal counsel.

Finally, I interviewed three colleagues with senior manager or partner-level responsibilities at national digital and public relations agencies, and who have considerable experience with social media and Internet asset management across a broad spectrum of high-level engagements.

Additional relevant documentation is cited in this report via footnote.

## Background

### What is Facebook?
Facebook is the dominant active *social media networking platform*, currently with more than 1 billion active monthly users worldwide[2]. It is essentially an Internet-mediated communications network for allowing individuals to share personal news and information, media (photos, links, articles), personal updates and communications with friends, colleagues and family. Facebook Users receive these updates through a stream of collective posts (the Facebook "Wall" or "feed"), which Users can receive and manage via

---

[2] Social Media Stats 2014. Shea Bennett, Mediabistro (January 20, 2014).

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

Internet browsers (such as Explorer or Chrome), tablets or smartphones. Facebook reduces the difficulties for staying connected and up-to-date with other people, most of whom are generally also connected "offline." Facebook also provides an interface for Users to interact as groups, to play games, to create, organize, and participate in events, to share life events, or for private person-to-person communications. For some age groups in the United States, Facebook is the preferred tool for interpersonal communications, vying with mobile phone, mobile texting or email for daily conversations[3].

### Why is Facebook significant for businesses?

Facebook provides an important way for Users to interact with companies, organizations and brands through advertisements and business "Pages". Business pages are similar to individual accounts, except that they allow fans and consumers to connect by "liking" them, thus allowing businesses to share relevant news, promotions, and content which is inserted into fans' update streams. Increasingly, consumers expect to interface with their favorite brands and companies through social media platforms such as Twitter, LinkedIn and Facebook, and as a result Facebook pages are becoming an important interface for customer and prospect communications for businesses across many industries.

As a key interface between consumer and company, Facebook pages are important for measuring, managing, and cultivating company reputation and personality – key aspects of a corporate brand.

### How does the Facebook reporting process work?

The primary process for reporting violations of Facebook's terms and policies is available to all Users. Every post (updates by individuals or Pages) has a "dropdown menu" that appears on the top-right corner; Users can select "I don't like this post" and provide reasons that include reporting it as spam, that it violates someone's intellectual property, or that it shouldn't be on Facebook due to policy violations. Similarly, visitors to Pages can initiate the reporting process for the entire Page by visiting the "dropdown menu" on the top right of the Facebook menu, by selecting the "Report a Problem" option.

By using the Facebook Help Center, there is also a Frequent Questions section with focus on topics like personal image rights, illegal activities, and intellectual property violations, and an online form for reporting them[4].

---

[3] Email vs. Social Networks. Pew Research Center (September 13, 2010).
[4] https://www.facebook.com/help/contact/208282075858952

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

Facebook has a Support Dashboard that allows Users to track the progress of reported violations.

### What is Facebook's notification policy for violations?

Violation reports are anonymous, and administrators of a disabled or merged account may not see the identities of Users who filed the report.

Facebook may:
- Send a warning to the administrators of a violating page, instructing them to remove content and to be more careful of other's rights.
- Remove the offending content, sending a notification (message or email) to the violating page's administrators which will be seen the next time they log in.
- Disable or remove the violating page, sending a notification (message or email) to the page's administrators which will be seen the next time they log in.

Facebook's help center states:

*"When we receive a claim of trademark infringement from a third party alleging that content on the site infringes their trademark, we may need to immediately remove or disable access to that material on Facebook. We aren't in a position to resolve disputes between parties.*

*If we remove your content due to a trademark claim, you will receive a warning from Facebook that includes the contact information of the party who made the report. If you believe the content was removed due to a mistake or misidentification, you can follow up with them directly."*

## Expert Observations

My analyses and opinions are provided in the form of answers to the following questions:

### Who "owns" Facebook fans?

**Facebook has license to, but doesn't own, all content.** Facebook owns the platform and technology, and under its terms and policy, has an unlimited nonexclusive worldwide license to any content and information shared on the Facebook network. Thus, it has *license and rights* to all fan content, indeed all content whatsoever. This is largely unchanged between March 2012 and April 2014.

**Facebook effectively owns the User profiles, and accounts.** By extension, Facebook owns all accounts and profile information. From the Facebook agreement, Users *"give us*

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

*permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you."* "Related content" might be a User's expressed interest in brands and activities, or connections to other Users and brands.

**Facebook definitely owns all mined information about Users and fans.** Facebook mines extensive information about its Users and their activity, and sells some of that data to advertisers. Further, it provides certain data to governments and government agencies, as demonstrated by recent news and popular outcry regarding information shared with the NSA. Facebook allows marketers *"to target ads at users based on the email address and phone number they list on their profiles, or based on their surfing habits on other sites."*[5] Facebook has also stated that it will maintain the visibility of the profiles of deceased Users (memorializing), indicating the company believes that Facebook rights survive the original user the profile is based upon[6].

**Facebook supports the original intellectual property of Users and businesses.** Facebook respects intellectual property carefully, and in my personal experience responds most quickly when a trademark or intellectual property violation is reported. From the Facebook Help Center: *"Facebook respects the intellectual property rights of others and is committed to helping third parties protect their rights. Our Statement of Rights and Responsibilities prohibits users from posting content that violates another party's intellectual property rights. When we receive a valid notice of IP infringement, we promptly remove or disable access to the allegedly infringing content. We also terminate the accounts of repeat infringers in appropriate circumstances."* And as printed in Facebook's Community Standards: *"Before sharing content on Facebook, please be sure you have the right to do so. We ask that you respect copyrights, trademarks, and other legal rights."* Accounts and pages that violate a brand's intellectual property are subject to removal – *"If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate... If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account"* (note, this wording regarding intellectual property is not substantially changed from March 2012). According to Facebook policy and my own experience, Facebook takes very seriously *any* page or account that violates intellectual property law or its own terms regarding intellectual property.

