UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-61582-CIV-COHN-SELTZER

STACEY MATTOCKS, an individual

       Plaintiff,

v.

BLACK ENTERTAINMENT TELEVISION, LLC
a District of Columbia limited liability company,

       Defendant.
_____/

### PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT TESTIMONY AND OPINIONS OF DEFENDANT'S EXPERT ARAM SINNREICH

Plaintiff, Stacey Mattocks, pursuant to Federal Rule of Civil Procedure 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), respectfully moves to exclude or limit the testimony and opinions of Defendant Black Entertainment Television's proffered expert, Aram Sinnreich, and states:

### Introduction

Defendant, Black Entertainment Television ("BET"), has proffered the "expert" testimony of Aram Sinnreich, a self-proclaimed "media researcher," with an expertise in the music industry, to opine regarding the potential market value of Plaintiff's Facebook Page for the television show, The Game, and the Likes associated with same.

Put simply, while Sinnreich may be an expert researcher, such expertise does not provide him with the requisite experience to testify as an expert as to any aspect of this case, and certainly not regarding the market value of Plaintiff's Facebook Page and associated Likes. Sinnreich's lack of qualifications should result in the exclusion of his testimony.

Aside from Sinnreich's inadequate qualifications, his testimony should be excluded as unreliable as a result of (a) his failures to connect any alleged methodologies used to his opinions, (b) his reliance upon hearsay opinions, and (c) the fact that his opinions have been developed solely for the purposes of litigation. Furthermore, significant portions of Sinnreich's testimony are not helpful to the trier of fact because the issues upon which Sinnreich opines do not require "expert" clarification. Lastly, as a result of all of the foregoing deficiencies with Sinnreich's testimony, any probative value Sinnreich's testimony may have (which is expressly denied) is greatly outweighed by the unfair prejudice to Plaintiff that would result from its admission. Consequently, Sinnreich's testimony falls well short of the requirements set by *Daubert* and its progeny and must be excluded from being introduced to the jury in any form.

### I.  Legal Standard

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

In assessing an expert's sources, methodology, and conclusions, *Daubert* requires the trial court to act as a "gatekeeper" to insure that speculative and unreliable opinions do not reach the jury. *Daubert,* 509 U.S. at 597. As the gatekeeper, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). In doing so, the Eleventh Circuit has stressed that the trial court's "gatekeeping" duty requires a "rigorous three-part inquiry" into whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). The party offering the expert maintains the burden of laying the proper foundation for the admission of the expert testimony. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). The admissibility of such testimony must be established by a preponderance of the evidence. *Id; see also Bourjaily v. United States,* 483 U.S. 171, (1987).

As will be demonstrated below, Sinnreich's testimony fails to meet these requirements and therefore, must be excluded from jury consideration.

### II. Sinnreich's Testimony Should Be Excluded Because He is Not Qualified to Render His Opinions

Determining whether a witness is qualified "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). Stated differently, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address. *Id.* A court may exclude an expert's testimony if it

determines the expert is testifying to an area <u>related to but outside</u> his expertise. *Kipperman v. Onex Corp.*, 411 B.R. 805, 843 (N.D. Ga. 2009) (emphasis added).

        *a. Sinnreich is an Expert in the Music Industry and Not the Issues Sub Judice*

In light of the foregoing, when the requisite scrutiny is applied, Sinnreich's lack of qualifications to testify regarding the issues *sub judice* is evident and should result in his exclusion. For example, Sinnreich states in his Report that he was asked to testify regarding the potential market value of Plaintiff's Facebook Page and associated Likes. [Sinnreich Rpt., attached as Exhibit A, at 1-2.] To Sinnreich's credit, he is apparently well-qualified to testify regarding music licensing, music software, music piracy, and other general matters related to the music industry. However, despite downplaying his experience in the music industry and portraying his past experiences as involving generalized (and arguably more germane) concepts such as "media," "culture" and "technology" in order to qualify as an expert in this case, it is clear that he is unqualified to provide expert testimony on any issue *sub judice*, and certainly not a market value analysis of Plaintiff's Facebook Page and associated Likes.

