EXPERT REPORT OF ARAM SINNREICH April 15, 2014

I.      Biographical Information

I am a researcher, author and educator whose work focuses on the intersection of media, culture, law and technology. I have worked in this field for 20 years. I am currently employed as Assistant Professor at Rutgers University's School of Communication and Information, in the Department of Journalism and Media Studies. I also work as a consultant for media and technology companies, both privately and under the aegis of firms such as Coleman Research Group, Rational Research and GigaOM. Previously I served as Co-founder and Managing Partner of media/tech consultancy Radar Research (2004-12), Director at media agency OMD Ignition Factory (2009-10), Visiting Assistant Professor at New York University (2007-09), and Senior Analyst at tech consultancy Jupiter Research (1997-2002). I have also served as an expert witness in several other litigations involving a range of issues related to media, law and technology.

I have done work on the subject of social media consistently since the emergence of this sector a decade ago. This experience is diverse, and includes, but is not limited to: Providing research and consultation for YouTube regarding its marketing strategy; developing a social media strategy for a financial services company; directing a business unit at a media agency devoted to PepsiCo's digital marketing strategy; publishing several peer-reviewed journal articles related to consumers' social media behaviors and opinions; publishing a research report for GigaOM examining the business relationships between traditional media companies and social media companies; contributing to the Encyclopedia of Social Media and Politics; and teaching several undergraduate, masters-level and doctoral courses related to online media.

In addition to my research work, I have published widely about media and technology, for periodicals including *Wired, Billboard, MediaPost,* and *The New York Times.* I am the author of two books about culture, law and technology: *Mashed Up* (2010) and *The Piracy Crusade* (2013), both published by University of Massachusetts Press. I hold an MS in Journalism from Columbia University, and an MA and PhD in Communication from Annenberg School at the University of Southern California.

In this report, I have been asked to testify regarding the potential market value of plaintiff Mattocks' Facebook fan site[1] for BET's television show "The Game," including

---

[1] Based on the materials provided to me including Mattocks' deposition, I understand that the Facebook page at issue was created by Mattocks and began as a true fan site, became the official Facebook page


EXHIBIT 4

with regard to the value of the individual "likes" garnered on the site by fans of the show. I will offer two opinions related to this matter: First, that Facebook fan pages and "likes" are not assets, there is no market for them, and their value is minimal; and second, that Mattocks' damages are minimal due to a variety of factors. I will also address what I believe to be the key shortcomings in the Expert Report submitted by Torres on behalf of Mattocks.

II.     Expert Opinion: Facebook Fan Pages and "Likes" Are Not Assets, There is No Market For Them, and Their Value is Minimal

A. There is No Market For Fan Pages and "Likes," and They Are Not Considered Assets By Investors

As Fernando Torres noted in his Support of Plaintiff's Amended Motion to Compel, there is an "absence of an active market for properties such as the one at issue in this case." In other words, the buying and selling of Facebook fan pages is fairly uncommon, and the terms for which they may be bought and sold are sufficiently obscure that such data cannot serve as the basis for an estimate of the value of the page and "likes" in this matter.

In fact, to my knowledge, a Facebook fan site has never been bought or sold at market. Six technology investors and marketing executives I consulted while researching this report also confirmed this impression, each relaying to me that they have never heard of such a site or its "likes" being bought or sold; in the words of one, such a transaction would be "uncharted waters."

To the extent that media and technology investors do consider Facebook fan pages or the "likes" they contain when making investment decisions, they are seen not as properties to be acquired, but as a form of market intelligence to inform the potential acquisition of other properties. As one investor told me, "I think of it less as an asset and more as data that indicates health or endurance of a brand and engagement with a product." In the words of another investor, "I have not run across any investments in which 'likes' or followers were used as anything but a momentum determiner – are you reaching critical mass, where are you compared to a month ago, et cetera."

---

for "The Game" when Mattocks started getting paid by BET to curate the page, and ceased to be the official Facebook page for the show when this relationship was terminated in 2012. Despite the page's evolving status, I refer to it as a "Facebook fan site" throughout this report for the sake of clarity and continuity. Thus, the term should not be taken as an endorsement of Mattocks' claim of ownership or her other claims in this matter.

