UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-61582-CIV-COHN-SELTZER

STACEY MATTOCKS, an individual,

Plaintiff,

v.

BLACK ENTERTAINMENT
TELEVISION LLC, a District of Columbia
limited liability company,

       Defendant.

_____/

## DEFENDANT'S MOTION TO EXCLUDE THE
## REPORT AND TESTIMONY OF FERNANDO TORRES

       Defendant, BLACK ENTERTAINMENT TELEVISION LLC ("BET"), by and through undersigned counsel, and pursuant to Rule 702, Fed. R. Evid., files this Motion to Exclude the Report and Testimony of Fernando Torres, Plaintiff's proposed damages expert, and in support thereof, states as follows:

### PRELIMINARY STATEMENT

       Torres offers the opinion that Plaintiff has been injured in the amount of $4.5 million dollars.  Plaintiff, who breached her agreement with BET by improperly exercising control over BET's intellectual property, commenced this action asserting five claims arising out of her alleged loss of a Facebook page (the "FB Page") for the BET television series *The Game* (the "Series").[1]

       Torres reaches his opinion that the fair market value of the FB Page was $4.5 million dollars by assuming the following:  (i) Plaintiff lost approximately $300,000 in revenue from Sulia.com, a third party site to whom she attempted to direct visitors, and (ii) BET would have earned approximately $8.7 million dollars in incremental revenue from its use of the FB Page.

---

[1] Plaintiff moved to amend her Complaint for the third time to include a claim based on her Twitter account related to the Series (the "Twitter Account").  However, Plaintiff provided no documents related to damages purportedly attributable to the Twitter Account, and Torres' report did not provide an opinion on the value of the Twitter Account either.  Torres' report is therefore wholly based on the FB Page.  This lack of a damages opinion can only be a concession that the Twitter Account has no value.

After adding together Plaintiff's alleged lost revenue and BET's alleged earned revenue, Torres arbitrarily and without any logical basis divides this total in half, arriving at the proposed damages figure of $4,506,490. These numbers and calculations are based on internally inconsistent conjecture and illogical and baseless methodology, with many of the underlying "facts" contradicted by Plaintiff herself. Indeed there are three separate reasons Torres' opinion should be excluded from this case, each of which is sufficient to bar his report and testimony.

As is set forth in Section 1 below, Torres' methodology is fatally flawed. He cannot include BET's purported financial benefits in a damages calculation based on predicted future revenue streams to the Plaintiff. Such an "income approach" to damages may not include defendant's profits. Including BET's supposed profits on top of Plaintiff's alleged lost profits has rendered his methodology for calculating damages wholly and irremediably unreliable. Moreover, Plaintiff's attempt to assign a fair market value to the FB Page based upon a hypothetical willing seller and a hypothetical willing buyer in the open market fails, since there is no open market for a Facebook page. Recognizing this fact, Torres substitutes a hypothetical negotiation between the parties, which is contrary to state law. For each of these reasons, his opinion cannot help the trier of fact in determining what, if any, Plaintiff's damages were.

As set forth in Section II, Torres' calculations of Plaintiff's lost profits are speculative and contrary to the record in this case.

- *First*, Torres' attempt to rely upon income derived from Sulia – a website that would pay Plaintiff for each unique visitor to Sulia.com from any of her numerous social media accounts – is improper given that both Plaintiff and Sulia have readily admitted that it is impossible to determine what percentage of the Sulia revenue – if any – is attributable to the FB Page as opposed to Plaintiff's many other social media sites.

- *Second*, in reaching his damages calculation, Torres assumes that Plaintiff would have been permitted to utilize BET's intellectual property as an authorized representative of its brand for an additional 5 years despite BET's admitted ability to revoke such permission at any time.

- *Third*, Torres assumes that the Series would have continued to air on BET for an additional 5 years. Torres himself conceded that he did not conduct any research on the average life span of a scripted cable television series like the Series, or even a television series of any genre.

As is set forth in Section III below, even assuming arguendo, BET's profits were relevant, Torres' calculations of those profits are flawed.

- *First*, BET never generated any revenue from the FB Page.

2

- *Second*, in an attempt to circumvent the lack of direct profits to BET from the FB Page, Torres looks to purported "indirect" profits BET may have earned from the promotional utility of the FB Page.  Torres attempts to tie an alleged "ratings bump" between the Series' last season on a prior network --the CW -- and the Series' first season on BET to the FB Page.  This attempt fails on a multitude of independent grounds:

  o Torres conceded that "the Facebook page itself is not responsible for fluctuations in ratings."

  o The FB Page existed before and after the purported ratings bump.

  o With absolutely no basis, Torres attributes 2/3 of the Series' purported ratings increase to the FB Page.  In so doing, Torres concedes that he did not consider whether the ratings increase could have instead resulted from other critical factors such as (i) the content of the Series, (ii) the scheduling of the Series, or (iii) the marketing of the Series.

  o Torres concocts a completely unsubstantiated advertising revenue calculation to arrive at a wholly baseless number for BET's purported indirect profits.

## ARGUMENT

The Federal Rules of Evidence allow an expert to offer opinion testimony if:

> (1) the expert is qualified to testify on the subject matter of his testimony; (2) the methodology that the expert used to reach his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue.

*United States v. Levinson*, 2013 WL 49718, at \*3 (11th Cir. Jan. 4, 2013) (citations omitted).  The burden of proving each of these elements rests on the party offering the expert.  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

To ensure that expert testimony complies with these requirements, the Court serves as a "gatekeeper" for the admissibility of the proposed testimony.  *See Sumner v. Biomet, Inc.*, 434 F. App'x 834, 840-41 (11th Cir. 2011).  "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  The Court's role in this respect is crucial because the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (citation and quotation marks

3

omitted).

