HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# STACEY MATTOCKS
# v.
# BLACK ENTERTAINMENT TELEVISION, LLC

## Civil Action No.13-61582
## United States District Court for the
## Southern District of Florida

# EXPERT REPORT OF FERNANDO TORRES, MSC

---

Submitted to

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, FL 33301
954-525-7500

Submitted by

IPmetrics Intellectual Property Consulting
9320 Chesapeake Drive
Suite 110
San Diego, CA 92123
858.538.1533

April 8, 2014

© 2014 IPmetrics, LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page i

IPmetrics
Intellectual Property Consulting

## TABLE OF CONTENTS

**I. INTRODUCTION ..... 1**

**II. QUALIFICATIONS ..... 1**

**III. BACKGROUND ..... 2**

A. Plaintiff Stacey Mattocks (MATTOCKS) ..... 2
B. Defendant Black Entertainment Television, LLC (BET) ..... 2
C. The Property at Issue (FB Page) ..... 2
D. The Alleged Wrongful Act ..... 13

**IV. DAMAGES ANALYSIS ..... 13**

A. Methodological Considerations ..... 14
B. Fair Market Value Analysis ..... 16
C. FMV Conclusions ..... 23

**V. SUMMARY OF OPINIONS ..... 24**

**EXHIBITS ..... 26**

**APPENDICES ..... 28**

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 1

IPmetrics
Intellectual Property Consulting

## I. INTRODUCTION

IPMETRICS® LLC ("IPMETRICS") was retained by TRIPP SCOTT, P.A. on behalf of their client, Stacey Mattocks, to provide expert witness services in relation to damages in the above referenced litigation matter pending in the United States District Court for the Southern District of Florida.

IPmetrics is a consulting firm founded in 2000. I am Fernando Torres, MSc, Chief Economist at IPmetrics and the expert designated to review this case and author this expert report. I have the necessary experience, education, and knowledge to render expert opinions relating to the fair market value of the use of intangible assets and online assets, as well as the economic benefits and/or damages resulting therefrom. I was tasked with reviewing the documents and circumstances of the case and proffering my initial expert opinions on this matter.

The analysis and opinions detailed in this report are presented as of April 8, 2014. They are based upon my knowledge, skills, experience, training, and education as an economist specializing in forensic matters and intellectual property. This report includes four appendices containing information required by Federal Rule of Civil Procedure 26(a)(2)(B). These consist of the qualifications of the testifying expert with a list of publications over the last ten years (Appendix A), litigation-related experience during the previous four years (Appendix B), a list of documents reviewed in this matter (Appendix C), and disclosure of compensation arrangements (Appendix D). IPmetrics' compensation in this matter is not, in any way, dependent upon the conclusions reached during the performance of the analysis.

## II. QUALIFICATIONS

I am a member and Chief Economist at IPmetrics LLC, a consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intangible assets. I have over 30 years of work experience in economics, financial analysis, and business management in the U.S. and Mexico.

Since 2004, I have specialized in intellectual property matters, applying my economics, finance and business experience, as well as skills in quantitative techniques, to the analysis and valuation of intangible assets, including valuation for transactional and litigation purposes (in both bankruptcy and infringement cases). Prior to joining IPmetrics, I was the Senior Economist at Consor® Intellectual Asset Management.

As an economist, I have undertaken projects involving the valuation and/or the assessment of misappropriation and infringement damages regarding rights of publicity, trademarks, patents, trade secrets, copyrights, and other intangible assets in such industries as online advertising, apparel and footwear, retail, pharmaceuticals, entertainment, telecommunications, and non-profit organizations, among others.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 2

IPmetrics
Intellectual Property Consulting

I regularly publish analyses and give presentations on topics related to intangible asset valuation in a variety of venues, many of which qualify for CLE credit. During the past few years, I have been an instructor for the course "Valuing Intangible Assets for Litigation," which is part of the requirements of the Certified Forensic Financial Analyst designation issued by the National Association of Certified Valuation Analysts (NACVA).

I am a member of the National Association of Forensic Economics, and of the Western Economics Association International, among others. My career has spanned from academia, to branches of government, private industry and consulting.

I earned a B.A. degree in Economics from the Metropolitan University in Mexico City (1980), and went on to earn a Graduate Diploma in Economics from the University of East Anglia (U.K., 1981), and a Master of Science Degree specializing in Econometrics from the University of London, England (1982).

My professional Vitae, which is attached as Appendix A, outlines the balance of my education and experience.

## III. BACKGROUND

### A. Plaintiff Stacey Mattocks (MATTOCKS)

MATTOCKS is an individual with a principal place of residence in Broward County, Florida.[1]

### B. Defendant Black Entertainment Television, LLC (BET)

BET is a District of Columbia limited liability company with its principal place of business in Washington, D.C.[2] Founded in 1980, BET operates a cable/satellite television channel and, since 2001, is part of the Media Networks segment of conglomerate Viacom, Inc. (NASDAQ: VIAB)[3]

### C. The Property at Issue (FB Page)

I understand that, at the core of the case at hand, is the value of the online property known as the Facebook.com Page for the TV show "The Game" (the "FB Page") and the "Likes": or "Fans" related to that page. To analyze this value, I considered the context defined by the nature of FB pages, the TV show "The Game", as well as the specific FB Page at issue.

[1] *Amended Complaint* filed March 13, 2014, at §3.
[2] *Amended Complaint* at §4.
[3] Viacom, Inc. Form 10K filed Nov. 14, 2013, pp 4, 11.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.



TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 3

IPmetrics
Intellectual Property Consulting

## a) Facebook Pages

The online social networking site Facebook.com ("FB") has been available to the general public since September 26, 2006.[4] Initially, only individuals were able to create profile pages and interact with other users. However, in November, 2007 FB introduced "Pages" as a way for public figures, organizations and businesses, groups or other non-individuals to set up a profile or identity on FB.[5]

The main way in which individual FB users connect with each other is by selecting the "Friend" button to add them to their network. The main way users interact with brands or groups that have FB pages is to select the "Like" button so a "fan" link is created allowing the FB page's posts to appear on each fan's home page (on the "news stream" of posts from friends and liked pages).

Examples of a range of FB pages are shown in Figure 1. The current number of "fans" is prominent, the "Like" button, and an invitation prompt to acquire more fans are also features of pages. Current[6] counts of "likes" or "fans" illustrated are: Coca-Cola, 80,979,795; Hugh Laurie, 4,199,707; Jimmy Kimmel Live, 1,399,299; and Mountain Biking Ireland, 1,684.Given the growing interest about FB and social networking among consumers, it is not surprising that the first significant occurrence of Google searches for the term "Social Media Marketing" began around the Summer of 2007, and interest in the term grew at a 12% monthly rate during the first three years, stabilizing since mid-2010 at about a 1% monthly growth.[7]

---

[4] Facebook Timeline at: https://www.facebook.com/facebook.
[5] *Ibid.*
[6] As of April 2, 2014.
[7] Google Trends data for the US only. http://www.google.com/trends/explore#q=social%20media%20marketing&geo=US&cmpt=geo.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 4

IPmetrics
Intellectual Property Consulting

**Figure 1**
**Brand, Celebrity, Entertainment, and Activity Facebook Page Examples**

Coca-Cola
80m
30
Hugh Laurie
4.1m
8
Jimmy Kimmel Live
1.3m
Mountain Biking Ireland
1,684

In summary, FB pages establish a hub of a community of FB users interested in keeping up-to-date on their chosen entertainment, brands, activities, and celebrities.

Facebook has built a dominant position in the social networking market, and such sites attract a significant amount of consumer time and attention. According to a reputable report, Americans spend an average of 37 minutes daily on social media, a higher time-spend than any other major Internet activity, including email.[8] Marketing communications from brands directly reach their FB page fans (or "Likes"[9]), but the greatest advantage of social networks over other forms of commercial communications is the ability of reaching the much larger universe of "Friends of Fans." Thus, the value of "Fans" on a FB page is recognized as being made up of the potential for increasing the depth of engagement and loyalty among "Fans," generating incremental purchase behavior, and leveraging the ability to

[8] Business Insider, Business Intelligence Report on Social Engagement (http://www.businessinsider.com/social-media-engagement-statistics-2013-12).
[9] Often used interchangeably in marketing.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 5

IPmetrics
Intellectual Property Consulting

influence Friends of Fans.[10] Obviously, acquiring Fans has become a fundamental goal for brands in all Business-to-Consumer markets. In studies aimed at estimating the costs of acquiring fans, advertising industry experts have based their analysis on the average of paid advertising needed, on average, to acquire a Facebook page "Fan" and convert them into paying customers. In a widely quoted study, considering 5 million Facebook ads placed by over 50 companies, the acquisition cost of "Fans" was found to be $9.56 less than the cost to acquire the same level of sales from non-Fans.[11] Thus, the net value of a Fan in the consumer packaged goods, auto, and finance markets was nearly $10.[12] Since Fans can be profitable, a wide array of companies implement marketing strategies to acquire them. Another study found that the average cost of advertising on FB to encourage a user to become a Fan on the advertiser's FB page was $1.07.[13] This cost varies across sectors and over time. In 2012, the cost per acquired Fan (Cost per click on Fan acquisition campaigns) averaged $0.55.[14]

**b) "The Game" TV Show**

*The Game* was created around 2004 by Mara Brock Akil as a spin-off of a prior show, *Girlfriends* (2000-2008).[15] Classified as a combination comedy/drama/romance, the show features a group of women who all have relationships with professional football players.[16] Originally produced by CBS Television Studios,[17] the show aired on broadcast television between October 2, 2006 and May 15, 2009 on the CW Television Network.[18] During that time, three seasons aired, as summarized in Table 1 below. During the final season (S3), ratings were typically below 1 rating point, i.e., less than 1% of US households were tuned to the show live.[19] During the February through May period of the final season on the CW network, the average rating was 0.49,[20] having fluctuated between 0.14 and 1.15 during the season.[21] These ratings[22] indicate that, on average