---

[5] Facebook Sells More Access to Members. Geoffrey Fowler, The Wall Street Journal. October 1, 2012.

[6] Facebook Will Now "Maintain The Visibility" Of Dead Users' Profiles. John Herman, Buzzfeed. February 21, 2014.

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

**The brands own the fans.** According to Facebook, violations (including trademark and copyright) can be reported by any User, or the administrator of an authorized Page. Facebook will process IP violations independently (removing violating pages of their own accord) if enough complaints are registered. Alternately, a formal request to remove the offending page by an authorized representative is generally treated promptly. However, if the page is a "duplicate" (e.g., representing the same brand) or has the same administrator of both the official and duplicate page, Facebook provides special resources to "merge" the pages, allowing the authorized page to keep all fans and "likes" from both pages: *"If you are an admin of multiple Pages that represent the same thing, we may be able to merge them. Merging Pages combines all your likes and check-ins into one Page...Merging Pages combines all your likes and check-ins, but all other content such as posts, photos and the username will be permanently deleted from the Page you merge. The Pages that you merge must be about the same thing. If it's not clear that your Pages represent the same thing, they will not be merged."* In my personal experience, the approval decision is made entirely by Facebook, although additional information (e.g. reasonable indication that the requesting administrator officially represents the brand such as company emails) may be requested. Brand representatives may request that "duplicate" or "violating" pages may be either deleted or merged (so long as the fans would not be confused or misled). Thus, it is my opinion that it is Facebook's practice to acknowledge that the relationship is between the fan and the brand, and not between fans and the specific Facebook page; and by extension, that brands may make claims on the fans of pages based upon their brands so long as those pages are not clearly represented as "unofficial".

I did not have access to the live content and media posted to "The Game" Facebook page prior to November 2010, although I did have access to sample content items as part of the provided transcripts. However, I believe that if all Page information, media and updates were not clearly shared as "unofficial", then I believe that Black Entertainment Television (or the previous IP owner, CBS Television Studios) could have requested that the Page be deactivated at any time since its creation. This is further confirmed by the actual communication between Facebook (Erin Ott) and BET staff on July 25, 2012:

*"...Pages are intended to be managed by representatives of a brand and 'fake' pages manages by individuals not associated with a brand are in violation of our policies."*

**Is there precedent for an employee, fan, or other Facebook page administrator to retain ownership of an "official" fan page and its community of fans by stripping all references to a brand's intellectual property?**

To answer this question, it helps to differentiate between *individual profiles / accounts* and *business pages.* Social media platforms such as Twitter or WordPress provide no differentiation between accounts for individuals or accounts for businesses, organizations, or brands; in contrast, social media sites like LinkedIn, Pinterest, and

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

Facebook have special structures especially designed to support groups, businesses and organizations separate from any individual. Through the creation of "business Pages", Facebook differentiates between connections to an individual (among individual Users) and between individual Users and brands.

**I am not aware of any precedent for an individual retaining ownership / administration of a Facebook page by removing all references to the brand or its intellectual property**; in fact, to do so would be problematic as all *previously posted brand content* would have to also be deleted. Further, it might not be feasible to delete content that was previously posted, and then shared by fans to other fans. In my experience, US intellectual property law has applied to Internet and social media assets even retroactively (prior to litigation).

**Stripping a brand from a page to retain its followers would probably violate Facebook terms.** Facebook does allow fan pages to be created of brands and celebrities, so long as intellectual property rights are not violated and the administrators never imply they represent the brand in any way (the following from Facebook's Pages Terms): *"Any user may create a Page to express support for or interest in a brand, entity (place or organization), or public figure, provided that it does not mislead others into thinking it is an official Page, or violate someone's rights."* However, the Terms also state that *"We will only process name changes and migrations that do not result in a misleading or unintended connection"* I believe that fans of The Game would probably be confused and misled if they were to be converted to a page not connected to "The Game" or "Black Entertainment Television".

## Were the actions of Facebook and Black Entertainment Television in merging "The Game" page managed by Stacey Mattocks consistent with Facebook's policy, terms, and past examples?

- By my understanding of Facebook's policies and terms, and the documents and transcripts presented to me, all actions were consistent with standard Facebook policy. At the time of "The Game" Facebook page merging, it was clearly an authorized and official page of the brand.
- Black Entertainment Television staff had a history of being Page administrators.
- Black Entertainment Television had clear ownership of all intellectual property pertaining to "The Game," and the core content of the page was based on "The Game." Thus, the foundation of the Page's relationships was between the brand and the fans.

Expert Witness Report of Guy Hagen, Regarding: Stacey Mattocks v. Black Entertainment Television, LLC., April 15 2014

## Summary of Opinions

Based upon my professional experience, the expectations of the professional colleagues I spoke with, Facebook's published policies and terms, and the communications I reviewed, it is my opinion that Black Entertainment Television should have expected to have the right to merge the fans of the "The Game" Facebook page, and such actions were consistent with standard practice. The Page followers (fans) believed they were interacting with a site that officially represented "The Game", and their relationships should be interpreted as between the brand and the individual Users, and not with individual page administrators.