In his Report, Sinnreich states he is a "researcher, author and educator whose work focuses on the intersection of media, culture, law and technology." [Sinnreich Rpt. at 1]. He adds that he has "published widely about **media** and technology," and is the "author of two books about **culture**, law and technology…" [*Id.*] (Emphasis added). However, the complete accuracy of these experiences is belied by a Declaration he submitted in another case in which he testified, *Curtis James Jackson III p/k/a 50 Cent, et al. v. Lee Q. Odenat, a/k/a "Q," d/b/a www.worldstarhiphop.com, et al.*, Case No. 1:09-CIV-05583 (JFK) (GWG), United States District Court for the Southern District of New York, wherein he listed an almost identical biographical information, except when compared to the biographical information submitted in

his Report, it is clear that Sinnreich removed references to his music experience in his Report. [A copy of Sinnreich's Declaration is attached as Exhibit B]. Specifically, Sinnreich declared: "I am a researcher, author and educator whose work focuses on the intersection of media, culture, law and technology, **with a special focus on music**." [Exhibit B at ¶2] (Emphasis added). Sinnreich also stated he had "published widely about **music** and technology," and is the "author of two books about **music**, law and technology…" [*Id.* at ¶ 3].

During deposition, it became clear that Sinnreich's Declaration more accurately reflected his expertise than the biographical information submitted with his Report; that is, that his expertise lies solely in the music industry. *See, e.g.,* [Sinnreich Dep., attached as Exhibit C, at 17:15-18:14]. While Sinnreich disputed that most, if not all, of his research was directed towards the music industry, when pressed, could only state generally that, "[t]he most honest answer I can offer to that question is that I often use in my research the music industry as a test case for broader issues that I'm exploring." [Sinnreich Dep. at 18:1-4]. Indeed, the only example of a report he rendered for litigation that did not involve the music industry was over ten years ago and involved digital streaming rights. [Sinnreich Dep. at 16:1-15; 18:5-14]. Sinnreich then candidly admitted that all reports he has rendered for litigation in the last five years have dealt exclusively with music. [Sinnreich Dep. at 18:5-14].

Sinnreich's published works also demonstrate that his expertise lies solely in the music industry. For example, the titles alone of the books Sinnreich published demonstrate they are dedicated to issues in the music industry and not to any issues *sub judice*: *Mashed Up: Music, Technology, and the Rise of Configurable Culture*, and *The Piracy Crusade*: *How the Music Industry's War on Sharing Destroys Markets and Erodes Civil Liberties*. Conceding that most of his published works are incongruent with the issues *sub judice*, Sinnreich claims the published

work most closely related to the issues in this case is a report he authored in 2013 titled *Frenemy mine: The pros and cons of social partnerships for online media companies*, which discusses the benefits and "pain points" of media companies' use of social media platforms. [Sinnreich Dep. at 95:11-24] (a copy of this report is attached as Exhibit D). However, like the Report he offers in this case, it does not appear Sinnreich did any real substantive, independent research on this topic. Instead, this report is merely a compilation of quotes from ten executives from different media sectors, tied together by Sinnreich's introductory, transitional, and conclusory sentences. Authoring this type of report, which is structurally identical to the Report in this case and is nothing more than a compilation quotes from media executives regarding social media, does not make the interviewer – Sinnreich – an expert on social media.

Sinnreich can use general terms like "media," "marketing," and "culture" in an attempt to gloss over his deficiencies as an expert in this case, but it is clear from his Report and his deposition testimony that his qualifications fall well short of what is required under *Daubert* and its progeny. Thus, Sinnreich lacks the requisite qualifications to be an expert in this case and his testimony should be excluded.

      b.  *Sinnreich is Not Qualified to Render Any Type of Market Value Analysis*

Aside from lacking in qualifications as an expert in areas outside of the music industry that would be relevant to this case, Sinnreich is similarly unqualified to render any type of market value analysis of Plaintiff's Facebook Page and associated Likes because he is neither an economist nor a Certified Public Accountant, has never taken any business evaluation courses or had any formal education with regard to business valuation, has never been a member of any financial analyst association groups for intellectual property, has never taught a course on the

valuation of intellectual property,[1] is unfamiliar with the IRS rules and regulations relating to intellectual property valuation, has never represented a buyer or seller in the sale of intellectual property, and has never conducted an asset based valuation of intellectual property assets. [Sinnreich Dep. at 43:6-13; 45:14-17; 55:25-56:8; 59:4-7; 84:10-23]. Sinnreich further admits that he has never held himself out as an expert in the area of valuing intellectual property. [Sinnreich Dep. at 52:15-18]. In fact, Sinnreich's only published works that allegedly discuss financial analyses of intellectual property assets are *The Piracy Crusade*, where, in one chapter, he discusses the "factors contributing to the economic restructuring of the music industry," and "*possibly*" in a book he co-authored in 2006 titled *Music and Fashion*. [Sinnreich Dep. at 48:5-10; 58:1-8]. However, Sinnreich's explanation of what is contained in the chapter in *The Piracy Crusade* relative to intellectual property asset valuation makes it clear that the information contained therein is inapplicable to the valuation of Plaintiff's Facebook Page and associated Likes, in part because it is dedicated to Sinnreich's specialty- the music industry. [Sinnreich Dep. at 58:9-3] ("Q: And [your analysis in that chapter is] directed towards the recording industry? A: Correct.").