In short, there is no market for Facebook fan pages or the "likes" they contain, and neither is typically considered an asset worth buying by those who invest in media and technology companies. Yet, even if there were such a potential transaction, it would be extremely difficult, if not impossible, to establish a market value for the "assets" in question. Part of the problem, as Torres noted, is the absence of precedent. Mattocks admitted as much as well, in the January 2012 letter marked as Exhibit 35 to her deposition, in which she acknowledged that there is "no widely accepted method for placing a value" on Facebook fan pages.

B. There is No Reliable Method to Value Facebook "Likes," and Their Value is Minimal at Best

Despite the absence of an actual marketplace, a great many marketing consultants, agencies and researchers have published dozens of studies, tools and articles over the past 8 years about the potential methods for evaluating "likes." These studies, tools and articles, which include the Vitrue Social Page Evaluator cited by Mattocks in her deposition testimony (page 206), have no clear consensus, and the range of valuations they suggest for a single Facebook "like" varies by orders of magnitude, from pennies to over a hundred dollars.

Several commentators have offered skepticism about these valuation schemes, and about the premise of assigning a fixed value to a Facebook "like" in the first place. Marketing agency executive Ryan Rasmussen, writing in MediaBistro, recently argued that such valuation schemes are little more than a form of self-promotion for the agency, consultancy or researcher responsible, and furthermore warned that "statistics like these should be carefully evaluated" before being applied to actual cases[2] – a precaution that, based on her deposition testimony, Mattocks did not appear to follow when arriving at her valuation. Even more bluntly, digital marketing executive, consultant and author Olivier Blanchard wrote in a blog post that "assigning an arbitrary (one might say 'cookie-cutter') *value* to Facebook fans in general, averaged out over the ENTIRE breadth of the business spectrum, is complete and utter bullshit."[3]

Marketing consultants, executives and investors I spoke to while researching this report also expressed skepticism about the hypothetical market value of Facebook fan pages and the "likes" they contain. As one director at a digital marketing agency told me, "We would probably advise [a media company such as BET] not to spend their money on

---

[2] http://allfacebook.com/ryan-rasmussen-zocalo-guest-post_b123356
[3] http://thebrandbuilder.wordpress.com/2011/08/17/the-5-basic-rules-of-calculating-the-value-of-a-facebook-fan/

'likes' anyway, to build them organically and spend money on visibility instead, now that Facebook forces you to pay for it."

Along similar lines, another executive, who runs a marketing agency focused on social media, told me that "the value of a 'like' has decreased pretty exponentially" in recent years, due in part to Facebook's strategic shift toward charging marketers for visibility on users' feeds. Even if such "likes" were to be bought and sold, another investor told me that they would probably sell "at a very modest price" because "return engagement is obviously worth a lot more" than the single interaction required for a Facebook "like." "There's casual 'likes,' and then there's real fan 'likes,'" this investor told me. "And, unfortunately, that's the thing that Facebook has never segregated."

To summarize, then, there is no current market for Facebook fan pages and/or the "likes" they contain. No investors or executives I spoke with have ever even heard of them being treated as assets or transacted directly between a buyer and a seller. While third-party speculation about the potential value of Facebook "likes" varies broadly, investors tend to take a very dim view of their value overall. Because of these factors, there is no scientifically reliable or generally accepted way to establish the value of the "likes" on Mattocks' fan page for "The Game."

III.   Expert Opinion: The Value of the Facebook Site for Mattocks Was Based Solely on Her Direct Revenues, Which Cannot Be Confirmed

A. Facebook Fan Sites' Limited Value Accrues to Brands, But Not to Curators Like Mattocks

To the extent that Facebook "likes" have any value at all, most of that value accrues to the brand being "liked" by Facebook users, rather than to the curator of the fan page. For instance, the Vitrue evaluation tool cited by Mattocks as the source of her $1.2 million valuation lists "earned media value" as one of the key factors in its analysis. In plain English, this means that much of the value of a Facebook fan site accrues to the company that owns a brand in the form of cost savings on marketing and promotion. In the present case, this means that the "earned media value" of the "likes" on Mattocks' site may have represented an opportunity for BET to save money on other forms of marketing, but did *not* represent any similar opportunity for Mattocks herself, because she doesn't own the brand or have a marketing budget to defray. In fact, of more than a dozen studies, tools and articles I reviewed purporting to assign an abstract value to Facebook "likes," all of them treated said value as a benefit accruing to the *brand* (BET in this case), rather than a third-party *curator* (Mattocks in this case).