If any of the expert's calculation is based upon unsound or unreliable methodology or subjective beliefs, then the entire expert report should be excluded. *See R & R Intern., Inc. v. Manzen, LLC*, No. No. 09–60545, 2010 WL 3605234 (S.D. Fla. Sept. 12, 2010) ("any conclusions by the expert <u>must be supported by good grounds for every step in the analysis, and if any step is rendered unreliable, the expert's testimony is inadmissible</u>."). *See also Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1299, 1304, 1308-09 (S.D. Fla. 2010) (methodologically flawed expert reports on damages excluded under *Daubert*).

**I.**

**TORRES' OPINION SHOULD BE EXCLUDED BECAUSE IT IS BASED UPON FAULTY METHODOLOGY AND IS THEREFORE NOT HELPFUL TO THE TRIER OF FACT**

As a threshold – and potentially dispositive – matter, Torres sets out to apply the income approach to determine the fair market value of the FB Page, but instead of calculating Plaintiff's lost profits, which is the sole objective of the income approach, Torres inexplicably includes BET's purported profits, as well as Plaintiff's purported lost profits in his damages calculation. In addition, Torres employs flawed methodology when calculating Plaintiff's lost profits because he abandons the well-accepted 'willing buyer-willing seller analysis' and supplants it with an inapplicable hypothetical negotiation analysis.

**A.   Torres  Misapplies the Income Approach**

Florida courts recognize three different methods for determining fair market value:  the income approach, the comparable sales approach (sometimes called the market approach), and the cost approach. *See, e.g., American Reliance Ins. Co. v. Perez*, 689 So. 2d 290, 291 (Fla. 3d DCA 1997).  Torres rejects the cost and market approaches on the basis that they are inapplicable to the FB Page.  Specifically, according to Torres, the cost approach is inapplicable because Mattocks created the FB Page for "free."  Torres Depo, p. 47/10-25, p. 48/1.  Torres deems the market approach inapplicable because there is no "open market" for the FB Page and the Likes, so has had no way to analyze sales of other comparable businesses.  Torres Depo, pp. 52-56.

As a result, Torres purportedly applies the income approach to determine the fair market value of the FB Page.  The income approach predicts future revenue streams to the Plaintiff. Under this approach, Defendant's profits, as opposed to a Plaintiff's lost revenue, are irrelevant.

4

*System Components Corp. v. Florida Dept. of Transp.*, 14 So. 3d 967, 980 (Fla. 2009) (the income approach values a business based on its predicted future revenue streams discounted to a total present value). By including BET's purported earned revenue, Torres' opinion violates the fundamental principle that damages should be equal to and commensurate with the loss a *Plaintiff* suffered and that a wronged party should be put in the position she would have been in had the wrong not occurred. *See*, *e.g. Hanna v. Martin,* 49 So. 2d 585 (Fla. 1950) (any "damages awarded should be equal to and precisely commensurate with the injury sustained").[2] Torres' inclusion of BET's purported financial benefits in his calculation is thus inappropriate and renders the methodology unreliable and the conclusion unhelpful to the trier of fact.

### B. Torres' Attempt to Assign a Fair Market Value to the FB Page Improperly Applies a Hypothetical Negotiation Analysis

The "fair market value" of a property (whether determined via the income, market or cost approach) is intended to reflect a hypothetical willing seller and a hypothetical willing buyer. Torres' determination of "fair market value," however, abandons the hypothetical willing seller-willing buyer analysis and supplants it with a very different, and utterly inapplicable, "hypothetical *negotiation*" analysis, speculating a negotiation between the Plaintiff and the Defendant.[3] The "hypothetical negotiation" analysis has no application to the state law claims pending in this case and is a transparent attempt to apply an inapplicable damages concept in order to use BET's purported profits to vastly inflate Plaintiff's "damages." In *Bizrocket.com, Inc. v. Interland, Inc.*, the Court precluded a fair market value opinion under *Daubert*, where, as

---

[2] *See also Lazovitz Inc. v. Saxon Constr., Inc.*, 911 F.2d 588, 591 (11th Cir. 1990) (under Florida law, contract damages are intended to place the injured party in as good a position as he would have been had the breaching party fully performed); *Nordyne, Inc. v. Florida Mobile Home Supply, Inc.,* 625 So. 2d 1283 (Fla. 1st DCA 1993) (in tort actions, the goal is to restore the injured party to the position it would have been in had the wrong not been committed).

[3] "Hypothetical negotiation" is used in intellectual property infringement cases. *See, e.g.,* 6 Patent Law Fundamentals § 20:59 (2d ed.) ("The Federal Circuit has affirmed that the hypothetical negotiation used to calculate a reasonable royalty seeks to determine the terms of the agreement that the parties would have reached at the time the infringement began."). *See also*, *American Farm Bureau Federation v. Alabama Farmers Federation*, 935 F. Supp. 1533, 1550 (M.D. Ala. 1996) (adopting use of fictitious license between the parties *nunc pro tunc* to determine royalty in trademark action); *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) ("A reasonable royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."). The purpose of the "hypothetical negotiation" is to either substitute for disgorgement of profits, which, unlike in this case, are awardable as damages by statute in infringement actions, or to calculate a "reasonable royalty," which again, in infringement actions, is the legal measure of damages. *See, e.g. Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007) (damages for patent infringement are to be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer," *citing* 35 U.S.C. § 284).

1402451

here, the analysis was subjectively premised on a party to the action rather than the requisite
hypothetical willing buyer and seller in the market, stating:

> In Florida . . . the "willing buyer and seller test" is an objective valuation,
> "requiring potential transactions to be analyzed from the viewpoint of a
> hypothetical seller whose only goal is to maximize his profit on the sale." *Estate
> of Watts v. Comm'r of Internal Revenue,* 823 F.2d 483, 486 (11th Cir.1987). As
> this court has stated, " '[t]he willing buyer and seller test' ... is ... evaluated using
> a legal fiction in which the 'willing buyer and seller' are hypothetical entities
> having reasonable knowledge of the relevant facts."