[10] COMSCORE, "The Power of Like: How Brands Reach and Influence Fans Through Social Media Marketing" White Paper, 2011. Based on measurements through the comScore® Social Essentials™ analytics platform. Comscore.com.
[11] Study by SocialCode, reported in trade publication Advertising Age, Nov. 22, 2011 (adage.com/print/231128).
[12] A variety of studies have found a wide range of values for this concept. Most are not comparable as they measure different aspects of what a Fan represents.
[13] Webtrends, white paper, 2011. Reported in The Wall Street Journal, "How Much Does a Facebook Fan cost?" February 1, 2011.
[14] Based on data in WebTrends®, "Ads for Fans", 2012, p 4.
[15] Internet Movie Database – Professional (IMDB*Pro*) at: https://pro-labs.imdb.com/title/tt0247102/details.
[16] *Ibid.*
[17] *Ibid.*
[18] A joint venture of CBS and Warner Bros.
[19] Nielsen Company documentation at: http://audiencewatch.nielsen.com/data/help/Training/Topics/Ratings/index.htm.
[20] Source: BET-004018.
[21] *Ibid.*
[22] Which are calculated based on the sampling methods of the Nielsen Co.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 6

IPmetrics
Intellectual Property Consulting

during that season, 563,000 households or 1.46 million people watched the show.[23] On its best days, up to 3.44 million people[24] watched the show.[25]

The CW Network cancelled "The Game" after season 3 and new episodes were not available until BET began showing season 4, starting on January 11, 2011, through its cable/satellite channels.[26] The first episode of the new season 4 had ratings of 4.61 points,[27] and an estimated audience of 5.3 million households, or 13.77 million people; a significantly larger audience than it originally had on broadcast TV.

There is no doubt that the season 4 premiere of *The* Game was an unprecedented success. On January 12, 2014, BET announced through a press release the claim that "...The Season 4 Premiere Telecast of THE GAME Ranks As The #1 Ad-Supported Sitcom Telecast In Cable Ever Viewed by 7.7 Million Viewers." More specifically, BET explained "... the BET premiere of THE GAME picked up where things left off at the end of season three with the show's main cast [...] In addition to its incredible on-air performance, THE GAME had the highest amount of social media buzz of all other prime-time television shows, according to Trendrr's Prime-Time Television Activity Chart for Tuesday, January 11, 2011. At one point, commenting on THE GAME Facebook page averaged 893 likes per minute, and 750 comments per minute, after the question "What did you think about tonight's episode?" within the first 28 minutes after the post. THE GAME related topics dominated Twitter with 9 out of the top 10 trending topics 30 minutes into the program. The show also contributed 52% of site page views on BET.com."[28]

Figure 2 shows the average ratings for *The* Game on Tuesdays during the 2011 – 2013 seasons shown on BET.[29] After the premiere of the revived show, ratings tended to decline to more "normal" levels closer to the three-year trend line (0.81 points) for an average rating of 0.86 between January and March.[30] The 2012 season 5 showed improved ratings most of the longer season,[31] to an average of 0.85, while a disappointing start to the

[23] In 2009-2011 there were 114.9 million households in United States. U.S. Census (Census.gov).
[24] In the same period, there were 2.6 people per household on average (Census.gov).
[25] Increasingly, it is acknowledged that delayed watching via DVR, internet streaming represents a growing portion of the eventual viewership. The rating data provided and referenced refers only to live watching. In addition, in the most sought-after 18-49 year-old demographic, the ratings were even worse: in its third and final season, *The Game* averaged a 0.7 rating in that segment and less than 1.7 million viewers (TV By the Numbers, May 23, 2009 reporting Nielsen data).
[26] As opposed to the CW broadcast available free over the air, BET requires a basic cable or satellite TV subscription.
[27] Source: BET-004018.
[28] BET Press Release dated January 12, 2011
[29] BET-004018.
[30] Season 4 had 13 episodes aired new between January 11 and March 29, 2011.
[31] Season 5 had 22 episodes aired new between January 10 and June 5, 2012.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 7

IPmetrics
Intellectual Property Consulting

2013 season 6[32] eventually, gathered momentum to finish on trend by its closing months at an average rating of 0.73.[33]

**Figure 2**

"The Game"
Average Live Ratings Per Individual Telecast
On Tuesdays During Seasons 4, 5 & 6
RATINGS
1.4
1.2
1.0
0.8
0.6
0.4
0.2
0.0
Average: 0.86
1 2 3 1 2 3 4 5 6 3 4 5 7 8 9
2011
2012
2013
Season 4
Season 5
Season 6
Month
Year

*Source: BET004018*

In addition, outside of the prime-time season, it must be noted that the show airs during most of the weekdays during most of the year. This provides additional viewership, as evidenced by the ratings, as well as opportunities to sell advertising time.

Figure 4 shows the ratings for all days of the week, i.e., including non-prime time shows and so-called encore episodes. Ratings for prime-time new episodes (0.78 per above) are nearly double than the encore shows (approximately 0.40).

[32] Season 6 had 21 episodes aired new between March 26 and May 21, 2012 and from July 2 through September 3, 2013.
[33] Data for February 2013 was not included in BET-004018.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 8

**Figure 3**

Average of AA%
"The Game"
Average Live Ratings Per Individual Telecast
By Day of Week
January 2011 – January 2014
Rating Points, AA%
Month and Year
2011
2012
2013
2014
DOW
Days of the Week from Sun=1 to Sat=7
Source: BET-004018
year
month

Viewership levels for the show are, overall, more than three-times the original broadcast run and evidently significant enough for season 7 to have started in March, 2014.[34]

Ratings are of central importance in the television industry, not simply to monitor popularity, but because they are an indicator utilized as the main arbiter of advertising rates.[35] From an economic perspective, media companies like Defendant BET produce and distribute content and finance their activities, at least partially,[36] by selling advertising time. Media companies need advertisers to make the production or acquisition of media content worthwhile, while advertisers need media companies to make their brands and products known to potential consumers.[37] In fact, media

[34] IMDB*Pro*.com.

[35] Package discounts are important, particularly for agencies and brands that can commit significant budgets to a network across a variety of products and/or shows. Ratings remain a key measure of potential consumer reach, even in those package arrangements.

[36] Depending on specific contractual arrangements with cable and satellite systems, content providers like BET additionally receive varying amounts as a share of subscription revenues.

[37] See, inter alia, H.L. Vogel, Entertainment Industry Economics, 8th Ed., 2011, Cambridge University Press pp 337-339; and, S.P. Anderson and J. Gabszewicz, *The Media and Advertising: a Tale of Two-Sided Markets*, in Handbook of the Economics of Art and Culture, Volume 1, Edited by V.A.Ginsburgh and D.Throsby, Elsevier, 2006, pp 567-614.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

companies like Defendant BET sell a joint product to two different categories of buyers: the medium itself to advertisers, and the medium content to media consumers.[38] Through BET, in this case, viewers of "The Game" interact with advertisers. Advertisers want more viewers to receive their marketing communications, Viewers find advertising a nuisance in so far as it detracts from the time available to watch a program. Viewers' tolerance and a finite timeframe limit the amount of advertising carried, which pressures ad rates upwards based on the attractiveness of the show to advertisers, which is measured by ratings.

The substantial increase in ratings for the revival of *The Game* TV series is a direct revenue driver for Defendant BET. The factors which can be credited with generating those increased levels of interest include the role played by the FB Page at issue. The extraordinary performance of the series debut in 2011 caught the attention of media observers and, for example, *The New York Times* asked "How does a show quadruple its audience?" and quoted BET's CEO and Chairwoman Debra L. Lee crediting the fan base on Facebook, among other factors such as the marketing plan, Twitter fans, and frequent re-runs during 2010, as well as the African-American target audience.[39] Furthermore, it noted that rather than create its own Facebook page, BET leveraged MATTOCKS' FB Page which had kept and grown interest on the show.[40]

**c) The FB Page**

As a fan of *The Game*, during 2008, MATTOCKS created a Facebook page[41] as a hub where the then-current episodes of the TV show could be discussed by the potential fan-base among FB users. The audience for the FB Page, the number of "fans" or "likes" grows as users:

- Search and find it via FB's search function.
- Are in the FB Page creator's network of FB "friends" and, seeing the activity posted on their News Feeds, access the page.
- Once on the FB Page, visitors can directly invite members of their own networks of "friends" to visit the page.
- FB users learn of the page through mentions and/or hyperlinks on articles, blog posts, ads, or comments throughout the worldwide web or other media, like TV, magazines, or newspapers.

Therefore, for the audience for a FB page to grow significantly, focused marketing efforts must be applied to disseminate its existence.

---

38 *Ibid.*
39 B. Stelter, "The Game is a winner, helped by BET loyalists", The New York Times, January 16, 2011,
40 *Ibid.*
41 Amended Complaint, at §7.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 10

IPmetrics
Intellectual Property Consulting

By the first year of its existence, and while season 3 was still on the air, MATTOCKS' FB Page accrued over 179,000 "likes" or "fans".[42]

Approximately a year after the cancellation of the TV show, MATTOCKS' marketing efforts had succeeded in acquiring over 750,000 "likes" or "fans" to the FB Page.[43] As demonstrated above, this level of consumer interest is publicly available for anyone searching for such a page on FB. If BET personnel performed any due diligence, as they would rationally do, in the run-up to acquiring the rights to The Game in or about April 2011, the existence of a fan community already close in size to the average broadcast audience for The Game would likely been a favorable factor in that decision.