Nevertheless, Sinnreich claims that he has experience conducting business valuations because he performed a "valuation" of the website worldstarhiphop.com in the *50 Cent* case. [Sinnreich Dep. at 43:18-44:1]. However, a review of Sinnreich's Declaration in that case reveals that his analysis appears to have been nothing more than an examination of the potential association in the minds of consumers between worldstarhiphop.com and the artist 50 Cent, based on the number of keywords that appeared in Google AdWords "Keyword Tool" for

---

[1] Sinnreich testified that he "thought" he taught a course called copyright media and culture, but did not state that the course included lessons on the valuation of intellectual property. [Sinnreich Dep. at 55:20-22].

worldstarhiphop.com in comparison to competing websites, and an analysis of traffic levels on worldstarhiphop.com. *See* Exhibit B at ¶19-23. This type of analysis clearly has no relevance to the valuation of Plaintiff's Facebook Page and associated Likes.

Indeed, the only "experience" Sinnreich has with valuing intellectual property assets is discussing with clients what he defines as the "strategic value" or "strategic viability" using a "strategic analysis" (as compared to a generally accepted and scientifically sound quantitative analysis, such as the method used by Plaintiff's expert, Fernando Torres ("Torres")) of intellectual property assets. [Sinnreich Dep. at 46:9-17; 59:8-12]. Sinnreich explained that strategic value "refers to the capacity of assets to be used for various business models" [Sinnreich Dep. at 54:19-21], but admitted that his "strategic analysis" does not use any revenues, income, or any other financial data. [Sinnreich Dep. at 59:23-60:3]. As an example of what such an analysis entails, Sinnreich explained:

> One of my clients was a financial services company that needed to restructure because change in regulations and part of what I did was to look at every asset the company had, figure out how the company could pivot, how it could change its overall strategy using the assets that it had in a way that would provide a sustainable business model in the future.

[Sinnreich Dep. at 55:3-10]. By way of an additional example, Sinnreich stated:

> I gave a webinar recently on Pandora, which is a publicly traded digital radio company, and I discussed the dimensions of their business model, such as the amount of money they make per listener hour, the ratio between the amount of money they make from advertising and subscriptions, to the amount of money they spend on content acquisition and customer acquisition, the competitive threats from new market entrants, so on and so forth.

[Sinnreich Dep. at 47:9-18]. Objectively, these experiences cannot be said to have relevance to the issues *sub judice*.

Despite his obvious lack of qualifications to do so, Sinnreich devotes a page and half of his Report criticizing Torres' methodologies concerning the Income Approach of a Fair Market Value Analysis. Yet, having never conducted an analysis using the Income Approach (or *any* approach) of a Fair Market Value analysis, Sinnreich cannot possibly be permitted to testify as to Torres' opinions.

While the methodologies used by Sinnreich in conducting his "strategic analysis" will be addressed in the following Section, what is clear from Sinnreich's testimony is that he plainly lacks any applicable experience in financial or market valuation of intellectual property assets. Furthermore, Sinnreich also lacks any applicable experience in the type of quantitative analysis performed by Torres to permit him to opine as to Torres' opinions. Thus, Sinnreich should be excluded from testifying regarding the market value of Plaintiff's Facebook Page and associated Likes, as well as Torres' Report, in any manner.

### III.  Sinnreich's Opinions Are Unreliable

As previously noted, district courts perform an important "gatekeeping" role to ensure that an expert's testimony is reliable. *Daubert*, 509 U.S. at 597; *Kumho Tire Co.*, 526 U.S. at 141. As the gatekeeper, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The "reliability criterion remains a discrete, independent, and important requirement for admissibility." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

### a.  Sinnreich Fails to Connect His Methodologies to His Opinions

Sinnreich's Report is noticeably silent as to the methodology used to determine the market value of Plaintiff's Facebook Page and associated Likes. The only indication of a

possible methodology is that Sinnreich claims to have reviewed twelve categories of documents produced in this case, websites and articles, three books, and conducted conversations with eight individuals in the tech/media/marketing arenas. [Sinnreich Rpt. at Section V]. Although he does not demonstrate any type of reliable methodology in his Report, Sinnreich testified that his analysis was a "strategic valuation," [Sinnreich Dep. at 59:8-12], which was allegedly comprised of the following different methodologies:

> Generally speaking there are different approaches for doing valuation. The traditional one is called SWAT [sic] analysis you look at the strengths, weaknesses, the opportunities and the threats facing the company. You look at the strategic landscape, you look at the economic norms and practices. You look at the laws and regulations. You look at the economic consumer, cultural and technological trends bearing on the industry. There is another form of analysis where you are looking kind of forward in time, where you look at the drivers and inhibitors, you know, what's going to push this industry forward, what's going to hold it back. When you are building a projective model you can quantify those things by creating models based on historical data and based on contemporary data and how those factors are likely to change over time. So there is no single protocol. It's a broad -- it's a large toolbox.
>
> In this case it was really a question of looking piece by piece at the question. Is there a market for likes? Do people buy and sell likes? I've never heard of it happening, but I asked some people who are in the business of buying and selling digital assets…
>
> Read all the evaluative methods that have been published, look at the similarities, the differences between those methods, use my experience to evaluate the evaluative mechanisms themselves, how appropriate is this to the given situation, how justifiable is this methodology. Look at the benefits that Mattocks herself gained from having her administrative role on the Facebook page. Trying to understand what it meant economically for her, what it meant strategically for her, looked at the role of Facebook service and intellectual property law played in enabling and constraining that relationship, look at financial information about her revenues before and after she parted ways with BET. Those were basically the approaches that I took in forming these opinions.

[Sinnreich Dep. at 87:9-89:1].

Despite Sinnreich's explanations as to the various methodologies he allegedly used, his testimony is unreliable because nowhere in his Report or in his deposition testimony does he explain with any requisite level of detail *how* he used those various approaches in arriving at his conclusions. Indeed, Sinnreich's Report is virtually devoid of footnotes or other citations to the sources he allegedly consulted in developing his opinions and conclusions. Sinnreich's failure to bridge his methodologies to his conclusions is precisely the situation where courts have rejected expert testimony as unreliable because the testimony is nothing more than the *ipse dixit* of the expert. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *United States v. Frazier*, 387 F.3d 1244, 1275 & n.10 (11th Cir. 2004) (noting that expert testimony relying on data connected by the *ipse dixit* of the expert may create "analytical distance between the particular opinion offered and the data, principles, and methods from which it is purportedly derived"). Accordingly, Sinnreich's testimony should be excluded as unreliable.

  b. *Sinnreich's Use of Hearsay Statements from Interviews is Unreliable*

*Ipse dixit* opinions aside, much like the report he authored titled *Frenemy mine*, Sinnreich's Report is composed primarily of hearsay from the eight individuals with whom he had conversations. Sinnreich's reliance upon these interviews is unreliable and as such, his testimony must be excluded.

While Federal Rule of Evidence 703 affords expert witnesses some leeway with respect to relying on hearsay evidence to support their opinions, such hearsay testimony is only permitted "if it is based upon the type of evidence reasonably relied upon by experts in the

particular field." *United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002). The purpose of this requirement is to limit or avoid reliability concerns. *See, e.g.*, *United States v. Batchelor-Robjohns*, 95 A.F.T.R.2d 2005-3001 (S.D. Fla. 2005) ("an expert may not blindly rely on the conclusions of another and still meet the reliability requirements of Rule 702 and *Daubert*"); *accord Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1108 (S.D. Ind. 2003) ("Although a testifying expert may rely on another expert's opinion, the testifying expert's opinion should be rejected if the underlying basis is unreliable."). However, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co.,* 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 592). Although an expert may rely on inadmissible hearsay, the expert must nonetheless apply his or her own extensive experience and reliable methodology to the inadmissible materials. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Moreover, an expert may not simply regurgitate other experts' opinions, especially without verifying or testing those facts, data, or opinions. *See, e.g. Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009).