Mattocks does not own the brand or any of the intellectual property related to "The Game," she did not, to my knowledge, contribute much in the way of original material (that is to say, her own creative productions) to the Facebook fan site, and her relationship to the site itself was circumscribed by Facebook's terms of service (TOS), which, among other things, provide a mechanism for a brand's owner to transfer "likes" from a fan site to an official site under certain circumstances. For all of these reasons, the value of Mattocks' fan site, and therefore the damages she may have suffered from losing the "likes" associated with it, were severely limited.

Investors I spoke with while preparing this report supported these sentiments. In the words of one, "The Facebook TOS is the thing that would scare most investors. You [the curator] don't own those things," and therefore, they're not worth buying, from the perspective of an investor or a media company. Similarly, another investor pointed out that the lack of original content on Mattocks' fan site would undermine its potential value as an asset. In his words, "How much are you altering the original?" He told me that in his own investment decisions, "I have a bias toward companies that are building their own value, as opposed to those who are . . . just being a distributor."

B. The Only Value Recognized by Mattocks Was Directly Related to Her Revenues

To the extent that Mattocks' Facebook fan site, and the "likes" it contained, had any economic value to her, that value was derived solely from the actual revenues she received as a result of her relationships with Sulia and Google. Mattocks appears to acknowledge this in her deposition testimony (page 157), in which she avers that, with or without BET's intellectual property, "I would still be making money [from the fan site]. That is the value it has to me."

Yet I haven't been presented with any evidence of revenues *specifically* attributable to Mattocks' Facebook page for "The Game." At several points throughout her deposition (including, but not limited to, pages 21, 23 and 199), Mattocks reiterates that she cannot reliably attribute revenues to specific pages in her portfolio of social media sites. In her own words (page 199), "There was no way that I could figure out this was how much money I made from 'The Game.'" This fact was confirmed by Sulia's counsel, who wrote in a March 26, 2014 email to BET's counsel that Sulia "has no data identifying the specific webpage from which traffic was directed, so it is unable to identify how many page views were generated from Mattocks' The Game Facebook page."

In her deposition (page 198), Mattocks claimed that "about 25 percent" of her total income was attributable to traffic originating from her Facebook fan page for "The Game." Even if this were true (and there is no apparent reason to believe it is), she

guesstimated that this amounted to revenues of about $25,000 per year. As one investor told me, such a figure "is so negligible" that it cannot even serve as the basis of an evaluation; in effect, without additional assets, the site would be worth nothing.

C. Mattocks Does Not Appear to Have Suffered Financially Subsequent to the Migration of "Likes"

Based on the documents provided to me in this case, it is not evident that Mattocks suffered financially at all as a result of the transfer of the "likes" from her fan page to BET's new official Facebook page. On pages 122-123, she confirmed that Exhibit 20 to her deposition illustrates that she made more money from Sulia – her chief source of income – in 2013 (after the "likes" were transferred) than in 2012 (most of which transpired before the transfer).

To summarize, revenue was the only basis for any economic value Mattocks may have recognized from her curation of the Facebook fan page for "The Game," and therefore the only basis for claims of economic damages she may have suffered from loss of "likes" on the page. Yet neither she nor Sulia cannot verify how much money she actually made from the page, the amount of revenue she claims to have made falls beneath the bottom threshold for consideration by outside investors, and her verifiable income shows a gain, rather than a loss, from the year before she lost access to the "likes" to the year following. Based on these factors, it is my opinion that Mattocks cannot make a reasonable claim to damages in this matter.