No. 04-60706, 2005 WL 6745909, *2 (S.D. Fla. May 23, 2005) (internal citations omitted).
Torres' improper attempt to premise his inflated fair market value upon what he thinks BET, and
only BET, ought to pay for the FB Page is no doubt driven by the admitted fact that there is no
open market for the FB Page, which admission further undercuts his esoteric "fair market value"
opinion.  Torres Depo, pp. 52-56.  Torres' legally impermissible use of the "hypothetical
negotiation" concept invalidates his strained and convoluted "fair market value" opinion.

## II.
### TORRES' OPINIONS AND CALCULATIONS REGARDING PLAINTIFF'S LOST PROFITS SHOULD BE EXCLUDED BECAUSE THEY ARE FLAWED AND ARE NOT HELPFUL TO THE TRIER OF FACT

Even assuming, *arguendo*, that Torres properly applies the income approach to his fair
market value analysis and his opinion was thus not barred as a whole for that deficiency alone,
his calculation of Plaintiff's lost profits is significantly flawed, which presents a separate ground
for excluding the report.  Pursuant to Federal Rule of Evidence 702, the testimony of an expert
must be based upon sufficient facts or data.  As will be shown below, Torres ultimately renders
his opinion and calculation for lost profits on insufficient and inaccurate data.

### A. Torres's Calculation Fails Under Both An Established Track Record of Profits Analysis and the Yardstick Test

Pursuant to Florida law, lost profits are generally proven by either an established track
record of profits test, which requires a business to have a developed record of profits, or the
'yardstick test,' which looks to revenue streams of similar businesses as comparables.  Torres'
analysis does not satisfy either test.  Specifically, Torres attempts to apply the track record test,
but his attempt fails because there is no established record of Plaintiff's profits related to the FB
Page.  Although Torres attempts to cite to Plaintiff's Sulia income, as more fully developed
below, her 2011 and 2012 income from Sulia is not a sufficiently established track record of

6

income under the track record test.  *See infra* para. II.B.  Moreover, Torres does not even attempt to apply the yardstick test because, as Torres admits, there are no comparables given the lack of a market for Facebook pages.[4]  Torres's failure to properly apply one of the two accepted methodologies for calculating lost profits affirms that his report is wholly unscientific and unreliable.

When an expert, as here, fails to do the necessary research, calculations or studies to support his assumptions and calculations, his report should be excluded.  *See, e.g., Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040, *5 (E.D. Pa. August 17, 2012) (excluding expert who lacked familiarity with industry and did not conduct or review any research or market surveys or studies: "Unverified profit and loss projections cannot be the type of evidence 'reasonably relied upon by experts' as required by *Daubert* . . . particularly where the expert professes no experience in the plaintiff's industry."); *Sanderson v. IFF*, 950 F. Supp. 981, 994 (C.D .Cal. 1996) (expert testimony unreliable for failure to conduct independent research, reliance on published and reviewed research, or any objective source to support opinion).  *See R & R Intern., Inc. v. Manzen, LLC*, No. 09-60545, 2010 WL 3605234, *8-*16 (S.D. Fla. Sept. 12, 2010) (rejecting expert's lost profits opinion under *Daubert* where expert failed to employ reliable methods, relied upon arbitrary numbers, speculation and conjecture, ignored contrary facts and was unhelpful to trier of fact); *Sostchin v. Doll Enterprises, Inc.*, 847 So. 2d 1123, 1125 (Fla. 3d DCA 2003) (criticizing wildly inflated future profits based upon expert's unwarranted assumptions as "accounting alchemy by which this humble enterprise was transformed into an engine of commerce").

## B. Torres Improperly Assumes that All Of Plaintiff's Sulia Income Is Directly Attributable to the FB Page In Determining Plaintiff's Lost Profits

Torres improperly calculates Plaintiff's income by assuming that all of the money Plaintiff earned from Sulia was directly attributable to Internet traffic from the FB Page, as opposed to Plaintiff's many other social media accounts.  Plaintiff partnered with Sulia to drive Internet traffic to Sulia's website, Sulia.com, in exchange for Sulia paying Plaintiff for each unique visitor to Sulia.com.  To generate Internet traffic, Plaintiff posted short news items about

---

[4]  "The yardstick test is generally used when a business has not been established long enough to compile an earnings record that would sufficiently demonstrate lost profits and compares the profits of businesses that are closely comparable to the plaintiff's."  *River Bridge Corp. v. American Somax Ventures ex rel. American Home,* 18 So. 3d 648, 650-51 (Fla. App. 4th DCA 2009).

various television shows on Sulia.com and then linked back to these posts on her numerous Facebook pages and Twitter accounts (the "Traffic Driving Business").  Mattocks Depo, pp. 20-23.  According to Plaintiff's 2011 and 2012 tax returns, the only documents provided by Plaintiff to Torres (and the only documents provided to Defendant in discovery to support Plaintiff's damages claim), Plaintiff earned $1,571 in 2011 and $96,591 in 2012 for a total of $98,162 from Sulia. Torres Report, p. 16.

Relying upon no further evidence, Torres posits that the $98,162 (the income from 2011 and 2012 combined) represents only ten months of Plaintiff's Sulia income[5] and surmises that Plaintiff's yearly income from Sulia related to the FB Page was approximately $107,000.  This analysis is problematic for two primary reasons: (i) Mattocks has admitted that her relationship with Sulia was not based solely on the FB Page and the Series and that it is therefore impossible to determine how much traffic was driven to Sulia.com from the FB Page; and (ii) Mattocks only posted about the Series for four months.