By October 2010, the FB Page had reached 1.8 million fans[44] and BET first contacted MATTOCKS about creating posts and stories about the upcoming return of the show for season 4 scheduled to premiere in January, 2011.[45] Soon thereafter, BET agreed to pay MATTOCKS as a social media freelancer to continue her own efforts in promoting the upcoming show on her FB Page.[46]

As noted in reference to the ratings for the return season 4, the audience for *The Game* exceeded expectations. The FB Page had been created at an extremely opportune time:

- The show was on its third broadcast season and about 22 new episodes were aired during its initial stages
- Interest in Facebook, social networks and social media was booming. In 2008, Facebook had 145 million monthly average users, more than doubling to 360 million in 2009.[47]
- Upon cancellation by The CW, and until BET began to actively promote season 4, the FB Page was in all likelihood the main, if not the only, forum for fans of the show to interact and maintain interest in the show.

Interest in watching the return of the show in 2011 was evidently supported by the existence, growth, and promotion of the FB Page by MATTOCKS. At the time of the season 4 premiere, the FB Page had acquired 3.234

[42] From a 6/7/2011 email from MATTOCKS to BET personnel Monique Ware (cc Jean-Pierre Lespinasse). BET-000182.
[43] *Amended Complaint*, at §10.
[44] BET-000182. This represents, approximately a net addition of 60,000 fans per month on average.
[45] *Amended Complaint*, at §11.
[46] *Amended Complaint*, at §13.
[47] Facebook, Inc., Form S-1, amended, filed April 23, 2012, p 54.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 11

IPmetrics
Intellectual Property Consulting

million fans (or "likes").[48] Directly, this represents 42% of the record-braking estimated 7.7 million viewers for the season opener cited above.

**Figure 4**
**MATTOCKS' Facebook Page for *The Game***
**(March 24, 2011)**

"The Game"

Not only was the FB Page involved in the build-up of the audience for the premiere of season 4 of *The Game,* as the season got underway MATTOCKS and BET collaborated in providing fans with posts, links, and imagery through the FB Page, thus reinforcing the supporting effect of the page. Thus, the fan base of the FB Page continued to grow. By the season 4 finale (March 29, 2011), this total reached 4.257 million.[49] Around that time, MATTOCKS expanded the social media presence of the FB Page and its positive impact on building the audience for the next season of *The Game* by creating an account on the micro-blogging Twitter service.[50] By the end of 2011, the FB Page had collected 5.66 million fans,[51] a net addition of 2.4 million fans during 2011. As of the date of this report, I have yet to receive specific data detailing the follower count and/or other metrics for the Plaintiff's Twitter account for *The Game*. Therefore, if and when I receive such information for consideration, I may need to expand the analysis of the monetization of the FB Page at issue and related internet assets.

[48] BET-000182.
[49] BET-000182.
[50] *Amended Complaint*, at §26.
[51] BET-003193.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

After the successful launch of the new season and as Season 5 approached, BET proposed a contractual arrangement with MATTOCKS in December, 2011 to effectively pay up to $85,000 over a one-year period but relinquishing all rights to the FB Page.[52] Such arrangement was declined by MATTOCKS, who continued to promote the show on her FB Page.

**d) The FB Page as a Business**

While the creation of a FB page is free of charge, FB monetizes the pages by placing targeted advertisements along the right-hand column of the page.[53] To generate revenue for the page creator, however, additional effort and means are necessary. MATTOCKS built the FB Page as a business by monetizing referrals to the page (hyperlinks) mainly through the subject-based social networking site Sulia.com.

In brief, the way Sulia.com operates is to gather member posts by popular topics under the headings of Politics, Arts & Entertainment, Sports, Tech & Science, Business, Living, Food & Dinning, and Health. Each post is attractively displayed containing a brief preview of the source post (which is hosted on a third-party site, such as Facebook.com) and hyperlinking via a text and/or image link to that source. Sulia monetizes the service by having advertising, called sponsored posts, alongside regular posts.[54] Certain featured members such as MATTOCKS participate in that revenue according to the ad revenue generated in connection with their postings.[55] Having launched in November 2011, by the end of August of 2012, traffic to Sulia hit Ten million visitors per month.[56] Popular posts, such as MATTOCKS posts about *The Game* linking back to the FB Page, can thus generate revenue though Sulia and drive traffic to the FB Page.[57]

At a limit of 2,500 characters, Sulia posts are not as restricting as communications using Twitter, but are shorter than typical blogs. Formatting is also limited. As opposed to Twitter, FB, Tumbler, and other social networks, Sulia pays select contributors and curates news feeds from established organizations and other sources.[58]

52 *Amended Complaint*, at §14.
53 Major brands can negotiate an exception to this practice as shown in Figure 1 for the Coca-Cola page.
54 Regular ads from networks such as Google's AdChoice are a more recent development http://sulia.com/advertise/ .
55 Based on
56 Business Wire, Press release
57 As of the date of this report, I have yet to receive specific data detailing the follower count and/or other metrics for the Plaintiff's Twitter account for *The Game*. Therefore, if and when I receive such information for consideration, I may need to expand the analysis of the monetization of the FB Page at issue and related internet assets.
58 Sulia "About Us" page (http://sulia.com/about/#about-us) and R. Pegoraro, "My Sulia Experiment three weeks in", January 26, 2013 (http://robpegoraro.com/2013/01/26/my-sulia-experiment-three-weeks-in/).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.



Other means of generating revenue based on the FB Page are cross-referencing posts to/from the FB Page on a separate blogging platform that allows for advertising using, typically, Google's AdSense system.[59] AdSense provides a way to earn money from websites by displaying customizable, keyword-targeted ads alongside the content of a site, or blog.

### D. The Alleged Wrongful Act

It is my understanding that by the end of 2011, BET created its own version of a fan page for The Game on FB.[60] This page did not attract a meaningful number of "fans" or "likes." According to FB analytics information, at beginning of July 2012, the total number of "fans" was 32 and, by August 27, 2012, the total was only 128.[61] The 6,272,797 "Likes" from the Plaintiff's FB Page were caused to be migrated by Defendant BET to their own "The Game on BET" page during the remaining days of August, pursuant to a request from BET staff (J.P. Lespinasse):

- On August 28, 2012, 3,009,684 fans[62] were transferred;
- On August 30, 2012, an additional 3,263,113 fans[63] were transferred; and,
- The FB Page was shut down.[64]

Thus, the Plaintiff was stripped of control of, and administrative access to, the FB Page at issue and, in effect, the valuable six and one quarter million strong fan base built up over 4 years was caused to come under the exclusive control of Defendant BET along with all its marketing potential.

## IV. DAMAGES ANALYSIS

In this section, assuming liability for the alleged wrongful acts is found by the Court, I present my opinions of value and the bases for them. The objective in this section is to determine the value of the property at issue as of the end of August, 2012.[65] In order to restore the Plaintiff to a financially equivalent position absent

[59] http://www.google.com/adsense/start/.
[60] *Amended Complaint*, at §28.
[61] Unique user totals from the "Lifetime Likes by Age and Gender" tab in: BET-001559.
[62] *Ibid.*
[63] *Ibid.*
[64] Email correspondence dated 8/23/2012 through 8/24/2012 between J.P. Lespinasse (BET staff) and Megan Carnes (FB) BET-004042-45.
[65] See, *inter* alia, American Reliance Insurance Company v. Perez, 689 So. 2d 290 (Fla. 3d D.C.A. 1997) (quoting City of Tampa v. Colgan, 121 Fla. 218, 230, 163 So. 577, 582 (1935), and citing 4 Nichols on Eminent Domain §12.02[1], at 12-62 to 12-70 (rev. 3d ed. 1996)). See also Ocean Electric Company v. Hughes Laboratories, Inc., 636 So. 2d 112 (Fla. 3d D.C.A. 1994) ("In order to achieve the objective of restoring the plaintiff to a financially equal position had the damage not occurred, damages for loss of personal property are to be measured based upon the market value of the property on the date of the loss[...]the market value of property or goods is determined by looking at the price which would be agreed upon at a voluntary sale between a willing seller and a willing purchaser."); [citing Jacksonville,

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 14

IPmetrics
Intellectual Property Consulting

the wrongful acts, my understanding is the loss of the property at issue is quantifiable by its Fair Market Value (FMV). FMV is generally understood to be the "Price at which a willing seller and a willing buyer will trade."[66] In this section, I will explain the specific methodology that is applicable to the facts of the case to measure such FMV, I proceed to apply the methodology to the facts of the case available as of the date of this report, and conclude as to my opinions of value.

## A. Methodological Considerations

In the economic and financial valuation professions, as well as in civil, tax, and bankruptcy matters, this concept of FMV has been adopted and is often defined by reference to the Internal Revenue Service's definition of FMV, which is as follows:

> *Fair market value (FMV) is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.*[67]

In essence, therefore, to determine the FMV of an asset used in business, such as the FB Page, two sides must be considered; demand and supply. The concept of FMV in a case such as this requires the analysis of a hypothetical negotiation that would have occurred but for the alleged wrongful acts. The outcome of such negotiation would need to make economic sense for both parties; provide both with a better alternative to maintaining the *status quo*.