This principle was applied in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013), which is on-point with the case *sub judice.* In *Kirby*, the Second Circuit considered the admissibility of reports and testimony from the defendants' putative experts, which were "undergirded" by inadmissible hearsay statements. *Id.* at 726 F.3d 135–36. The district court excluded the reports and testimony on the grounds that they were mere "factual narratives" and founded on interviews and secondary sources that attempted to reconstruct events about which neither expert had first-hand knowledge. *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720,

729 (S.D.N.Y. 2011). The Second Circuit affirmed the district court's exclusion of the reports and testimony on the basis that the experts failed to "bring their expertise to bear" in any way because their reports and testimony were undergirded by hearsay statements made during freelance interviews in both formal and informal settings. *See Kirby*, 726 F.3d at 136; *Kirby*, 777 F. Supp. 2d at 729. Thus, the Second Circuit stated that a party cannot use as pretense the fact that the "testifying expert used the hearsay as the basis of his testimony" where the experts themselves fail to "bring their expertise to bear" with respect to that hearsay, and then "speculate as to the motivations and intentions" of parties. *See Kirby*, 726 F.3d at 136.

Similarly, in *Recreational Developments of Phoenix, Inc. v. City of Phoenix*, 220 F. Supp. 2d 1054 (D. Ariz. 2002), the district court considered an expert report that was founded on, *inter alia*, "random interviews," unspecified professional journals, interviews with health providers, and "student conversations and surveys." *Id.* at 1060–61. In holding that the expert testimony was inadmissible, the district court found that the infirmity of the report was "not that it purport[ed] to rely on inadmissible evidence," but rather the report "is completely devoid of any reliable methodology." *Id.* at 1061. For example, the court noted that the expert's report failed to identify how his data was derived from his sources, and found that the report was particularly deficient because it gave "no indication of the nature…of interviews with health providers or students, the method by which interview subjects were chosen, and no methodological details" about anonymous self-analyses conducted by students. *Id.* Therefore, the expert report afforded the court "no means of assessing the reliability" of the expert's foundational materials or the conclusions the expert purported to draw from such materials. *Id.*

Further, the district court also deemed inadmissible a second expert report that "relie[d] on information gleaned from various 'experts,' but include[d] no citation or other information

from which the Court could determine reliability." *Id.* at 1063. Underlying the court's reasoning with respect to the inadmissible reports was the principle that "the Court must still determine whether an expert's testimony rests on a reliable foundation" notwithstanding the rule that "an expert may rely on inadmissible evidence if it is of a type reasonably relied on by other experts in the field." *Id*. at 1061, 1063–64 (quoting *Daubert*, 509 U.S. at 597) (internal quotation marks omitted).

Sinnreich's testimony and Report suffer from the same fatal flaws as the experts' testimony and reports in *Kirby* and *City of Phoenix*, in that Sinnreich affords no means of assessing the reliability of the conclusions he drew from his interviews of individuals without first-hand knowledge of the issues *sub judice*. Indeed, it does not appear Sinnreich has even attempted to verify the information gleaned from his interviews. *See, e.g. Eberli, supra.* As such, by relying heavily on quotes from other individuals, Sinnreich has failed to bring his own alleged expertise to bear.

Moreover, relying upon interviews may be a methodology employed by Sinnreich as an expert *researcher*, but that does not make them a reliable source for the purposes of testifying as to the market value of Plaintiff's Facebook Page and associated Likes. In fact, as Torres stated in his Report, there are only three generally accepted approaches to calculating the Fair Market Value of property; none of which were employed by Sinnreich or depend on interviews.

Lastly, a primary purpose of the reliability requirements detailed above is to prevent the expert from acting as a "conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Kirby*, 726 F.3d at 136; *see also Williams v. Illinois*, 132 U.S. 2221, 2225 (2012). This rule is particularly applicable here, where a substantial portion of Sinnreich's testimony merely quotes the individuals interviewed. For example, in

Section II of his Report, the only portions that contain independent thoughts are his introductory, transitional, and conclusory sentences. Thus, his "opinions" have not been independently developed bur rather are comprised of hearsay statements. Accordingly, his testimony must be excluded.

   *c. Sinnreich's Opinions are Unreliable Because They Are Offered Solely For Purposes of Litigation*

A "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d 1311, 1317 (9th Cir. 1995). *See also* Fed.R.Evid. 702, 2000 amend. note.; *Sumner v. Biomet, Inc.*, 434 Fed. Appx. 834, 842-43 (11th Cir. 2011) (holding expert opinion arrived at solely for purposes of litigation weighed heavily against its admissibility). This is because experts whose "findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests." *Daubert*, 43 F.3d 1311, 1317 (9th Cir. 1995).