IV.   Expert Opinion: Torres' Expert Report Was Flawed in Several Respects

A. When Mattocks Built the Facebook Page, It Was Not a "Business"

Throughout his report, Torres makes it clear that his analysis is based on the premise that the Facebook fan site for "The Game" was a "business." He first makes this claim on page 12, when he argues that "MATTOCKS built the FB page as a business by monetizing referrals to the page." As Mattocks' deposition and several of the exhibits attached to it demonstrate, this was not, in fact, the case. Mattocks does not appear to have derived any revenues from the page, or to have made any efforts to do so, until *after* her paid relationship with BET began. In other words, she did not "build the FB page as a business," and to the extent that she began to treat the site as a business, it was only after she was employed by BET to manage its official site for "The Game." This fact cannot have been lost on Torres; as he acknowledges, Sulia, which was Mattocks' primary source of revenue outside of BET, did not even launch until

November 2011, about a year after BET first started paying Mattocks to curate the page.

B. The Income Approach to Valuation Doesn't Apply in This Case

Even if we accept Torres' opinion that the Facebook page was a business, there is no adequate way to value it. Under Florida law, it is my understanding that there are three methods of valuing a business: income-based, asset-based, and market-based. Torres describes these three methods on pp. 14-15 of his report, and accurately observes that neither the market-based nor the asset-based (which he calls "the cost approach") is feasible in this case. Instead, he opts for the income-based approach, which, he says, is based on the "expected economic income over the life of the asset."

Torres then proceeds to develop an entire evaluation methodology based on the premise that Mattocks' "expected economic income" derived from the Facebook page is reliably ascertainable. Yet Torres seems not to have taken Mattocks' own deposition testimony, or the wealth of supporting exhibits thereto, into account in making this judgment. As I have relayed above, both Mattocks and Sulia acknowledge that there is no method for establishing the *past* income recognized by Mattocks from the site, let alone projecting future income. Even Mattocks' ambitious guesstimation that 25% of her Sulia revenues are attributable to the Facebook page in question is ignored; Torres takes her *total* Sulia income and uses it as the foundation of his analysis, as though it were solely attributable to the Facebook page (a brief aside acknowledging that the figure also reflects unspecified "related entertainment topic social media activities" is conveniently glossed over and plays no role in the financial analysis that follows).

Clearly, if Mattocks' expected revenues from the Facebook page cannot be reliably ascertained (and they most certainly cannot), then any valuation based on the income approach is spurious. Given that Torres (confirming my own analysis, above) has already ruled out the other two evaluation methods, we must conclude that the Facebook page and the "likes" it contains cannot be fairly evaluated given the methods established by Florida law.

C. The Fair Market Value Cannot be Ascertained

Torres' analysis is based on estimating a "Fair Market Value" (FMV) for the purported assets associated with the Facebook page and its "likes." He describes the FMV as the "Price at which a willing seller and a willing buyer will trade" and "the price that property would sell for on the open market." Yet, as he acknowledges, there is no "open market" for these types of assets (a telling sign that they do not represent much value to

buyers). Thus, the FMV must be calculated based on the existence of a hypothetical "willing buyer" and a hypothetical "willing seller."

In this particular case, there is no universe of willing buyers and sellers, and no "property" as the term is commonly understood. There was an intangible, non-commodity asset (the Facebook page and its "likes"), hijacked by a co-administrator and held at ransom for an exorbitant price. Mattocks did not *own* the "likes" on the Facebook page, nor did she own the intellectual property that brought the "likes" to the page. BET was essentially asked to pay for access to its own customers, at a rate with no market precedent or logical justification. Furthermore, there was nothing hypothetical about the "buyer" and "seller" in this matter. As Torres acknowledges, this was a case of two specific parties squaring off over the ability to access a piece of software. Finally, there was no competition; no alternate "sellers" of the purported assets, and no alternate "buyers" beyond BET. As competition is widely acknowledged to be a crucial component of FMV analysis, it is curious that Torres chose not to address this fact.