1.  *It is impossible to determine how much traffic*
*was driven to Sulia.com specifically from the FB Page*

The record is clear that Plaintiff's relationship with Sulia was not specific to the FB Page; instead, Plaintiff's Sulia income reflected traffic driven to Sulia.com from *all* of Plaintiff's numerous other social media accounts, including the Twitter account that is the subject of Count II of Plaintiff's Second Amended Complaint.[6]  Mattocks Depo, p. 21/18-25, p. 22/1-25, p. 23/1-13; Sulia Depo, p. 17/21-25, p. 18/2-3,5, p. 21/8-12, p. 24/10-17.  Mattocks admitted in her deposition that statements in the Second Amended Complaint related to her relationship with Sulia were "highly misleading."[7]  Mattocks Depo, p. 161/18-22.  Indeed, Plaintiff has conceded it is improper to attribute all of her Sulia income to the FB Page, and during her deposition, estimated that only 25% of the monies earned from Sulia were directly related to the FB Page, as

---

[5] It is unclear what the basis is of this assumption since the tax returns do not show when during the years 2011 and 2012 the income reflected therein was actually earned.  Nevertheless, Torres testified that the 2011 income was earned during the last 2 months of 2011 and the 2012 income was earned during the first 8 months of 2012 (coinciding with the "date of loss") even though it is undisputed that Plaintiff's Traffic Driving Business relationship with Sulia continued after the date of loss and continues today.  Sulia Depo, p. 24/4-9.  In the absence of records showing when in 2012 the $98,000 from Sulia was actually earned, Torres could have divided the $98,000 by 12 to determine approximate monthly earnings and multiplied that by 8-- the number of months in 2012 that preceded the date of loss, and, when added to the small amount of 2011 income, would have totaled about $68,000 – not $107,000, which was Torres' starting point.
[6] Sulia Depo, p. 24/4-9.
[7] "42. . . . Mattocks signed an agreement with Sulia, which paid Mattocks approximately $2,000 to $3,000 per week based on how many users were directed to Sulia from links that Mattocks posted on the FB Page and Twitter." Second Amended Complaint, DE 46, ¶ 42.

opposed to her other accounts.  Mattocks Depo, p. 198/12-25, p. 199/1-25, p. 200/1-22.
Addressing this blatant inconsistency between his report and Plaintiff's testimony, Torres admits
that he failed to review Plaintiff's deposition as well as the Sulia corporate representative's
deposition and therefore did not incorporate Plaintiff's 25% estimate into his analysis.[8]

Moreover, Mattocks, as well as the corporate representative from Sulia, conceded that
there is no way to determine how much traffic was driven to Sulia.com specifically from the FB
Page at issue in this case, as opposed to Mattocks' numerous other social media accounts.

> Q:      So you get paid by Sulia depending on how much traffic you
> drive from your various Facebook pages; is that correct?
> A:      Right, that's correct.
> **
> Q:      As you sit here today –can you tell me how much money you
> have earned strictly and solely from The Game Facebook page?
> A:      No.
> Q:      And that is because Sulia is the one that has the traffic source
> numbers?
> A:      That is correct.  And also Google.

Mattocks Depo, p. 21/ 25, p. 22/1-3, p. 23/5-13**.**

Moreover, the corporate representative from Sulia testified:

> Q.  [I]s there any way of identifying any monies that were paid to
> Stacey Mattocks specifically as a result of traffic driven from The
> Game Facebook page?
> A.  No.
> **
> Q.   [T]raffic that Stacey was paid for came from both Twitter
> accounts and Facebook pages; is that right?
> A.  Yes, that is correct.
> **
> Q.  Okay.  Just for purpose of clarification, the reason that Sulia
> cannot identify payments made to Stacey Mattocks specifically
> with respect to The Game Facebook page is because Sulia does not
> maintain records of where the traffic comes from that they are
> paying Stacey for; is that correct?
> A  Yes that's correct.

Sulia Depo, p. 17/21-25; p. 18/2-3, 5; p. 21/8-12;  p. 24/10-17

---

[8] Torres admitted it was his usual practice as a professional expert witness to review the deposition of the party
whose interests he was representing.  Torres Depo, p. 7/5-14.  Torres' excuse that the deposition was not "available"
at the time his report was rendered is simply not the case.  Torres' report was rendered on April 15, 2014; Plaintiff's
deposition was conducted on March 17, 2014 and transcribed on March 28, 2014.  Moreover, Torres admitted he
had *still* not read Mattocks' deposition as of the date his own deposition, May 28, 2014.

Notwithstanding this unambiguous testimony, Torres testified that he thought it was appropriate to credit **all** Sulia money from the Traffic Driving Business to the FB Page because the FB Page had so many Likes as compared to Plaintiff's other Facebook pages:

> Q.  And this 98,000, that was the result of traffic being driven not only from this Facebook page but from many Facebook pages and Twitter accounts that were separately maintained by Ms. Mattocks, isn't that true?
>
> A.  Yes.  That is, in principle, the total universe, but because advertising revenue is generated as a proportion of traffic, there's a lot more traffic that's going to be coming from the Facebook page with 6 million-plus members than from any other page that has likely very few members in comparison.  So most of the traffic that is generated through Sulia is traffic likely coming from the Facebook page ….

Torres Depo, p. 113/17-25; p. 114/1-7.

When pressed about Plaintiff's many other social media accounts and their impact on Plaintiff's Sulia income, Torres was forced to admit that he did not even try to parse out the Sulia income:

> Q.  So can you tell me what portion of the $98,162 was the result of her monetization of the Facebook page at issue and what – what portion was the result of her "related entertainment topic social media activities?"
>
> A.  No, I don't have precise information to distinguish the two.

Torres Depo, p. 108/20-25; p. 109/1.

> 2.  *Plaintiff only posted about the Series on Sulia.com for four months, which further undermines Torres' claim that all of the Sulia income is attributable to the FB Page*

Plaintiff only posted about the Series on Sulia.com for a four month period, from January 2012 to April 2012, but Torres again ignores this fact and attributes all of Plaintiff's 2011 and 2012 Sulia income to the FB Page.  Sulia Depo, pp. 28-30.  Because Plaintiff only posted about the Series on Sulia.com for four months, then presumably Plaintiff's FB Page and Twitter accounts related to the Series drove significant traffic to Sulia only during those four months.  It is reasonable to assume that Plaintiff's other social media accounts, *i.e.* those not related to the Series, drove traffic to the Sulia.com in the months that Plaintiff was not posting about the

Series.  However, Torres made the exact opposite assumption.  That Sulia only featured Plaintiff's posts about the Series for a limited time period is further evidence of the fallacy of Torres' claim that *all* of Mattocks' income from Sulia is attributable to the FB Page.