To quantify FMV, three general methodological approaches have been in generally accepted use:[68]

- The Cost Approach – Derived from the conceptualization that a willing buyer will not pay more for an asset than the cost to obtain (by purchase or construction) an asset of equal utility.
- The Market Approach – Whereby existing unrestricted markets exist, the value of an asset can be determined based on comparable actual

T. & K.W. Ry. v. Peninsular Land, Transp. and Mfg. Co., 27 Fla. at 1, 9 So. at 661; State v. Book, 523 So.2d 636, 638 (Fla. 3d DCA), rev. denied, 534 So.2d 398 (Fla. 1988) And Charles T. McCormick, Damages §44 (1935) (market value defined as sale by leisurely seller to willing buyer).

[66] H.C. Black, Black's Law Dictionary, Rev. 4th Ed. West Publishing 1968, p 716.

[67] IRS Publication 561 (4/2007), Determining the Value of Donated Property: http://www.irs.gov/publications/p561/ar02.html#d0e139.

[68] See, e.g. - American Reliance Insurance Company v. Perez, 689 So. 2d 290 (Fla. 3d D.C.A. 1997) (citing McNayr v. Claughton, 198 So. 2d 366, 368 (Fla. 3d D.C.A.1967) ("in order to translate words into dollar amounts there must be mathematical formulae to consider, and, of course, there are. These are the "three well recognized guides to appraisal: (1) the cost approach; (2) the comparable sales and (3) the income or economic approach." And McNayr v. Claughton, 198 So.2d 366, 368 (Fla. 3d DCA 1967).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 15

IPmetrics
Intellectual Property Consulting

transactions that have taken place and lead to a price expectation for the asset under consideration.

- The Income Approach – The value of an asset to a buyer or seller depends on their respective risk-adjusted expected economic income over the life of the asset.

There are a variety of specific methodologies that stem from these general approaches, their suitability depends on the nature of the subject asset and its use in business, and the availability of information, among other factors. The "Replacement Value" method is often used in the insurance industry and falls within the Cost Approach. The uses of "Market Comparables" in Real Estate, or "Valuation Multiples" in Finance, are methods under the Market Approach. The Discounted Cash Flow method is one example of a method under the Income Approach.

To measure the FMV of a marketing intangible such as the FB Page at issue in this case, the Cost Approach is not a suitable framework. The cost to create a FB page that provides the same linkages to a potential audience does not reflect the economic value of such access. This utility of this type of asset depends to a large extent on the timing of its creation, the competition at the time, and the effectiveness of its promotion. Typically, their utility cannot be replicated.

Generally, there are no organized markets for marketing intangibles and comparability is usually limited. Unlike Real Estate or Financial markets, there are no generally-available price quotations and, in addition, the transactions that do occur do not provide sufficient liquidity to the market to apply past transactions to value current ones.

To quantify the value of an asset such as the FB Page, the Income Approach would require consideration of the expected revenue derived by both seller and buyer from ownership control of the asset. The seller would not be rationally inclined to dispose of an asset for less than what is expected it will generate in the foreseeable future. Similarly, a buyer would not justify a purchase for an amount that is less than the expected benefit of owning the asset.

Given the facts of the case, the information available, and the nature of the property to be valued, it is my professional opinion that the most applicable methodology to value the FB Page at issue in this case is the Income Approach and, specifically, a discounted cash flow analysis considering the economic value expected from the asset, a discount rate reflecting the uncertainty of the business, and reasonable expectation regarding the remaining economic life of the asset.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 16

IPmetrics
Intellectual Property Consulting

## B. Fair Market Value Analysis

The FMV analysis of the FB Page, utilizing the Income Approach, consists of three phases:

1. Determination of the Seller's minimum asking price
2. Determination of the Buyer's maximum bid price
3. Analysis of the negotiation of an agreeable price

The prices in phases 1 and 2 are to be determined based on a discounted cash flow analysis of expected revenue from ownership of the FB Page. In phase 3, the analysis will turn to the negotiation within the range defined by those two prices.

### a) Seller's Minimum Asking Price

To determine the expected revenue from the FB Page from the hypothetical Seller's perspective, I considered the historical revenue Plaintiff was able to obtain online marketing activities centered around the property at issue based on information from Plaintiff's tax returns. In my opinion, this is a suitable indicator of the future economic benefits that a rational operator of the FB Page would have expected to continue to obtain from the monetization strategy in place at the time. The applicable discount rate was determined applying the generally accepted Buildup Method. This is an accepted method in which the discount rate is estimated as the sum of a risk-free rate of return and one or more risk premia representing the required reward to an investor for taking on specific risks.[69] The applicable timeframe for the analysis considered the potential life cycle for the TV show *The Game* which, at the valuation date, had been on the air for 5 seasons and was reasonably expected to air for an additional 5 seasons at the most.[70]

**Revenue** – As detailed in Exhibit 1, during the last two months of 2011 and the first nine months of 2012, Plaintiff received income of $98,162 from Sulia, Inc. in connection to her monetization of the FB Page and related entertainment topic social media activities[71] as discussed in the background section.[72] Considering the specific time frame, the annualized amount of revenue is **$107,273.**[73] Over the next 5 years, this revenue would be reasonably expected to grow. However, considering the show's

[69] See, e.g., Morningstar, SBBI® Valuation Yearbook. 2013, Ch. 3, p 27.
[70] Currently, the show is on its seventh season and has maintained substantial ratings, compatible with the expectation of a 10-season timeframe.
[71] Plaintiff's prominent role in the social media presence of *The Game* undoubtedly played a role in fostering additional commenting and promotional activities of other shows that became additional revenue-generating activities.
[72] Additional income from AdSense advertising on Plaintiff's other internet properties was not taken into account, nor was other income from other employment.
[73] This is 365 days at a weighted-average daily rate of $293.90 (See Exhibit 1).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

ratings and the fan base accrued by the FB Page at the time, the potential market could be expected to be nearing saturation. A conservative assumption for the expected growth rate beyond the valuation date would be based on the notion that the online traffic monetization opportunities would continue to grow only at the rate of growth of the population targeted by the network and show, i.e. at **1.04%** annually.[74] Table 1 shows the Seller's revenue projections based on these considerations.

**Table 1**
**Seller's Revenue Projections**

| Years ending August 31, | Revenue* |
|---|---|
| 2013 | $ 108,392 |
| 2014 | 109,523 |
| 2015 | 110,666 |
| 2016 | 111,821 |
| 2017 | 112,988 |
| Sum | $ 553,390 |

**See Exhibit 1 for details.*

**Discount Rate** – Also detailed in Exhibit 1, the determination of the appropriate discount rate to apply in this valuation considers a risk free rate based on the yields of 5-year US Treasury securities.[75] In addition, the risk and uncertainty associated with the broad online communications industry considers the relevant market rates at the valuation date for the general risk of equity investments, the risk level of the industry, and the small size of the business venture represented by both Sulia, Inc. and the Plaintiff's FB Page business. In addition, intangible marketing assets have incremental risks associated with the uncertainties of their legal standing, the high rate of failures, and other risks. Therefore, it is generally accepted that an additional asset class risk premium is necessary to properly reflect the risk of investing in this type of assets. The total discount rate thus determined, conceptually reflecting what would be the required rate of return for this investment, is **23.32%** per year.

**Net Present Value –** The Seller's minimum asking price is determined by discounting the revenue forecast at the corresponding discount rate. The result is the Net Present Value of the forecasted revenue and is, therefore, an amount that, received at the valuation date, would be equivalent to the

[74] The general US population is expected to grow at 0.76% per year but, broken down by race, the Black or African-American population is expected to grow at 1.04%. (Table 4. Projections of the Population by Sex, Race, and Hispanic Origin for the United States (Census.gov).

[75] Market yield on U.S. Treasury securities at 5-year constant maturity. Board of Governors of the Federal Reserve System, Statistical Release H.15 for August 2012. (http://www.federalreserve.gov/releases/h15/data.htm).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 18

IPmetrics
Intellectual Property Consulting

revenue expected after adjusting for risk. As detailed in Table 2 and Exhibit 1, the Net Present Value from the Seller's perspective amounts to **$306,918**.

**Table 2**
**Seller's Discounted**
**Revenue Projections**

| Years ending August 31, | Discounted Revenue* |
|---|---|
| 2013 | $ 87,899 |
| 2014 | 72,024 |
| 2015 | 59,016 |
| 2016 | 48,357 |
| 2017 | 39,623 |
| **Total** | **$ 306,918** |

**See Exhibit 1 for details.*

In summary, based on generally accepted economic valuation principles, the Seller in this case would not have benefited from accepting a price for the FB Page for an amount less than **$306,918**. The facts of the case indicate, moreover, that prior offers[76] of $15,000 to $85,000 fell well below this minimum asking price. Plaintiffs counter offer[77] of $1.2 million is consistent with this analysis.

**b) Buyer's Maximum Bid Price**

The calculation of the corresponding maximum bid price from the perspective of the hypothetical buyer calls for consideration of the factors driving the economic benefit reasonably expected by this party. In the absence of adequate disclosure of Defendant BET's advertising revenue information, however, as of the date of this report I considered publicly available information regarding the advertising and media industries that is particularly relevant to the analysis.[78]

As discussed in the Background section, advertising is a key revenue driver for media companies like Defendant BET. Advertisers are willing to pay in proportion to the value they perceive and, generally, this is measured by (potential) consumer impressions. Thus, generally the value of a marketing asset like the FB Page is proportional to the number of impressions that it can provide for advertising purposes.