Sinnreich's testimony lacks reliability because it was developed solely for the purposes of this litigation. Indeed, as Sinnreich has not indicated otherwise, his theories that Plaintiff's Facebook Page and associated Likes have no or little value were developed to match Defendant's theory in this case and were not the product of independent research. As demonstrated above, Sinnreich has never engaged in the type of research required to qualify as an expert in this case. Thus, his methodologies do not match the level of intellectual rigor required by *Daubert* and its progeny and should be excluded.

### IV. Portions of Sinnreich's Testimony Should Be Excluded Because it is Not Helpful to the Trier of Fact

The final prong of the Eleventh Circuit's "rigorous three-part inquiry" is that the "testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260. Stated differently, expert testimony is "admissible if it concerns matters that are beyond the understanding of the average lay person." *Whelan v. Royal Caribbean Cruises Ltd.*, 976 F. Supp. 2d 1328, 1332 (S.D. Fla. 2013) (citation omitted). It is well-settled that the Eleventh Circuit "follows the generally accepted rule that expert testimony should be excluded where 'it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.'" *Abramson v. Walt Disney World Co.*, 370 F. Supp. 2d 1221, 1225 (M.D. Fla. 2005) (citing *Hibiscus Associates Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995).

Sections III(B) and (C) of Sinnreich's Report are devoid of *any* expert analysis whatsoever that would assist the trier of fact. Section B, titled *The Only Value Recognized by Mattocks Was Directly Related to Her Revenues*, simply quotes Plaintiff's deposition testimony and an email from Sulia stating that it could not identify how many page views were generated from Plaintiff's Facebook Page, and concludes that the Facebook Page is worth nothing. Sinnreich adds that "one investor told him" that the revenue Plaintiff generated was "so negligible" that it cannot even serve as a basis for evaluation, but this hearsay statement fails as unreliable for the reasons explained in Section II above. Likewise, in Section III(C), titled *Mattocks Does Not Appear To Have Suffered Financially Subsequent to the Migration of "Likes,"* Sinnreich merely examined Plaintiff's deposition testimony and a document showing

revenue she generated from Sulia and concluded that she made more money the year after the Likes were transferred.

Nothing in Plaintiff's deposition testimony or the documents reviewed by Sinnreich requires clarification from an expert, as jurors are fully capable of evaluating the evidence and drawing their own conclusions as to these basic matters. Essentially, Sinnreich seeks to improperly provide an expert opinion as to a lay issue. *See, e.g., White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) (an expert who testifies outside his area of expertise "ought not to be anointed…a court-approved expert witness for what is essentially a lay opinion."). Therefore, Sections III(B) and (C) of Sinnreich's Report should be excluded.

### V. Sinnreich's Testimony Should Be Excluded Because it is More Prejudicial than Probative

Beyond its clear failure to meet the *Daubert* standard, Sinnreich's testimony is also inadmissible under Federal Rule of Evidence 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert*, 509 U.S. at 595 (1993). Indeed, Rule 403 is particularly important in the expert context because it "can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* (citation omitted).

As demonstrated herein, Sinnreich is unqualified to opine regarding the market value of Plaintiff's Facebook Page and associated Likes, and his testimony is unreliable and not helpful to the trier of fact. For all of these reasons, if admitted, Sinnreich's testimony is likely to mislead the jury and result in unfair prejudice to Plaintiff. Especially as it relates to Sections III(B) and (C) of Sinnreich's Report, where the expert's testimony relates to common knowledge, the less

its exclusion can be said to prejudice the proponent's case. *See Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993). Thus, any possible probative value of Sinnreich's testimony (which is expressly denied) is heavily outweighed by the unfair prejudice and confusion that would result if heard by the jury and, as such, should be excluded from jury consideration.

WHEREFORE, Plaintiff respectfully requests this Court enter an Order excluding the opinions and testimony of Aram Sinnreich at trial and granting such other and further relief as it deems just and proper.

By: */s/ Peter G. Herman*
Fla. Bar No. 353991

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, Fifteenth Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475

Peter G. Herman
pgh@trippscott.com
Fla. Bar No. 353991
Alexander D. Brown, Esq.
adb@trippscott.com
Fla. Bar No. 752665
Adam S. Goldman, Esq.
asg@trippscott.com
Fla. Bar No. 86761

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was served via CM/ECF this 20th day of June, 2014, to the attorneys on the below Service List.

By: */s/ Peter G. Herman*
Fla. Bar No. 353991
pgh@trippscott.com


## SERVICE LIST

Karen L. Stetson, Esq.
Gray Robinson, P.A.
1221 Brickell Avenue Suite 1600
Miami, FL 33131
Karen.Stetson@gray-robinson.com
*Counsel for Defendant*