V.   Resources I Consulted and Considered in Forming My Opinion

  A. Court filings and associated documents

   1. 2-27-14 Plaintiff's Document Production CONFIDENTIAL MAT00012210 google adsense 2010-aug 2012.PDF
   2. 2-27-14 Plaintiff's Document Production MAT00012201-12208 CONFIDENTIAL.PDF
   3. 2-27-14 Plaintiff's Document Production MAT00012209 CONFIDENTIAL.PDF
   4. 3-17-14 Deposition Transcript Stacey Mattocks (condensed version).PDF
   5. Expert Report of Fernando Torres
   6. Mattocks deposition exhibits 8, 18, 19, 20, 21, 35, 45, 46, and 55.
   7. Notice of Filing Declaration of Fernando Torres in Support of Plaintiff's Amended Motion to Compel D.E.33.PDF
   8. Order Regarding Confidential Materials with Exhibit A.pdf
   9. Sulia00001 - 325.pdf
   10. Sulia00326 - 842.pdf
   11. Sulia00843 - 857.pdf
   12. Spreadsheets produced by Mattocks:
       a. 2%2F13%2F2012 Stacey Mattocks.xlsx
       b. 2%2F20%2F2012 Stacey Mattocks.xlsx
       c. SM Old.xlsx
       d. Stacey Mattocks 2%2F27.xlsx

    e. Stacey Mattocks 3%2F5.xlsx
    f. Stacey Mattocks 3%2F19%2F2012 - 3%2F25%2F2012.xlsx
    g. Stacey Mattocks 3%2F26 - 4%2F1.xlsx
    h. Stacey Mattocks 4%2F2 - 4%2F8.xlsx
    i. Stacey Mattocks 4%2F9 - 4%2F15.xlsx

B. Web pages, books and articles

1. https://www.facebook.com/policies/
2. https://www.facebook.com/legal/
3. https://www.facebook.com/help/
4. https://www.facebook.com/page_guidelines.php
5. https://www.facebook.com/communitystandards
6. http://adage.com/article/digital/facebook-admits-organic-reach-brand-posts-dipping/245530/
7. http://blogs.hbr.org/2012/11/how-to-calculate-the-value-of/
8. http://valueofalike.com/
9. http://Howmuchismytwitterworth.com
10. http://www.slideshare.net/Syncapse/syncapse-value-of-a-fan-2013-summary-of-findings
11. http://mashable.com/2013/04/17/facebook-fan-value-researcher/
12. http://adage.com/article/digital/study-facebook-fan-worth-10-average-brands/231128/
13. http://boss.blogs.nytimes.com/2013/04/23/putting-a-dollar-value-on-a-facebook-fan/
14. http://thebrandbuilder.wordpress.com/2011/08/17/the-5-basic-rules-of-calculating-the-value-of-a-facebook-fan/
15. http://newsfeed.time.com/2013/11/07/interactive-this-is-how-much-money-twitter-owes-you/
16. http://socialmediatoday.com/minterdial/1731891/what-value-facebook-fan
17. http://allfacebook.com/ryan-rasmussen-zocalo-guest-post_b123356
18. http://www.dynamiclogic.com/docs/slick-sheets/dynamiclogic_fanindex.pdf
19. http://smallbusiness.chron.com/calculate-online-business-value-22462.html
20. http://www.aphotoeditor.com/2012/10/16/facebook-shuts-down-business-fan-page-for-repeated-copyright-infringement/
21. http://www.socialmediaexplorer.com/social-media-marketing/like-my-facebook-page-youre-mine-owned/
22. http://www.inta.org/PDF%20Library/Facebook%20Takedown%20Policy%20Summary.pdf