### C. Torres Improperly Relies Upon a Five Year Projection in Determining Plaintiff's Lost Profits

Even assuming Torres had properly accounted for Sulia revenue – which, as set forth above is not the case – Torres' lost profit analysis is also flawed given his baseless assumption that Plaintiff would have continued to generate income from Sulia by way of the FB Page for an additional five years.  This premise both assumes (1) that BET would have continued to employ Plaintiff to assist with BET's official FB Page for another five years and (2) that BET would have continued producing the Series for five more years.  Torres has no reasonable basis to make either of these assumptions.

Florida law prohibits experts from making entirely speculative future projections: "Reliability of the income approach depends upon the reasonableness and credibility of assumptions about future operations and financial results."  *Mistretta v. Mistretta*, 31 So. 3d 206, 209 (Fla. 1st DCA 2010).  Given that Torres' projection of Plaintiff's and BET's activities five years into the future is entirely speculative, his report should be excluded.

### 1. *Plaintiff did not have an agreement with BET entitling Plaintiff to use BET's intellectual property for five years*

The Letter Agreement between Plaintiff and BET, in which Plaintiff gave BET administrative access to the FB Page and the right to update the FB Page's content in exchange for payment from BET, had no duration and was thus terminable at will.  *See, e.g., Williams v. Heritage Operating, L.P.*, 23 So. 3d 806, 807 (Fla. 2d DCA 2009) (because contract contained no provision regarding duration, it was terminable at will).  Florida law prohibits parties from seeking lost profits when the parties' contract is terminable at will.  *See, e.g.*, *Fidelity Warranty Services, Inc. v. Firstate Ins. Holdings, Inc.*, 74 So. 3d 506, 514 (Fla. 4th DCA 2011) (income-based business valuation based upon projected future lost profits of five years too speculative where underlying agreement could be terminated on 90 days' notice and future income beyond ninety days was too speculative); *Sheradsky v. Basadre*, 452 So. 2d 599, 604 (Fla. 3d DCA 1984) (future lost profits inappropriate where lease breached was a tenancy at will); *Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc.*, 459 So.2d 335, 337 (Fla. 5th DCA

1984) (lost profits too remote where there was no contract for future business).  Here, Torres

simply assumes – with absolutely no basis – that BET would have continued to employ Mattocks

to assist with its official FB Page for another 5 years.  Torres makes this assumption

notwithstanding that there was no contractual obligation for BET to do so.  As such, Torres'

assumption that Plaintiff's relationship with BET would extend five additional years is utterly

speculative and contrary to relevant law.

> 2. *Torres' assumption that the Series would air on BET for five more years is highly speculative and admittedly unlikely*

Torres' assumption that BET would continue to produce and air the Series for an

additional five years – and therefore that the Series would have a ten-year life span – is again

highly speculative and not based on any evidence in the record.

Torres notes that before August 2012, the Series aired for five years (3 years on the CW

and 2 years on BET), and he then simply assumes the show would continue to air for five

additional years.  Assuming that Sulia would pay Plaintiff $100,000 per year, for five years,

Torres concludes that Mattocks' lost income is $500,000.   Moreover, Torres admits that he did

not conduct any research on the average life span of a scripted cable television series like the

Series, or even a television series of any genre.  Indeed, Torres' own testimony supports the

<u>unlikelihood</u> that new episodes of the Series would air for ten years:

> I think for the most part, a lot of shows – most successful shows
> run about six or seven seasons.  I think it's been going down as the
> cable options explode and the attention spans erode in society.
> And choices are growing.  So it would have to be older shows that
> can last more than 10 years.

Torres Depo, p. 122/18-25.

When pressed, Torres explained that his general knowledge or familiarity with "the

entertainment and online marketing space" led him to believe there was no "hard and fast rule"

for how long a cable television series would air on a particular network.  Torres, however, cites

two of the most popular television series of all times, *M\*A\*S\*H* and *Star Trek*, which he claims

had ten year life spans.  Torres Depo, pp. 124-25.  Not only is the success of these series

tremendously outnumbered by series with much shorter runs, but there is nothing to connect

these examples to the current television marketplace.  M\*A\*S\*H last aired 31 years ago, in

1983.[9]  Star Trek originally ran for three years, ending in 1969.  There have been 4 other separate Star Trek series, none of which ran 10 years, and the last of which concluded in 2005.[10] Moreover, the shows are different in genre (the Series is a comedy drama as opposed to satirical comedy and science fiction), target audience (the Series targets a specifically African American audience unlike *M\*A\*S\*H* and *Star Trek*), and network (BET is a cable television network; *M\*A\*S\*H* and *Star Trek* initially aired CBS and NBC, two of the Big Three television networks).[11]  Torres' reliance on these wildly popular and highly dissimilar television series as the basis for his attributing a ten year life span to the Series only further highlights the unreliable, unscientific and deeply subjective nature of his expert report.

### III.
### TORRES' OPINIONS AND CALCULATIONS REGARDING BET'S ALLEGED PROFITS ARE NOT ONLY IRRELEVANT BUT SHOULD BE BARRED BECAUSE THEY ARE FLAWED AND ARE NOT HELPFUL TO THE TRIER OF FACT

As set forth above in Section I, BET's alleged profits relating to the FB Page are irrelevant to the income approach applied by Torres.  Even if, however, there was any legal basis to include BET's profits as Plaintiff's damages, Torres' attempt to calculate BET's profits is fundamentally flawed because his underlying assumptions are speculative and untethered to actual facts.[12]

### A.  **BET Never Generated Any Profits From the FB Page**

As a threshold matter, BET *never* generated any income from the FB Page.  BET did not, for example, charge third parties to advertise on the Page, nor did it use the Page to sell any goods or services.