[76] *Amended Complaint* at §14, §29, and §32.
[77] See: BET000106.
[78] It is my understanding that a Motion to Compel Production is yet to be ruled on as of the date of this report.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 19

IPmetrics
Intellectual Property Consulting

From the evidence in the case, it is clear BET personnel saw the value to the company of the existence of the Plaintiff's FB Page before the BET debut of the show in January 2011. MATTOCKS was contacted as early as October 2010,[79] 14 months before the eventual start of season 4. The impact of the FB Page on ratings was acknowledged by BET executives and industry observers based on the exceptional ratings the return of the series in early 2011.[80] The impact of the FB Page was recognized as not only maintaining interest in the series through its long hiatus and providing a record-breaking audience for season 4, but also in generating traffic to the network's own website, at BET.com.[81] In other words, the FB Page was recognized by BET as an important and strategic marketing asset.

As season 5 ended, the FB Page has 6.27 million fans. If BET had to advertise on a broad basis in FB, general estimates would place the cost of such advertising somewhere between $6.7 million[82] and $3.4 million.[83] In this case, however, BET did not spend on advertising for the Plaintiff's FB Page to acquire Fans; rather, Plaintiff MATTOCKS grew the Fan base organically through the interest generated by the content provided through the FB Page. Once the Fan base and the connections to Fans and Friends of Fans are in place, the FB Page does provide a solid means of effectively disseminating marketing communications and maintaining and growing interest in a brand's offerings. That is where the value to the buyer of such internet asset resides.

For the purposes of this report, the determination of the hypothetical buyer's maximum bid price for the property at issue is based on quantifying the expected incremental revenue from the increased audience made available from the very first episode of first BET season. Conceptually, this is the amount of revenue that could be expected to be lost if the FB Page did not contribute to the marketing of BET's products.

Therefore, the steps involved in this process are: determining the incremental ratings impact attributable to the FB Page; calculating the incremental value of the advertising time available on the show, based on the increased ratings; apportioning the incremental advertising revenue to ascertain the reasonable impact of the FB Page; discounting the revenue potential over the reasonable economic life remaining in the show as of the valuation date.

**Incremental Ratings Effect** – The size of the audience that watched *The Game* during season 3 was 0.49 points, indicating 563,000 households or a regular audience of 1.46 million people.[84] As reviewed in the foregoing

[79] Amended Complaint, at §11.
[80] For example, internal communications such as those in: BET001759, BET002311, and BET003165,
[81] See, in particular, Monique Ware and Tracey Cooper's communications in BET001576.
[82] At $1.07 per fan, see above.
[83] At $0.55 per fan, see above.
[84] In 2009-2011 there were 114.9 million households in United States. U.S. Census (Census.gov).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.



sections, considering season 4, airing on Tuesdays during the first three months of 2011, average ratings were 0.86.[85] For season 5, airing on Tuesdays through June 5, 2012, average ratings were 0.85.[86] As of the end of August 2012, therefore, the audience for the show would be reasonably be expected to average 0.86 rating points, equivalent to an audience of 2.65 million people.[87] The incremental ratings for the revival season were thus **0.37**,[88] which is equivalent to an audience of 1.15 million of people.[89] This increment is attributable in large part to the FB Page, as recognized by BET executives at the time, as well as the media, e.g. - *The New York Times*, and *The Hollywood Reporter*.[90] Such increment is attributable to the attraction and consolidation of a significant proportion of the audience to the FB Page as well as the marketing strategy implemented by BET. It is a fact that the FB Page represented a heavily engaged audience, 2.75 times larger (in early 2011) than the typical broadcast audience for *The Game* (in 2009). On the other hand, it has long been recognized that the main drivers of a television show's success are its content and scheduling[91]. Nevertheless, the influence of the latter factor has dramatically been reduced over time by the multiple means of time-shifted watching available to consumers since the *Betamax* Supreme Court decision in 1984.[92] Thus, the show's audience can be attributable to a compounding of content, scheduling and marketing and promotion. The *incremental* audience is mainly due to marketing and promotion, and to a lesser extent the prime-time cable scheduling, but not to the content as the main premise of the plot, characters, and cast remained mostly unchanged. In this context, given the recognition by BET and its clear interest in the reach of marketing messaging through the FB Page,[93] it is my opinion that at least two thirds of the incremental ratings can be reasonably attributed to the FB Page in considering the value to the buyer.

Therefore, for the purposes of valuation, the incremental ratings attributable to the FB Page are: 0.247.

**Incremental Advertising Value** – A cable network's advertising revenue for a commercial spot can generally vary widely. The value of a 30-second spot can be as low as $2,000, or as high as $1 million dollars for a major

[85] Calculated from Tuesday data between January and May, 2011 in BET-004018.
[86] Calculated from Tuesday data between January and May, 2012 in BET-004018.
[87] Calculated considering 119.9 million households, 2.6 people per household per the Census figures.
[88] Directly 0.49 subtracted from 0.86.
[89] Considering 119.9 million households, 2.6 people per household per the Census figures.
[90] New York Times (1/16/2011) [http://www.nytimes.com/2011/01/17/business/media/17bet.html]; and The Hollywood Reporter (1/17/2011) [http://www.hollywoodreporter.com/blogs/live-feed/game-quadrupled-audience-move-bet-72494].
[91] See, *Inter alia*, J.G> Webster and J.J. Wakshlag, "A Theory of Television Program Choice" in: Communication Research, October 1983 vol. 10 no. 4 430-446.
[92] Mainly in reference to the proposition that personal home recording and storage of an entire copyrighted work can be a lawful "fair use" of the work. See: http://www.law.cornell.edu/copyright/cases/464_US_417.htm
[93] E.g. - BET-001576, BET-000182.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 21

IPmetrics
Intellectual Property Consulting

sports event.[94] Given that the rates for these commercials are predicated on ratings, these values can be normalized by analyzing, not the cost per spot, but the cost per ratings point (cpp). The range of cpp during 2011 for the all households demographic was from $17,500 to $19,500.[95] Therefore, the incremental advertising value of a prime-time 30-second spot for season 4 can be estimated as between **$4,317** and **$4,810**. A normal 30-minute episode of The Game, which typically runs 21 minutes of content,[96] leaves 9 minutes for commercials. For this estimation, pending receiving specific revenue information from Defendant BET, if at least 50% of commercial time is available for the network – the rest consisting of house ads and time available for provider allocation – there are nine 30-second commercial spots per episode for BET to sell. At the incremental rates calculated above, the incremental revenue expected per prime-time episode is between **$36,225** and **$40,365**. During the 2011 season, there were 927 airings of the show throughout the year, and 614 in 2012, 515 of which occurred before the end of August.[97] Judging by the ratings information providing, each year the number of off-days and prior-season airings has declined significantly since 2010.[98] As of the end of August, 2012, the length of the prime time season was 22 episodes with 493 additional showings. It is reasonable to assume that in looking forward to the next few seasons over the shows run at BET, 22 episodes per season would get the range of cpp for the ad time noted above, while the 493 remaining showings would be sold for a more typical *daytime cable TV* cost per point of at least $6,600.[99] The associated ratings during 2012 for not-new episodes in all time slots are 0.43.[100] Since this rating is only 50% of the rating for the new-episode/prime-time showings,[101] only 0.22 rating points are considered in valuing the advertising revenue potential of the extended showings. The following table summarizes the range of expect incremental advertising revenue expected from *The Game* in a typical season:

[94] Marketing Communications LLC, The 2014 Thumbnail Media Planner, p 40.
[95] Marketing Communications LLC, The 2011 Thumbnail Media Planner, p 33.
[96] IMDB*Pro*, at: https://pro-labs.imdb.com/title/tt0772137/.
[97] BET-004018.
[98] BET-004018.
[99] Marketing Communications LLC, The 2014 Thumbnail Media Planner, p 36.
[100] BET-004018.
[101] 0.43 compared to 0.86.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 22

IPmetrics
Intellectual Property Consulting

**Table 3**
**Annual Incremental Advertising Revenue Expectations**

| Category | Lower Bound | Upper Bound |
|---|---|---|
| 22 New Episodes (prime time) | $ 854,700 | $ 952,380 |
| 493 other episodes (non-prime time) | 6,338,934 | 6,338,934 |
| **Total** | **$ 7,193,634** | **$ 7,291,314** |

*See: Exhibit 2 for details.*

**Net Present Value –** Based on the same 5-year economic life expectation for the series, and the assumption of growth at the same rate as the target population (1.04% per year), the hypothetical buyers expected incremental revenue is estimated to reach just over $6 million, utilizing only the lower bound estimated revenue from Table 2. Table 3 below shows the full Buyer's Incremental Revenue Projections summing about $37.1 million.

**Table 4**
**Buyer's Incremental Revenue Projections**

| Years ending August 31, | Incremental Revenue |
|---|---|
| 2013 | $ 7,268,699 |
| 2014 | 7,344,548 |
| 2015 | 7,421,188 |
| 2016 | 7,498,629 |
| 2017 | 7,576,877 |
| Sum | $ 37,109,941 |

*See: Exhibit 2 for details.*

Applying the same discount rate (23.32%) determined for the buyer's appraisal of the property as, by the accepted methodology both buyer and seller are assumed to be properly informed as to the risks attached to the property, the net present value of the incremental revenue stream is determined to be **$20,581,708**, as shown on Table 5 (See Exhibit 2 for details).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 23

IPmetrics
Intellectual Property Consulting

**Table 5**
**Buyer's Discounted Incremental Revenue Projections**

| Years ending August 31, | Incremental Revenue |
|---|---|
| 2013 | $ 5,894,416 |
| 2014 | 4,829,846 |
| 2015 | 3,957,544 |
| 2016 | 3,242,785 |
| 2017 | 2,657,117 |
| **Total** | **$ 20,581,708** |

*See: Exhibit 2 for details.*

To determine the likely maximum bid price based on the expected incremental revenue, the final step is a profitability analysis.