23. http://www.squiresanders.com/files/Event/b0a61a0f-0dbb-40ec-9d9c-28098ba64bd4/Presentation/EventAttachment/6d163bc0-e29d-4fcb-b809-e413da7d516e/Establishment-and-Enforcement-of-Brands-in-Social-Media.pdf
24. http://www.bloomberg.com/news/2014-03-27/ferrari-fights-21-year-old-racer-for-control-of-facebook-page.html
25. http://socialmediatoday.com/nate-mendenhall/1383781/how-claim-facebook-page-isn-t-yours
26. http://thesocialskinny.com/how-to-claim-back-your-brand-on-facebook-and-twitter/
27. http://www.emoderation.com/taking-control-of-an-unofficial-facebook-brand-page-without-igniting-a-pr-disaster
28. http://readwrite.com/2012/09/20/like-shortcuts-these-will-cost-you-money-and-more
29. http://mashable.com/2013/04/26/facebook-cost-per-like/
30. http://www.hypebot.com/hypebot/2013/12/best-of-2013-buying-facebook-likes-costs-you-money-while-reducing-real-likes-and-fan-engagement.html
31. http://www.adweek.com/news/advertising-branding/putting-value-brands-facebook-pages-107365
32. http://www.adweek.com/news/technology/value-fan-social-media-360-102063
33. http://www.syncapse.com/value-of-a-facebook-fan-2013/
34. http://www.nytimes.com/2011/01/17/business/media/17bet.html
35. http://sulia.com
36. Barabási, A. L., & Albert, R. (1999). Emergence of scaling in random networks. science, 286(5439), 509-512.
37. https://en.wikipedia.org/wiki/The_Game_(U.S._TV_series)
38. http://www.floridabizval.com/business-valuation-approaches/
39. http://www.southfloridafamilylawattorney.com/Family-Law-Overview/Business-Evaluations.shtml
40. Poundstone, W. (2010). *Priceless: The Myth of Fair Value (and How to Take Advantage of It)*. Macmillan.
41. Zyla, M. L. (2012). *Fair Value Measurement: Practical Guidance and Implementation*. Wiley.

C. Interviews

For the explicit purposes of clarifying and researching matters related to this report, I spoke to several executives in related fields. I did not relay the details of the case to my sources, telling them I was under a non-disclosure agreement,

and discussing the matters at a general level and using hypothetical examples. While none of my conversations were off-the-record, my sources weren't aware that their words might be used in the context of an expert witness report, so I have opted to keep them anonymous in these pages. The sources consulted include the following:

1. Tech investor and veteran digital media executive (long conversation)
2. Tech investor and veteran digital media executive (long conversation)
3. Tech investor and veteran digital media executive (long conversation)
4. Digital marketing consultant and author (long conversation)
5. Chief executive of a marketing agency focused on digital media (long conversation)
6. Senior digital media executive (brief conversation)
7. Senior digital media executive (brief conversation)
8. Chief marketing officer at social media platform (brief conversation)

VI. Publications by Aram Sinnreich, 2005-2014

Sinnreich, A. & Latonero, M. (forthcoming, 2014). Uncommon knowledge: Testing persistent beliefs about configurable culture and society. In L. Lievrouw (Ed.), *ICA Theme Book, 2013.* Peter Lang.

Sinnreich, A. (forthcoming, 2014). Music cartels and the dematerialization of power. In S. Waksman & A. Bennett (Eds.), *The Sage Handbook of Popular Music.* Thousand Oaks, CA: Sage.

Sinnreich, A. (forthcoming, 2014). The emerging ethics of networked culture. In E. Navas, O. Gallagher, & x. burrough (Eds.), *The Remix Studies Reader.* New York: Routledge.

Sinnreich, A. (2014). *Legal challenges and opportunities for 3D printing.* (Research report). GigaOM.

Garlitz, J. & Sinnreich, A. (2014). Musicians and social media in politics. In K. Harvey (Ed.), *Encyclopedia of Social Media and Politics.* Washington, DC: Sage.

Sinnreich, A. and Latonero, M. (2014), Tracking Configurable Culture From the Margins to the Mainstream. Journal of Computer-Mediated Communication. doi: 10.1111/jcc4.12073

Trammell, A. & Sinnreich, A. (2014). Visualizing game studies: Materiality and sociality from chessboard to circuit board. *Journal of Games Criticism, 1*(1). Published online: http://gamescriticism.org/articles/trammellsinnreich-1-1/

Sinnreich, A. (2014). *3D printing: Hype, hope or threat?* (Research report). GigaOM.