In an attempt to make an end run around this critical fact, Torres attempts to quantify the "indirect" profits BET may have earned from the promotional utility of the FB Page.  Torres does so by including BET's purported profits from the Series itself as Plaintiff's damages.  Such

---

[9] http://en.wikipedia.org/wiki/M*A*S*H_(TV_series).

[10] http://en.wikipedia.org/wiki/Star_Trek.

[11] http://www.bet.com/shows/the-game.html.

[12] While Torres has experience in providing expert testimony concerning the valuation of certain assets, he has no apparent background, experience or expertise in the field of television, and, particularly, in the areas of television ratings, advertising income and the expected life span and popularity of television shows, all of which, as a result of Torres' peculiar "methodology," figure prominently in his calculation of "fair market value."

a valuation is highly speculative and not supported by legally recognized methods of valuation and should therefore be precluded.  *Hanna v. Martin,* 49 So. 2d 585 (Fla. 1950).

**B.** **Torres' Attempt to Tie A Purported Ratings Increase to the FB Page Is Illogical and Speculative Given his Admissions and the Inconsistencies With the Factual Record**

1. *Torres concedes that the "Facebook page itself is not responsible for fluctuations in ratings"*

Torres posits that the Series' ratings increased when the Series moved from the CW to BET, and much of that increase is attributable to the FB Page.  This notion of a ratings increase, however, is flawed.  To the contrary, the Series' ratings *declined* for a period of time when the Series aired on BET and the FB Page was active.  When asked about the aforementioned ratings decline, Torres admits that evaluating the relationship between the FB Page and the Series' ratings requires a "complex analysis," which he did *not* undertake:

> Q.  Do you think that… the Facebook page is responsible for the decline in ratings for The Game?
> A.  No.
> Q.  So the Facebook page, as far as you're concerned, was responsible for increasing ratings but not responsible for any decline in ratings; is that a fair statement?
> A.  No.
> A. **The Facebook page itself is not responsible for fluctuations in ratings.  And the Facebook page also changes over time.  So if you want to draw any parallel between the two, it would have to be a much more complex analysis.**

Torres Depo, p. 127/9-25.

In sum, Torres suggests that when the ratings for the Series increased, the increase was attributable to the FB Page, but when the ratings declined, the factors were too complex to link to Plaintiff.  This admission alone makes clear that Torres' alleged "tie" between the FB Page and the performance of the Series is unsupportable and utterly unreliable.

2. *The FB Page existed both before and after Torres' so-called ratings bump, thus there can be no causation between the Series' performance and the FB Page*

Another fundamental problem with Torres' attempt to tie the alleged ratings bump to the FB Page is the fact that that he simply has it wrong:  the FB Page existed both when the series aired on the CW (the prior network) and when it aired on BET.  Torres Report, p. 9.  For that reason alone, there can be no inference that the FB Page directly caused a ratings increase.

Torres therefore has no reliable basis for concluding that the FB Page had any impact at all on the alleged ratings increase.

**C.** **Torres Has No Basis For Apportioning 2/3 of the Alleged Ratings Increase to the FB Page**

Torres quantifies the ratings increase as 0.37 and concludes, without any support, that 2/3 of that increase is attributable to the FB Page and the other 1/3 is attributable to BET's "other marketing efforts."  Torres, however, made absolutely no attempt to account for other critical factors that go to the success of a television series.

*1.  Torres ignores two of the three factors he concedes are relevant in evaluating a series' success*

By his own admission, Torres states that there are three components to a television show's success, which he weighted equally:  (1) content of the show, (2) scheduling of the show and (3) marketing of the show.  Torres Depo, p. 162/8-20. Here, Torres afforded no credit for the Series' success to either content or scheduling because, according to him, they did not change when the Series moved from the CW to BET.  Torres Depo, p. 163/16-23.  Claiming that the content and scheduling are "constants" that cancel each other out, Torres concluded that "what changed between the old show . . . at the CW and the new show with BET has to do with marketing." Torres Depo, p. 162/21-25, p. 163/3-14.  Having deemed that the Series' content and schedule should be given no weight when considering the Series' success, Torres decreed that the FB Page was responsible for 2/3 of the Series' success on BET.

Torres, however, is flatly incorrect.  First, Torres readily conceded that he performed no specific analysis of the scheduling of the Series on the CW Network verses BET stating: "I didn't do any specific analysis of that." Torres Depo, p. 164/1-4; 7-10.  For this reason alone, the 2/3 apportionment is not reliable.  Second, Torres' opinion that the Series' content didn't change is simply nonsensical.  The Series – which featured evolving characters and an ongoing, changing storyline – clearly had different content.

However, Torres admits that the FB Page did not change:

A.  It's the marketing the show, the connection with the potential audience that is changed in the interim.  So that increment, I'm attributing it to the Facebook page, because that was the only consistent marketing between the two seasons as far as marketing is concerned.
Q.  So if it was the – if it was the one constant in marketing, then you're saying that it has to all be attributable to that?

A.  That is a first approximation of it.  So instead of attributing 100 percent, I'm only attributing two third to the Facebook page.

*Id*.  Therefore, rejecting content and scheduling as irrelevant "constants," Torres inconsistently gives primary weight to the FB Page precisely because it was a "constant" during what he considered to be the relevant time period.

> 2      *Torres has no basis for apportioning the ratings*
> *increase between the FB Page and BET's "other marketing" efforts*

Torres' report, which blithely attributes 2/3 of the ratings increase to the FB page and 1/3 to BET's "other marketing efforts," does not properly take into account BET's various other marketing efforts beyond the FB Page.  Torres explains the math behind his 2/3 attribution to the FB Page as follows:

> Q.  So is it fair to say that you can't tell me today or you can't set forth for me today any kind of a mathematical calculation as to how you got to two-thirds, attributing two-thirds of the incremental ratings to the Facebook page at issue?
>
> A.  I just gave it, that explanation.  It's one third of the success of the show in the industry is attributed to the marketing of the show. <u>So one third of the incremental ratings, I'm attributing it to the marketing of the show.  The rest, I'm attributing it to the Facebook page.  That's where the two-thirds comes from</u>.