**Incremental Net Revenue Expected** – The net revenue that could reasonably be expected from the incremental advertising revenue calculated so far can be estimated by considering the net operating margin of the Media Networks segment of BET's parent company Viacom, Inc. According to Viacom's Form 10-K report for the fiscal year ending September 30, 2012, the closest fiscal year to the valuation date, this segment had a **42.30%** operating margin.[102] This means that the expected incremental operating profit from control of the FB Page would be estimated at $8,706,063 (See Exhibit 2). Relative to the number of Fans the FB Page had at the end of August 2012, this amount represents a value of **$1.39** per Fan, which is compatible with the range of values of a Facebook Fan discussed in the literature, as cited in the previous section of this report.

In summary, based on the ratings increase generated by the return of the show and clearly supported by the FB Page, the hypothetical buyer would be reasonably expected to achieve incremental profits of this amount and, therefore, would find it economically reasonable to offer no more than this amount for control of the FB Page. The buyer's maximum bid price is, therefore, **$8,706,063.**

## C. FMV Conclusions

If the hypothetical buyer and the hypothetical seller were to have negotiated for the sale of the FB Page on or about August 31, 2012, the methodology to estimate the range of FMV negotiations indicates the negotiation range would be between $306,918 and $8,706,063.

[102] The segment had Operating Income of $3,889 million on $9,194 million of revenue. Viacom 10K for Sep. 30, 2012, p 113.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 24

IPmetrics
Intellectual Property Consulting

The hypothetical negotiation would occur between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. In actuality, of course, the seller in this case would likely not have had ready access to BET's ratings and advertising rates. As of the date of this report, I have been able to consider ratings, but BET has not provided revenue information. Nevertheless, the FMV concept relies on a common basis of reasonable knowledge.

The exact course of the negotiation in these equal terms would have likely approached a market price near the mid-point of the negotiating range.[103] In the concept of FMV, both parties must be assumed not to be under a compulsion to sell or buy. That is, the concept calls for assuming BET would not walk away from the negotiation before an agreement was reached, and that MATTOCKS would not accept a price below her minimum ask due to personal circumstances or intimidation. To some extent, the results are consistent with the facts that the Plaintiff had rejected all offers below the minimum ask determined here, although the Defendant proceeded to request the transfer of the FB Page by other means rather than respond to the $1.2 million amount set forth in early 2012.[104]

The estimated FMV of the FB Page at issue is, therefore, found to be approximately **$4,500,000**.[105]

## V. SUMMARY OF OPINIONS

Upon reviewing the documentation listed in Appendix C to this report, performing independent research on the parties' respective economic activities, and informed by my experience in economic analysis, I arrived at the following conclusion in this matter, the bases for which are explained in the preceding sections of this initial report:

> Damages measured by the Fair Market Value of the property at issue, the Facebook Page for the TV Show *The Game* and related "Likes", are **$4,500,000**.

[103] Under certain conditions, economic theory predicts the 50/50 solution would be a market-clearing equilibrium based on the Nobel Prize-winning theories of John Nash. In game theory, the Nash equilibrium is a solution concept of a non-cooperative game involving two or more players, in which each player is assumed to know the equilibrium strategies of the other players, and no player has anything to gain by changing only their own strategy.
[104] BET000106.
[105] The exact mid-point being $4,506,490.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 25

IPmetrics
Intellectual Property Consulting

The foregoing conclusions are based upon the documents and information reviewed as of the date of this report, and I hold these opinions with a reasonable degree of professional certainty. I hereby reserve the right to amend or supplement these conclusions as additional information and/or documents become available for review and consideration.

Sincerely,

Fernando Torres, MSc
Chief Economist
IPmetrics LLC

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 26

IPmetrics
Intellectual Property Consulting

# EXHIBITS

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 26

IPmetrics
Intellectual Property Consulting

# EXHIBIT 1

**S. Mattocks v. BET, LLC**
***The Game* Facebook Page – Fair Market Value Analysis**
**Valuation for Seller's Minimum Asking Price**
***Valuation Date: August 31, 2012***

## Income Approach

### 1) Expected Annual Revenue[1]

| Fiscal Year | Period | Days | Gross Income | Daily Income |
|---|---|---|---|---|
| 2011 | Nov - Dec | 60 | $ 1,571 | $ 26.18 |
| 2012 | Jan - Sep | 274 | 96,591 | 352.52 |
| Total | | 334 | $ 98,162 | $ 293.90 |
| **Annualized Revenue** | | **365** | **$ 107,273** | |

| | Population Growth |
|---|---|
| **Expected Growth Rate[2]:** | **1.04%** |

### 2) Discount Rate[3]

| Factor | Value | Source |
|---|---|---|
| Risk Free Rate | 0.71% | Market yield on U.S. Treasury securities at 5-year constant maturity. Board of Governors of the Federal Reserve System, Statistical Release H.15 for August 2012. (http://www.federalreserve.gov/releases/h15/data.htm) |
| Equity Risk Premium | 6.14% | Long-horizon expected equity risk premium (supply side). Table C1. Morningstar: 2012 SBBI Valuation Yearbook (data for 12/31/2011). |
| Industry Risk Premium | -1.31% | Communications Services sector (SIC 489) Average for 2011-2012. Table 3-5: Morningstar: 2012 and 2013 SBBI Valuation Yearbook. |
| Micro-Cap Size Premium | 11.77% | Risk premium for market capitalizations below $87 million. Table C1. Morningstar: 2012 SBBI Valuation Yearbook (data for 12/31/2011). |
| Intangible Asset Risk Premium | 6.00% | Additional risk premium for the inherent risk in online intangible assets, based on statistical studies of corporate bond rate spreads for bonds including intangibles as collateral.[4] |
| **Discount Rate** | **23.32%** | |

### 3) Discounted Revenue[5]

| Years ending August 31, | Revenue | Periods | Discount Factor | Discounted Revenue |
|---|---|---|---|---|
| 2013 | $ 108,392 | 1 | 0.8109 | $ 87,899 |
| 2014 | 109,523 | 2 | 0.6576 | 72,024 |
| 2015 | 110,666 | 3 | 0.5333 | 59,016 |
| 2016 | 111,821 | 4 | 0.4325 | 48,357 |
| 2017 | 112,988 | 5 | 0.3507 | 39,623 |
| **Net Present Value** | | | | **$ 306,918** |

Notes:

[1] Source: Plaintiff's IRS Wage and Income Transcript dated: 9/11/2013. Form 1099 Income from Sulia, Inc. only.

[2] Base assumption is fan base of the FB Page is saturated and only growing in proportion to population (Census.Gov).

[3] Calculated applying the *Build-Up* method. See: Morningstar 2012 SBBI Valuation Yearbook, Ch. 3.

[4] See, e.g. M. Loumioti, "The use of intangible assets as loan collateral," Oct. 2011, Harvard Business School White Paper.

[5] Calculated discounting the forecasted revenue over a 5-year time frame (Seasons 6-10).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

# EXHIBIT 2

**S. Mattocks v. BET, LLC**
***The Game* Facebook Page – Fair Market Value Analysis**
**Valuation for Buyer's Maximum Bid Price**
***Valuation Date: August 31, 2012***

## Income Approach

### 1) Expected Incremental Revenue[1]

| Year | Season | Ratings Average |
|---|---|---|
| 2009 | 3 | 0.49 |
| 2011 | 4 | 0.86 |
| 2012 | 5 | 0.85 |
| Incremental | | 0.37 |
| Attribution | | 66.7% |
| **Incremental Ratings** | | **0.247** |

| | Population Growth |
|---|---|
| **Expected Growth Rate[2]:** | **1.04%** |

| Category | Lower | Upper | Source/Reference |
|---|---|---|---|
| Advertising Revenue Per Point | $ 17,500 | $ 19,500 | *(Industry Average)* |
| Incremental Advertising Revenue | $ 4,317 | $ 4,810 | *Per 30-second spot* |
| Num. Spots Available For Sale/Episode | 9 | 9 | *(50% of 9-minutes)* |
| Incremental Ad Revenue Per Episode | $ 38,850 | $ 43,290 | |
| Expected Num. of New Episodes/Year | 22 | 22 | *(As shown in 2012)* |
| **Incremental Revenue (New Episodes)** | **$ 854,700** | **$ 952,380** | |
| Advertising Revenue Per Point (daytime) | $ 6,600 | $ 6,600 | *(Industry Average)* |
| Expected Ratings (not new/non-prime) | 0.22 | 0.22 | *(Adjusted from BET-004018; excludes new episodes)* |
| Incremental Ad Revenue Per Episode | $ 12,858 | $ 12,858 | *(assumes 9 spots/episode)* |
| Num. fo Not New/Non Prime Episodes | 493 | 493 | *(As shown in 2012)* |
| **Incremental Revenue (Other Episodes)** | **$ 6,338,934** | **$ 6,338,934** | |
| **Total Incremental Annual Revenue** | **$ 7,193,634** | **$ 7,291,314** | |

### 2) Discount Rate[3] (See Exhibit 1)

| **Discount Rate** | **23.32%** |
|---|---|

### 3) Discounted Revenue[4]

| Years ending August 31, | Revenue | Periods | Discount Factor | Discounted Revenue |
|---|---|---|---|---|
| 2013 | $ 7,268,699 | 1 | 0.8109 | $ 5,894,416 |
| 2014 | 7,344,548 | 2 | 0.6576 | 4,829,846 |
| 2015 | 7,421,188 | 3 | 0.5333 | 3,957,544 |
| 2016 | 7,498,629 | 4 | 0.4325 | 3,242,785 |
| 2017 | 7,576,877 | 5 | 0.3507 | 2,657,117 |
| **Net Present Value** | | | | **$ 20,581,708** |

### 4) Maximum Bid Price[5]

| Fiscal Year | NPV Incremental Revenue | Net Margin[6] (%) | NPV Incremental Profit |
|---|---|---|---|
| 2012 | $ 20,581,708 | 42.3% | **$ 8,706,063** |

Notes:

[1] Source: BET-004018.