Sinnreich, A. (2014). The Polish parliament, masked and anonymous. *In Media Res.*

Sinnreich, A. (2013). *The revolution will be targeted: RTB and the future of programmatic advertising.* (Research report). GigaOM Pro.

Sinnreich, A. (2013). *Frenemy mine: The pros and cons of social partnerships for online media companies.* (Research report). GigaOM Pro.

Sinnreich, A. (2013). *The Piracy Crusade: How the Music Industry's War on Sharing Destroys Markets and Erodes Civil Liberties.* Amherst, MA: University of Massachusetts Press.

Sinnreich, A. (2013). How bad is P2P, anyway? In R. Braga & G. Caruso (Eds.), *The Piracy Effect.* Cinergie Books; 49-62.

Latonero, M. & Sinnreich, A. (2013). The hidden demography of new media ethics. *Information, Communication & Society,* 1-22. doi: 10.1080/1369118X.2013.808364

Bossewitch, J. & Sinnreich, A. (2013). The end of forgetting: Strategic agency beyond the Panopticon. *New Media & Society, 15*(2): 224-242.

Sinnreich, A. (2012). Welcome to Alphaville, Avoid the Ghetto. *Truthdig.com.*

Sinnreich, A., Graham, N. & Trammell, A. (2011). Weaving a New 'Net: A Mesh-Based Solution for Democratizing Networked Communications. *The Information Society, 27*(5): 336-345.

Sinnreich, A. (2011). 'This Is What We Do': Why I Hated Chrysler's Super Bowl Ad. Truthdig.com

Sinnreich, A. (2011). Remixing Girl Talk: The Poetics and Aesthetics of Mashups. *Sounding Out!*

Sinnreich, A. (2010). *Mashed Up: Music, Technology, and the Rise of Configurable Culture.* University of Massachusetts Press.

Sinnreich, A. (2010). Controllers, controlled. *Kill Screen Magazine.*

Sinnreich, A. (2010). Book Excerpt: 'Mashed Up: Music, Technology, and the Rise of Configurable Culture' *Truthdig.com*

Sinnreich, A. & Gluck, M. (2009). Conquering BD-Live Complexity: Strategies for Optimizing the Interactive Audience Experience [Uncredited whitepaper, Akamai.com].

Sinnreich, A., Latonero, M., & Gluck, M. (2009). Ethics Reconfigured: How Today's Media Consumers Evaluate the Role of Creative Reappropriation. *Information, Communication & Society, 12*(8); pp. 1242-1260.

Sinnreich, A. & Zager, M. (2008). E-Speech: The (Uncertain) Future of Free Expression. *Truthdig.com*

Sinnreich, A., Chib, A., & Gilbert, J. (2008). Modeling information equality: Social and media latency effects on information diffusion. *International Journal of Communication, 2*(1), 1-20.

Sinnreich, A. (2007). Right Move, Wrong Reasons: Inside the EMI/Apple Deal. *Truthdig.com*

Sinnreich, A. (2007). Closing the Box on Pandora? *Truthdig.com*

Sinnreich, A. (2007). Come together, right now: We know something's happening, but we don't know what it is. [Review of the book *Convergence Culture,* by Henry Jenkins]. *International Journal of Communication, 1*(1).

Sinnreich, A. & Gluck, M. (2006). Music and fashion: the balancing act between creativity and control. In D. Bollier and L. Racine (Eds.), *Ready to Share: Fashion and the Ownership of Creativity.* Los Angeles: Norman Lear Center Press; pp. 47-69.

Gluck, M. & Sinnreich, A. (2006). Clumsy To Cool: Branded Entertainment And The Rules Of In-Game Ads. *MediaPost*

Sinnreich, A. (2005). All that jazz was: remembering the mainstream avant-garde. *American Quarterly, 57*(2), 561-572.

VII.   Expert Witness History

In the past five years, I have testified as an expert by deposition in one trial: *Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481.

VIII.  Statement of Compensation

For my work as an expert witness in this matter, I am being compensated at the rate of $450 per hour, with a fixed $6,000 fee for any days spent in court.