Torres Depo, p. 167/15-25; p. 168/1 (emphasis supplied).

Torres, however, simply ignores the critical question, namely, how he came up with the 2/3 attribution, in light of the fact that BET undertook significant additional marketing efforts to promote the Series, including, but not limited to, (i) promoting the Series on the BET Website, (ii) advertising the Series on television, (iii) displaying billboards nationally and, (iv) airing "marathons" of reruns of the Series to lead up to its premier.  Barnhill Depo, pp. 53-54, 98-100.

Torres concludes, without any evidentiary support, that the foregoing substantial and costly marketing efforts were far less responsible for the "ratings bump" than the FB Page. Indeed, admitting that he was aware of BET's considerable marketing efforts beyond the FB Page, Torres stated that he made *no effort at all* to quantify those other efforts.  Torres Depo, p. 86/23-25, p. 89/6-25, p. 90/1-14.  As such, Torres admits that he failed to do any research or perform any analysis that would allow him to identify the factors that led the Series to achieve higher ratings on BET than on the CW.  Torres Depo, pp. 164, 167-69 (no analysis of promotional efforts of CW vs. BET; no analysis of overall audience size or audience

16

demographics of two networks; and no analysis of content scheduling on CW vs. BET). This admitted lack of research and expertise underscores the unsound and unreliable nature of Torres' expert report.

### D. **Torres' Attempt to Assign an Incremental Advertising Value to the FB Page Is Inconsistent with the Record And Speculative**

Even assuming that Torres could tie a ratings increase to the FB Page (which he cannot) and even assuming that Torres could furnish some support for his 2/3 apportionment of the Series' ratings increase to the Series (which he cannot), Torres has no cogent basis for assigning an incremental revenue figure to BET.

After determining – with no basis – that the Series' so-called "ratings bump" was 2/3 attributable to the FB Page, Torres then applies the following unsupportable and internally inconsistent method to assign a dollar value to that "bump."

> *1. Torres' incremental revenue methodology for the Series premier episodes is speculative and must be rejected*

Torres concludes that the revenue associated with the premier episodes would have been $854,700 based upon the following:

- Torres uses (i) the *2011 Thumbnail Media Planner*, a publicly available marketing guide that provides an overview, which is not specific to BET, of advertising media audiences and costs, and (ii) the "ratings bump" figure from a prior section of his Report (0.247) to reach his conclusion that a premier 30-second advertisement during a premier episode of the Series would be worth between $4,317 and $4,810 in advertising revenue to BET.
- Torres then speculates that nine advertisements would air during a premier episode of the Series, multiplies that number by the purported value to BET ($4,317 and $4,810), and ultimately determines that BET's "incremental revenue" per premier (first run) episode is between $36,225 and $40,365.
- Torres then multiplies this incremental revenue by the number of unique premier episodes (22), and he arrives at an advertising revenue range of $854,700 to $952,380  for premier episodes, which like all other figures, was ultimately projected out five years.

Torres Report, pp. 20-23.

This speculative analysis must be rejected because his reliance on general averages from the *2011 Thumbnail Media Planner* and vague estimates about the number of advertisements broadcast per premier episode is highly speculative and is not grounded in reason or facts.  *See Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2nd Cir. 2004) (finding valuation testimony unreliable where expert could not, "explain a number of variables and assumptions used in his

analysis" and failed to account for differences between companies); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1224 (M.D. Ga. 2005) (in testing for reliability, the Court must examine the methodology supporting each expert's opinion step-by-step. If the chain of reliability is broken at one step, then the Court should not admit the expert's opinions based on the faulty methodology).

 2. *Torres' Methodology for the Series repeat episodes is not only speculative but also inconsistent with his equally speculative analysis of premier episode*

Torres concludes that the revenue associated with the re-run (or repeat) episodes would have been $6,338,934 based upon the following:

- Torres determines that the typical number of re-runs per year was 493 (vs. 22 premier episodes).
- Torres, without any explanation, then abandons the *2011 Thumbnail Media Planner* he had consulted regarding premier episodes, and instead relies upon the *2014 Thumbnail Media Planner* to evaluate the 493 re-runs (also switching from the "all households" to the "typical daytime cable" category) to conclude that $6,600 per ratings point[13] should be used for re-run episodes.
- Torres then makes no effort to determine a "ratings bump" attributable to the FB Page for the re-runs (despite the fact that re-runs make up over 95% of the episodes he assigns a profit figure to) and instead determines that the ratings for re-runs were generally 50% lower for re-runs than ratings for premier episodes, concluding, *ipse dixit*, that because "associated ratings during 2012 for non-premier episodes in all time slots" are 0.43 and 0.43 is half of ratings for premier episodes (0.86), an appropriate multiplier would be half of the ratings for re-run episodes, 0.22.
- Torres then multiplies $6,600 x 0.22 ($1,452), assumes nine spots per episode, ($1,452 x 9=$12,858), and multiplies by 493 episodes (493 x $12,858 ) to arrive at $6,338,934 for non-premier episodes, which, again, was projected out five years.

Torres Report, pp. 21-23.