[2] Base assumption is fan base of the FB Page is saturated and only growing in proportion to population (Census.Gov).

[3] Calculated applying the *Build-Up* method. See: Morningstar 2012 SBBI Valuation Yearbook, Ch. 3.

[4] Calculated discounting the forecasted revenue over a 5-year time frame (Seasons 6-10).

[5] Calculated from the Media Networks segment Operating Income ($3,889 million) on revenue ($9,194 million) from Viacom 10K for Sep. 30, 2012, p 113.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 28

IPmetrics
Intellectual Property Consulting

# APPENDICES

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 29

IPmetrics
Intellectual Property Consulting

## APPENDIX A
## QUALIFICATIONS OF FERNANDO TORRES, MSC

Fernando Torres is an intellectual property economist with nearly 30 years of work experience in economics, financial analysis, and business management in the U.S. and Mexico. He is a member and Chief Economist at IPmetrics LLC, an IP consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intangible assets.

Since 2004, Mr. Torres has applied his economics, finance and business experience, as well as skills in quantitative techniques, to the analysis and valuation of intangible assets, including valuation for transactional and litigation purposes (bankruptcy and infringement cases). Prior to joining IPmetrics, Mr. Torres served as Senior Economist at CONSOR® Intellectual Asset Management.

During recent years, Mr. Torres has undertaken projects involving the valuation and/or the assessment of infringement damages regarding copyrights, trademarks, patents, trade secrets, rights of publicity, and other intellectual assets in such industries as commercial agriculture, auto parts, apparel and footwear, retail, pharmaceuticals, entertainment, telecommunications, and non-profit organizations, among others.

Mr. Torres regularly presents on topics related to intangible asset valuation in a variety of venues, many of which qualify for CLE credit. During the past few years, Mr. Torres has been an instructor for the course "Valuing Intangible Assets for Litigation," which is part of the requirements of the Certified Forensic Financial Analyst designation issued by the National Association of Certified Valuation Analysts (NACVA).

Mr. Torres has been particularly active in the area of the copyright and rights of publicity infringement issues, encompassing from the unlicensed use of celebrity images to a class action lawsuit against the major social networking site.

Mr. Torres is also the editor and author of the online Patent Value Guide and his perspectives on the value of patents and other intellectual property assets have been cited in the media, including Managing Intellectual Property, The New York Times, Forbes.com, Business News Network, Business Valuation Resources, and The Democrat & Chronicle.

Mr. Torres is a member of the National Association of Forensic Economics, and of the Western Economics Association International, among others. His career has spanned from academia, to branches of government, to private industry and consulting.

He first earned a B.A. in Economics from the Metropolitan University in Mexico City (1980), and went on to earn a Graduate Diploma in Economics from the University of

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.



East Anglia (U. K., 1981), and a Master of Science Degree specializing in Econometrics from the University of London, England (1982).

Prior to specializing in IP, his career centered on financial analysis and management in the private sector, having been both a brand development consultant and an entrepreneur in several business ventures, mainly in computer services and the health care industry. During the 1980s, Mr. Torres was Professor of Economics at the Metropolitan University in Mexico City, teaching Economic Policy, Economic Growth, Microeconomics, and Quantitative Methods. Mr. Torres was later a financial consultant (NASD Series 7, 63, 65) for half a dozen years with AXA Advisors LLC.

## PROFESSIONAL ASSOCIATIONS

- National Association of Forensic Economics
- American Economic Association
- International Trademark Association
- Western Economics Association International
- Society for Computational Economics

## SPEECHES AND PRESENTATIONS

- "Intellectual Property Valuation Techniques," MCLE presentation, San Diego, CA, April 2013
- "Intellectual Property Valuation and Monetization," a seminar for the Special American Business Internship Training (SABIT) Intellectual Property Rights program, U.S. Department of Commerce. March, 2013.
- "Recent Developments in Intellectual Property Economic Damages," Presentation at the Annual Conference of the National Association of Forensic Economics. June, 2011.
- "Valuing the Intangible: Where to Start?" CLE presentation to Sheppard Mullin Richter & Hampton, LLP. December, 2009.
- "Defending and Enforcing Your Technology." Panelist at: Foley's Emerging Technologies Conference: Navigating a New World – San Diego, CA (Foley & Lardner LLP); September 2009.
- "Intellectual Property Valuation, Monetization and Disposition in Bankruptcy" – CLE presentation at the Spring Trademark Program of the NY Intellectual Property Law Association – New York, NY; June 2009.
- "Damages Valuation and Expert Witnesses" (co-presenter) – CLE presentations to:
    - Gibson, Dunn & Crutcher LLP – Irvine, CA (June, 2008)
    - Arent Fox, LLP — Washington, DC (April, 2008)
    - Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. – Washington, DC (April, 2008)
- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – Fort Lauderdale, FL; December 2007

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 31

IPmetrics
Intellectual Property Consulting

- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – Philadelphia, PA; October 2007
- "Trademark Values in Corporate Restructuring" – Western Economics Association International 82nd Annual Conference – Seattle, WA; July, 2007
- "Entrepreneurship and Innovation" (Session Chair) – Western Economics Association International 82nd Annual Conference – Seattle, WA; July, 2007
- "Alternative Focuses for 'But For' Scenario Specification in Commercial Litigation" (Discussant) – National Association of Forensic Economics, Western Conference – Seattle, WA; June, 2007
- "Patent Values in the Evolving I.P. Market" – Practicing Law Institute – Hot Topic Briefing Teleconference; May 2007 (CLE Presentation)
- "Key Issues in Intellectual Property Due Diligence" – Due Diligence Symposium 2007 – ACG – Iselin, NJ; April 2007
- "Life Sciences IP Due Diligence" – American Conference Institute – San Francisco, CA; January 2007
- "Developments in Patent Valuation" – Practicing Law Institute – San Francisco, CA; January 2007 (CLE Presentation)
- "Collins & Aikman Europe and Other Cross-Border Asset Sales: A Tale of Two Venues" – American Bankruptcy Institute, Winter Leadership Meeting – Phoenix, AZ; December 2006
- "Valuing Intangible Assets for Litigation" (Instructor) – National Association of Certified Valuation Analysts (NACVA) – San Diego, CA; December 2006
- "Effective IP Litigation Support and Valuation" – LeBoeuf, Lamb, Greene & MacRae, LLP – New York, NY; February 2006 (CLE Presentation)

## PUBLICATIONS

- "The Impact of Reorganization on Trademark Values," in: IP Management and Valuation Reporter, March 2012, BVR, Portland, OR.
- "Fundamental Principles of Patent Value," in: IP Management and Valuation Reporter, January 2012, BVR, Portland, OR.
- Book Chapter: "Valuation, Monetization, and Disposition in Bankruptcy" in *IP Operations and Implementation for the 21st Century Corporation*, John Wiley and Sons, Inc. (November, 2011).
- Chapter 15: "Copyrights" in Wiley Guide to Fair Value Under IFRS, John Wiley and Sons, Inc. (May, 2010).
- "The Road to Asia," Feature Article (co-author) in: World Trademark Review, No. 23, February/March 2010, pp. 19-22.
- "Trademark Values in Corporate Restructuring" (July, 2007). Social Sciences Research Network: http://ssrn.com/abstract=1014741

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 32

IPmetrics
Intellectual Property Consulting

- "Establishing Licensing Rates Through Options" (September, 2006) Social Sciences Research Network: http://ssrn.com/abstract=1014743 and in: http://formulatorres.blogspot.com/2006_05_01_archive.html
- Book Chapter: "Ch. 9: Recent developments in Patent Valuation" in: Practicing Law Institute, Patent Law Institute 2007: the Impact of Recent Developments on Your Practice, PLI Course Handbook (March 19, 2007).
- "Establishing Licensing Rates through Options," in: ipFrontline, September 12, 2006 (http://www.ipfrontline.com/depts/article.asp?id=12586&deptid=3).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

# APPENDIX B
# LITIGATION-RELATED EXPERIENCE
# (Since 2010)

| Date Range | Parties | Case No. | Court | Status | Nature | Hired by | Involvement |
|---|---|---|---|---|---|---|---|
| April - 2010 | *Credit Solutions LLC v.* ***KVIS LLC*** | *No. 33-145-00373-09* | American Arbitration Association – (St. Petersburgh, Fla.) | *Closed* | Unfair Competition Claims and trade secret misappropriation | *Karla Gonzalez-Acosta, Esq.* | Damages Expert Report, Deposition and Arbitration Testimony |
| December – 2010 | *In Re: McConnell and* ***Gregg*** | *07D005483* | Superior Court of the State of California – County of Orange | *Closed* | Value of Estate Assets | *Hughes & Sullivan, PPC* | Patent Value Court Testimony |
| November 2010 – March 2011 | *Miller International, Inc. v.* ***Clinch Gear, Inc., et al.*** | *10-CV-01167WDM* | United States District Court for the District Of Colorado | *Settled* | Trademark Infringement | *Quinn Emmanuel* | Expert report on likelihood of trademark confusion |
| June – Nov 2011 | *Gen. C.E. Yeager v.* ***Aviat Aircraft Inc.*** *& S. Horne* | *10-CV-2055* | United States District Court<br><br>Eastern District of California | *Closed* | Rights of Publicity, False Endorsement | *Wilson Elser Moskowitz Edelman & Dicker LLP* | Expert Rebuttal Report and Opinion on Damages |
| June 2011 | ***Hebrew University of Jerusalem*** *v. General Motors LLC* | *10-CV-3790* | United States District Court<br><br>Central District of California | *Closed* | Rights of Publicity, False Endorsement | *Arent Fox* | Expert Damages Report, Deposition |
| June 2011 – Sept. 2011 | ***Laserfiche*** *v. SAP AG, et al.* | *10-CV-7843* | United States District Court<br><br>Central District of California | *Settled* | Trademark Infringement. | *Law Offices of R. Weiss, Buchwalter Nemer,& MaceikoIP* | Expert Damages Report – Rebuttal, Deposition |
| May – July 2011 | *Yellow Pages Photos, Inc.* ***v. User-Friendly Phone Book, LLC, et al.*** | 10-CV-00436 | United States District Court<br><br>Middle District of Florida | *Closed* | *Copyrights Advertising* | *David M. Snyder, PA* | Expert Damages Rebuttal Report |
| February 2012 | ***The Int'l. Aloe Science Council Inc.*** *V. Fruit of the Earth, Inc.* | *11-CV-2255* | United States District Court<br><br>District of Maryland | *Settled* | Trademark Infringement. | *Kane Kessler, P.C.* | Expert Rebuttal Report on Damages, Depositions |