Moreover, Torres makes no attempt to quantify the impact of the FB Page, if any, on the ratings of the repeat episodes of the Series.  Instead, he applies his own numbers in a calculation that is not tied to any underlying facts.  Notably, Torres does not commence his analysis by determining "incremental ratings" specific to re-run episodes as he had for premier episodes. Torres merely skips this step altogether without explanation.  Instead, he applies the almost

---

[13] The Thumbnail Media Planner purports to provide the *average* cost of advertising on television based on ratings numbers (cost per ratings point) such that, according to Torres, an advertiser in 2014 could expect to pay $6,600 per ratings point ($6,600 x ratings percentage) to advertise on "typical daytime cable," which is an undefined term.

identical "incremental ratings" figure to the premier and re-run episodes.  Torres Report, p. 21.
Presumably Torres employs these different "methodologies" for the re-run and premier episodes
because this strategy enables Torres to use essentially the same multiplier (0.247 for premier
episodes; 0.22 for non-premier/re-run episodes) without having to tie <u>any</u> ratings of the re-run
episodes to the FB Page.  Torres' methodology in this regard is fundamentally flawed,
improperly ignores the actual ratings numbers, and cannot be justified.  Not only does Torres
skip the essential step of quantifying the impact of the FB Page, if any, on the ratings of the
repeat episodes of the Series, he also uses different underlying data to calculate it.  Torres uses
average advertising figures for the "all households demographic" from the *2011 Thumbnail
Media Planner* for premier broadcasts, yet uses figures for "daytime cable TV" from the *2014
Thumbnail Media Planner* for re-run broadcasts.  As with much of Torres' methodology, Torres
makes no effort to explain or justify the propriety of relying on different categories of
information applicable to different time periods in order to calculate "incremental revenue" for
non-premier episodes of the Series.  As such, Torres' analysis is internally inconsistent and
flagrantly draws upon inconsistent information and data.

### 3.  Torres' assumption of a ratings increase over 5 years is highly speculative

Like Torres' "lost profits" evaluation, which improperly assumed that the Series would
air on BET for five additional years (*see supra* at p.12), his analysis of BET's profits similarly
assumes an ongoing ratings bump of five years even though there are no facts in the record to
support this assumption.  Indeed, Torres only compared two years of ratings – the Series' last
season of new episodes on the CW, which premiered in 2009, and the first season of new
episodes on BET, which aired in 2011.  Inexplicably, Torres did not compare the ratings of 2012
and 2013 or of 2013 and 2014, despite the fact that BET produced that information in discovery,
likely because the actual numbers are far less favorable than Torres' unsubstantiated projections.
The actual ratings numbers, according to third party The Nielsen Company, show that the Series'
ratings on BET were either flat or declined between 2011 and 2013.  Torres' decision not to
factor this information into his report, but to instead rely on verifiably false projections,
underscores that Torres is not qualified to testify competently, that his report utilizes unreliable
methodologies, and that his testimony will not assist the jury in applying any specialized
expertise to understand the evidence in issue.  *See City of Tuscaloosa v. Harcros Chems., Inc.*, 58
F.3d 548, 562 (11th Cir. 1998) (expert testimony must be excluded if the reasoning or

methodology is invalid or cannot properly be applied to the facts of the case); *Powell v. Carey International, Inc.*, 2007 WL 1068487, *4 (S.D. Fla. April 9, 2007) (fundamentally flawed expert report and testimony would not aid the trier of fact).

### E.    Torres' Failure to Factor Expenses into His Analysis Is Flawed

Recognizing the need to take expenses into consideration in his analysis of BET's supposed incremental revenue, Torres inexplicably derives his figure for BET's expenses for the Series from what he labels as the "net operating margin of the Media Networks segment," from the 2012 10-K Report of Viacom Inc., BET's parent company.  Torres Report, p. 23.

Torres' use of this figure is highly problematic because Viacom Inc.'s 10-K combines revenue and expense information related to a number of Viacom-owned properties, including MTV, VH1, CMT, Logo, BET, Centric, Nickelodeon, Nick Jr., TeenNick, Comedy Central, TV Land, Spike, and Tr3s, among others.  However, Torres, in taking an expense figure from the 10-K, fails to provide any justification or explanation as to why a broad "net operating margin" figure of a parent company would reliably apply specifically to determine BET's expenses related to the Series.  Torres' stab-in-the-dark methodology runs afoul of the prohibition against basing future net income projections on speculation and conjecture.  There simply is no connection between this number and his fair market value calculation, and Torres does not even venture to provide a rationale, let alone any recognized accounting principle, for his expenses calculation.

### IV.

## TORRES' ULTIMATE CALCULATION IS ARBITRARY AND UNSUPPORTED AND, AS SUCH, SHOULD BE BARRED

Having constructed large and wholly unsubstantiated numbers for both Plaintiff's lost profits and the alleged incremental value to BET, Torres arrives at his final damages number by citing the maximum value of the FB Page to Plaintiff, namely, $306,918, and the maximum value of the FB Page to BET, $8,706,063.  Torres then concludes, with absolutely no explanation, that the parties would simply "meet in the middle" of these two figures.  Torres Report, p. 24.  As such, his final number, $4.5 million, is the final random act in a series of inexplicable calculations.[14]

---

[14] Torres' novel "fair market value" calculation in equation form is:

 **(Income of FB Page x 5 years/ reduced to pres.val.) + ("Profit to BET" x 5 years/reduced to pres. val. x % op. margin )**

$$\div 2 \qquad\qquad = \textbf{FMV}$$

CASE NO.: 13-61582-CIV-COHN-SELTZER

## CONCLUSION

Torres' conclusions are speculative and unreliable and his methodologies are convoluted. His opinions do not help the trier of fact in determining what Plaintiff's damages, if any, are. For all of these reasons, Torres' opinions should be excluded from this case and this Court should prevent him from testifying.  As set forth in detail above, Torres does not remotely meet the standard for expert testimony as set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. Based on the foregoing, Defendant BET requests this Court's entry of an order excluding the testimony and report of Fernando Torres.

Respectfully submitted,

GRAY ROBINSON, P.A.
Attorneys for Defendant
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Karen.Stetson@gray-robinson.com
Phone: (305) 416-6880
Fax: (305) 416-6887

By:  /s/ Karen Stetson
Karen Stetson
Florida Bar No 742937
Jonathan L. Gaines
Florida Bar. No. 330361

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via ECF to the parties in the attached Service List on this 20th day of June, 2014.

By:      /s/Karen L. Stetson

## SERVICE LIST

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor

21

1402451

CASE NO.: 13-61582-CIV-COHN-SELTZER

Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475
Alexander D. Brown, Esq.
adb@trippscott.com
Peter G. Herman, Esq.
pgh@trippscott.com
Adam S. Goldman, Esq.
asg@trippscott.com

1402451