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 34

IPmetrics
Intellectual Property Consulting

| Date Range | Parties | Case No. | Court | Status | Nature | Hired by | Involvement |
|---|---|---|---|---|---|---|---|
| March 2012 | ***A. Fraley, et al*** *v. Facebook, Inc.* | *11-CV-1726* | United States District Court<br>Northern District of California | *Pending* | Rights of Publicity<br>Class Action | *The Arns Law Firm* | Expert Declarations in Support of Motion for Class Certification, Value of Injunctive Relief, Deposition |
| April – May 2012 | ***Estate of Michael Jackson, et al,*** *v. Howard Mann, et al.* | *11-CV-0584* | United States District Court<br>Central District of California | *Settled* | Rights of Publicity | *Katten Muchin Resenman*<br>*Kinsella Weitzman Iser Kump & Aldisert* | Expert Damages Report |
| June – July 2012 | *Bruce Lee Enterprises v.* ***A.V.E.L.A., Inc. Urban Outfitters, Inc., Target Corporation, and Leo Valencia*** | *10-CV-2333* | United States District Court<br>Southern District of New York | *Pending* | Rights of Publicity | *Melissa W. Woo-Allen* | Expert Damages Rebuttal Report |
| Aug – Sept 2012 | *Essy Ghavamedinni v.* ***AEG Facilities, et al.*** | *11-CV-568* | United States District Court<br>Southern District of California | *Settled* | Copyright / Rights of Publicity | *Seyfarth Shaw LLP* | Damages Expert Consulting |
| Aug 2012– | ***J.A. Fry/Fox Network Systems*** *vs Aztec Doberman Pinscher Club of San Diego* | *11–1329 BTM* | United States District Court<br>Southern District of California | *Pending* | Copyright | *Hamilton & McInnis* | Damages Expert Report |
| Oct – Dec 2012 | ***Rock and Roll Religion, Inc. and Defiance USA Inc.*** *vs CELS Enterprises, Inc. and R.Goldman* | 09-cv-05258 | United States District Court<br>Central District of California | *Settled* | Trade-mark | *The Taillieu Law Firm* | Likelihood of Confusion Expert Report |
| Nov – Dec 2012 | ***BSH Home Appliances Corp.*** *v. The Julia Child Foundation for Gastronomy and the Culinary Arts* | *12-cv-11590* | United States District Court<br>District of Massachu–setts | *Settled* | Rights of Publicity | *Miller Barondess, LLP* | Expert Damages Report |

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

| Date Range | Parties | Case No. | Court | Status | Nature | Hired by | Involvement |
|---|---|---|---|---|---|---|---|
| June-July 2013 | *ITC Textiles* ***v. JC Penney & Bluprint*** | *12-02975* | United States District Court<br>Central District of California | *Settled* | Copyright | *Ezra Brutzkus Gubner* | Expert Damages Report |
| July-August 2013 | ***Raul Lizalde, VEBS Inc.*** *v. Advanced Planning Services, Inc., et al.* | *10-0834* | United States District Court<br>Southern District of California | *Settled* | Copyright | *Ward & Hagen LLP* | Preliminary Expert Damages Report |
| August 2013 | *Jude Law v.* ***Paloform Inc.*** | *SC120354* | Superior Court of the State of California (Los Angeles) | *Pending* | Rights of Publicity | *Wilson Elser Moskowitz Edelman & Dicker LLP* | Preliminary Expert Damages Report, Arbitration |
| September – November 2013 | *Scidera, Inc. v.* ***Newsham Choice Genetics, LLC*** | *AAA 16-174-00582-12* | American Arbitration Association | *Closed* | Contract, Database | *Neymaster Goode, PC* | Expert Damages Rebuttal Report, Deposition, Arbitration |
| October 2013 | ***Americeuticals*** *et al V. Bella Medical Products et al* | *13-CV-283* | United States District Court<br>Central District of California | *Settled* | Trademark Infringe-ment | *Hamrick & Evans, LLP* | Expert Damages Report |
| November 2013 | *Imagenetix, Inc.* ***v. Frutarom USA, Inc.*** | *12-CV-02823* | United States District Court<br>Southern District of California | *Pending* | Breach of License/ Contract | *Duane Morris LLP* | Expert Rebuttal Report on Damages |
| December 2013 | ***Soft Serve, Inc. d/b/a/ SPRINKLES v.*** *Sprinkles Cupcakes, LLC* | *13-CV-01782* | U.S. District Court for the District of Columbia | *Pending* | Trademark Infringe-ment | *Wiley Rein LLP* | Expert Damages Report |
| February 2014 | ***Lambert Corp.*** *v. LBJC, Inc.et al.* | *13-CV-0778* | United States District Court<br>Central District of California | *Pending* | Copyright & Trademark Infringe-ment | *Ezra Brutzkus Gubner LLP* | Expert Damages Report, Deposition |

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 36

IPmetrics
Intellectual Property Consulting

## APPENDIX C
## DOCUMENTS AND SOURCES RELIED UPON

In the course of preparing this report, I relied upon the following list of principal documents and sources, as well as the documents and sources cited in the body of the report, including the footnote references.

1) *Amended Complaint,* Case 0:13-cv-61582, Filed October 4, 2013.

2) *Plaintiff's Rule 26 Initial Disclosures*, Filed December 13, 2013.

3) *BET LLC's Rule 26(a)(1) Initial Disclosures*, filed December 18, 2013.

4) *Plaintiff's Reply To Defendant's Verified Response To Plaintiff's Amended Motion To Compel Production*, filed March 31, 2014.

5) *Second Amended Complaint*, Filed March 13, 2014.

6) Documents Produced by Defendant BET identified as:

   a. BET-003193

   b. BET-003452–60

   c. BET-000064-70

   d. BET-000029-30

   e. BET-000901-6

   f. BET-000056, 58, 248, 361, 366, 810, 1184, 1303, 1445, 1497, 1576, 1583, 1594, 1664, 1733, 1759, 1777, 1853, 1861, 1894, 2055, 2067, 2085, 2086, 2094, 2098, 2114, 2222, 2229, 2311, 2347, 2390, 2659, 2691, 2813, 2864, 3158, 3165, 3170, 3171, 3172, 3252, 3309, 3314, 3517, 3547, 3555, 3628, 3888

   g. BET-004014, 15, 16, 17, 18, 106

7) Documents Produced by Plaintiff MATTOCKS identified as:

   a. MAT00000184

   b. IRS Wage and Income Transcript dated 9/11/2013

8) Viacom, Inc. Form 10K filed Nov. 14, 2013.

9) Facebook: (www.facebook.com).

10) Google Trends data. (www.google.com/trends/).

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**
Expert Report of Fernando Torres, MSc
Page 37

IPmetrics
Intellectual Property Consulting

11) Business Insider, at www.businessinsider.com.

12) comScore, at: www.comscore.com.

13) Advertising Age, at: www.adage.com.

14) WebTrends, at www.webtrends.com

15) Internet Movie Database – Professional at: pro-labs.imdb.com.

16) Nielsen Company at: audiencewatch.nielsen.com.

17) U.S. Census Bureau at: Census.gov.

18) H.L. Vogel, Entertainment Industry Economics, 8th Ed., 2011, Cambridge University Press.

19) S.P. Anderson and J. Gabszewicz, The Media and Advertising: a Tale of Two-Sided Markets.

20) The New York Times, January 16, 2011.

21) Facebook, Inc., Form S-1, amended, filed April 23, 2012.

22) Sulia at: www.sulia.com.

23) IRS Publication 561 (4/2007), at: www.irs.gov.

24) Morningstar, SBBI® Valuation Yearbook. 2013.

25) Marketing Communications LLC, The 2014 Thumbnail Media Planner.

26) Marketing Communications LLC, The 2011 Thumbnail Media Planner.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.

TRIPP SCOTT, P.A.
S. Mattocks v. BET
April 8, 2014

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
Expert Report of Fernando Torres, MSc
Page 38

IPmetrics
Intellectual Property Consulting

**APPENDIX D**
**COMPENSATION**

IPmetrics is being compensated on this project at a rate of $300 per hour for all services related to the production of this report. Deposition and/or trial testimony will be billed at the rate of $375 per hour. Expenses are not included in the above fee and are billed separately.

IPmetrics' compensation is not dependent, in any way, upon the conclusions reached during the performance of the analysis.

© 2014 IPmetrics LLC - Dissemination may be subject to the Court Protective Order.