UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 13-61582-CIV-COHN-SELTZER

STACEY MATTOCKS, an individual,

      Plaintiff,

v.

BLACK ENTERTAINMENT
TELEVISION LLC, a District of Columbia
limited liability company,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, BLACK ENTERTAINMENT TELEVISION LLC ("BET"), by and through its undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P., files this Motion for Summary Judgment, and in support thereof states as follows:

### PRELIMINARY STATEMENT

While retained by BET to co-manage BET's Official Facebook Page for its television series *The Game*, Plaintiff negotiated with BET for a better position. When Plaintiff felt those negotiations reached an impasse, she attempted to exert leverage by severely limiting BET's access to its Official Facebook Page containing its intellectual property, and in doing so breached her agreement with BET. BET notified Mattocks that her breach had terminated the agreement, and advised her that any license to use BET's intellectual property was revoked. BET then designated a different Facebook page as the official Facebook page for *The Game*, and requested that Facebook migrate the "likes" that had been registered by fans of *The Game* to that page. In accordance with its policy and procedure that the "likes" on a Facebook page follow the brand being "liked," Facebook migrated the "likes" to the successor official Facebook page. The migration caused the former official Page to cease operating.

Plaintiff asserts claims against BET for tortious interference with her relationships with Facebook and Twitter (Counts I and II); breach of contract, asserting BET's breach of the Letter Agreement (Count III); breach of "good faith and fair dealing," asserting that a "notice and cure"

provision should be read into the Letter Agreement (Count IV); and conversion, asserting that migration of the "likes" constituted "conversion" by BET of Mattocks' property (Count V).

Plaintiff's claims are utterly without merit and BET is entitled to summary judgment. Plaintiff's tortious interference claims fail because Florida law expressly provides that BET was entitled to protect its own intellectual property and business interests, and because BET cannot be characterized as a "stranger" with respect to the Facebook page and Twitter account Plaintiff used in her role as a paid BET consultant. Plaintiff's contract claim fails because there is no evidence BET breached the terms of the Letter Agreement, and Plaintiff's prior breach precludes her claim. Plaintiff's "good faith and fair dealing" claim fails because there is no express contractual notice-and-cure provision and such a provision cannot be implied by the covenant of good faith and fair dealing. The conversion claim fails because Plaintiff has no legally cognizable property interest in "Likes" registered by Facebook users who are fans of *The Game*.

BET is also entitled to summary judgment because Plaintiff cannot show that she suffered damages as a result of BET's alleged conduct – which is an essential element of each of Plaintiff's claims. Plaintiff's sole basis for seeking damages is the Expert Report of Fernando Torres, which is currently subject to a *Daubert* challenge and which is inadmissible for all of the reasons stated therein. Without that report, Plaintiff cannot show damages resulting from BET's alleged conduct, and accordingly, BET is entitled to summary judgment.

## STATEMENT OF FACTS[1]

### The Television Series *The Game*

From 2006 to 2009, the CW Network (the "CW")[2] aired the television series *The Game,* a dramatic comedy about the lives of professional football players and their wives and girlfriends (the "Series"). In 2009, the CW cancelled the Series. Barnhill Decl., ¶¶ 1-3.

After the Series was cancelled by the CW, BET acquired syndication rights to air seasons 1 through 3 of the Series (collectively, the "Pre-Existing Episodes"). BET began to air re-runs of

---

[1] Deposition transcripts are cited with the last name of the deponent, followed by the transcript citation (page/line). The deposition excerpts are attached hereto in the following order: Mattocks (Ex. A), Torres (Ex. B), Lespinasse (Ex. C), Ware (Ex. D), Moore (Ex. E), Sulia (Ex. F). Declarations are cited with the last name of the declarant, followed by "Decl." Declarations are attached hereto in the following order: Barnhill (Ex G), , Carter –Jenkins (Ex. H), Lespinasse (Ex. I).

[2] The CW Television Network ("the CW") is a television network launched at the beginning of the 2006–2007 television season after its two predecessors, UPN and The WB, ceased independent operations, offering a mixture of programming targeting the 18 to 34 year-old demographic.
http://simple.wikipedia.org/wiki/The_CW_Television_Network

the Series in 2010.  Barnhill Decl., ¶¶ 4-5.  In March, 2010, BET reached an exclusive license
agreement with CBS to produce new episodes of the Series, to premier in January, 2011.
Barnhill Decl., ¶ 6.  The agreement covered Pre-Existing Episodes as well as new episodes of the
Series.  *Id.*  To date, BET has aired 3 new seasons of the Series.  Barnhill Decl., ¶ 7.

**Facebook "Fan" Pages**

Facebook "Fan" Pages are Facebook pages that are created with a specific focus, such as
a corporate brand, a community cause, a celebrity or an institution, that allows fans of that
subject matter to receive information about it, express interest in it, or interact about it.
https://www.facebook.com/page_guidelines.php ("Facebook, TOS, Page Terms"); Hagen
Report, p. 6.[3]  Unlike personal profiles, Facebook Fan Pages are viewable by anyone on
Facebook.  Facebook, TOS, Page Terms.  Facebook treats official, corporate-sponsored Fan
Pages differently than unofficial Fan Pages.  According to Facebook's Terms of Service:

> A Page for a brand, entity (place or organization), or public figure
> may be administered only by an authorized representative of that
> brand, entity (Place or organization) or public figure (an "official
> Page").
>
> Any user may create a Page to express support for or interest in a
> brand, entity (place or organization), or public figure, provided that
> it does not mislead others into thinking it is an official Page, or
> violate someone's rights.  If your Page is not the official Page of a
> brand, entity (place or organization) or public figure, you must:
>> i.   not speak in the voice of, or post content as though
>>      it was coming from, the authorized representative of
>>      the Page's subject matter; and
>> ii.  make clear that the Page is not the official Page of
>>      the brand, entity (place or organization) or public
>>      figure.

Facebook TOS, Page Terms.[4]  *See also* Hagen Report at p. 9, FB e-mails, p. 8.[5]

Facebook users can "like" a Facebook Page (including a Fan Page), or specific postings
on a Facebook Page, by clicking a "like" button provided by Facebook.

> "Liking" on Facebook is a way for Facebook users to share information with each
> other. The "like" button, which is represented by a thumbs-up icon, and the word
> "like" appear next to different types of Facebook content. Liking something on

---

[3] Attached hereto as Exh. J.
[4] Attached hereto as Exh. K.
[5] Copies of e-mails between BET and Facebook are attached hereto as Composite Exh. L, which is referred to as
"FB e-mails, p.___."

Facebook "is an easy way to let someone know that you enjoy it." What does it mean to "Like" something?, Facebook, http://www.facebook.com/help/452446998120360 (last visited Sept. 17, 2013). Liking a Facebook Page "means you are connecting to that Page. When you connect to a Page, it will appear in your timeline and you will appear on the Page as a person who likes that Page. The Page will also be able to post content into your News Feed." What's the difference between liking an item a friend posts and liking a Page?, Facebook, http://www.facebook.com/help/452446998120360 (last visited Sept. 17, 2013).

*Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013).

Any Facebook user who "likes" a piece of content or a particular page remains in control of his or her "like" at all times and is free to "unlike" the page or piece of content as he or she sees fit by clicking the "unlike" button provided by Facebook.  *See*, "How do I unlike something?", www.facebook.com/help/226926007324633, DE 55-1.

**Plaintiff Creates a "Fan" Facebook Page Focused on the Series**

In 2008, when the Series was airing on the CW, Plaintiff created a Facebook page focused on the Series (the "FB Page").  Mattocks, pp. 23/18-25, 24/1, 208/8-25, 209/1; DE 46,¶ 7.  As set forth above, due to Facebook's policies, Plaintiff was limited to posting comments about the Series.  Mattocks, pp. 23/18-25, 24/1-10.  Plaintiff could not, and did not, post any BET- or third-party-owned content from the Series.  *Id.*  Plaintiff also could not hold her FB Page out to the public as the "Official" Series Facebook page.  Facebook, TOS, Page Terms. Plaintiff operated the FB Page as an unofficial "Fan" page until BET retained her services as a social media consultant in or around December, 2010.  Mattocks, pp. 25-27.

**Plaintiff is Retained by BET to Manage the Series' Official FB Page**

Around October 2010, BET learned of the FB Page and contacted Mattocks.  Ware, pp. 52-53; Mattocks, pp. 24/11-25, 25/1-5.  In January 2011, BET agreed to pay Mattocks as a part time social media consultant.  Mattocks, p. 41/2-5.  Mattocks' responsibilities included managing the FB Page, which was no longer just a "Fan" Facebook page, but had become the official, BET-sponsored Facebook Page for the Series.  Mattocks, p. 27/5-17 and Exh. 7.[6]

Because the FB Page was now the official page for the series, BET prominently displayed its trademarks and logos in the top header of the FB Page (Mattocks, p. 27/5-17), encouraged BET's viewers to "like" the FB Page (Lespinasse, p. 46), and provided Mattocks

---

[6] Exhibits to the Mattocks Deposition are attached hereto as Composite Exh. M.

with exclusive content, including links to video clips and photographs, to post to the FB Page. Mattocks, pp. 30/7-14, 136/11-14; Mattocks, Exh. 27; Ware, p. 61/19-25.  Both Mattocks and BET employees posted on the FB Page.  Lespinasse, pp. 47, 81, 85; Mattocks, pp. 34-36.  Most postings took place during the weeks leading up to the premier of a new season of the Series and during its sixteen week run.  Mattocks, Exh. 30.

Mattocks acknowledged that the FB Page was the official FB Page for the Series. Mattocks, Exh. 7.  Indeed, when the FB Page was inexplicably disabled on February 8, 2011, Mattocks contacted FB to get the page reinstated, stating: "I work for BET Network running their fan page for their hit TV show 'The Game.'"  Mattocks, Exh. 28.  BET compensated Plaintiff at a rate of $30 an hour for her services.  Mattocks, p. 137/11-24.  This was the highest hourly rate Mattocks had ever been paid by any employer.  Mattocks, p. 141/2-18.  Over the parties' less than two-year relationship, while the FB Page served as the official BET-sponsored page for *The Game*, the number of Likes grew from 2.3 million to over 6 million.  SAC, DE 46, fn. 3; Mattocks, Exh. 13.

Because the FB Page was the "official" FB Page for the Series, it was imperative for BET to protect its brand and image by exercising control over the content of the Page.  Moore, p. 65. For example, BET had to approve materials not directly obtained from BET before Mattocks could post them.  Mattocks, pp. 185/17-25, 186/1, Exhs. 50 and 51.  Similarly, Mattocks was prohibited from releasing internal ratings information without BET's permission (Mattocks, pp. 183/8-12, 184/2-17, 186/19-25, 187/1-6, Exhs. 48, 49 and 53) and she was told not to release information about the Series without ensuring its accuracy.  Mattocks, Exhs. 48, 53. Mattocks also assisted BET in its enforcement efforts to protect its intellectual property by notifying BET when she discovered third parties streaming episodes of the Series online without permission. Mattocks, pp. 117/21-25, 118/1-17, Exh. 17.

**The Parties Enter into the Letter Agreement Providing BET Access to the FB Page**

In or around February 10, 2011, BET and Mattocks entered into a Letter Agreement. Pursuant to the Letter Agreement, Mattocks gave BET full administrative access to the FB Page and agreed that BET could update the content on the FB Page at BET's "sole discretion."  The Agreement provided as follows:

> This letter confirms our agreement that you will provide BET
> Interactive, LLC ("BET") with administrative access to the
> Facebook page (the "Page") for "The Game" and that BET will not

change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion.

Letter Agreement. DE 46-1; Mattocks, Exh. 14. In her deposition, Mattocks confirmed that under the Letter Agreement, BET was entitled to full administrative access to the FB Page:

> Q:    Okay. What would administrative access, at the time the letter agreement was entered into, have enabled BET to do?
>
> A:    **They could do anything that I could do**.
>
> **
>
> Q:    Isn't it true that at the time of this letter agreement – you have already testified, administrative access meant full access in every respect; isn't that true? Isn't that what administrative access meant at the time that you entered into this letter agreement in February of 2011?
>
> A:    **Yes**.

Mattocks, p. 91/18-21, p. 92/8-15 (emphasis added).

**Plaintiff Breached the Letter Agreement by Demoting BET's Full Access to the FB Page**

After the Letter Agreement was executed, the parties engaged in discussions about the possibility of BET employing Plaintiff on a full time basis. When Plaintiff grew dissatisfied with the status of negotiations in June 2012, she informed BET that she was "demoting" BET's access to the FB Page "until such time as the parties could reach an amicable and mutually beneficial agreement" concerning her potential employment. Mattocks, Exh. 26.[7] That same day, Plaintiff downgraded BET's access to the FB Page, Mattocks, pp. 59-65 and Exhs 9 and 10, thereby depriving BET of its contractually mandated "administrative access" and right to "update the content" at BET's "sole discretion."

In her deposition, Mattocks, after initially testifying inaccurately[8], admitted that after she downgraded BET's access, BET was no longer able to post content:

> Q:    Prior to demoting BET, they were able to post their own content without going through you in any way; isn't that true?

---

[7] Plaintiff admits in her complaint that she demoted BET's access to gain leverage in her employment negotiations with BET. DE 46, ¶ 67 ("In June 2012, <u>following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks demoted BET's Administrative Access status . . .</u>").

[8] Although Mattocks initially maintained at her deposition that she had only demoted BET from Manager to Moderator, which, if true, would have allowed BET to continue to update content on its own, she quickly changed her story when shown proof that just <u>six minutes</u> after demoting BET from Manager to Moderator, she demoted BET all the way down to Insights Analyst, an entirely passive role. Mattocks, pp. 47-49, 59-65, Exhs. 9 & 10.

| | | |
|---|---|---|
| A: | That is correct. | |
| Q: | And after you demoted them, they were unable to post their own content without going through you; isn't that true. | |
| A: | That is correct. | |

Mattocks, p. 62/19-25, p. 63/1-14; p. 86/23-25; p. 87/1-5. *See also* Mattocks, p. 160/19-25, p. 161/1. Due to Plaintiff's calculated breach of the Letter Agreement, BET no longer had the ability to control or update content on the page (whether adding or removing content). Lespinasse, pp. 80/10-19, 84/21-25, 85, 86/2-18; Moore, p. 65/9-16. As a result, BET lost its ability to protect its brand as well as its intellectual property. Moore, p. 65/9-16. BET no longer had the ability, for example, to delete third party materials posted without the intellectual property owner's permission, to delete materials posted in violation of BET's third party contractual obligations, to update or modify false information about the Series, or even delete materials promoting competitive shows or competitively sensitive information. Mattocks, Exhs. 48, 49, 50, 51 53.

On August 27, 2012, BET sent Plaintiff a letter advising her of the breach:

> We regret to inform you that your actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game (the "Game FB Page") materially breaches the letter agreement ("Letter Agreement") between us, dated February 12, 2011 which granted BET rights to the Game FB Page. Accordingly, the Letter Agreement is hereby terminated effective immediately.
>
> Further, BET hereby rescinds any and all rights that may have been previously granted to you directly, implicitly or otherwise, to use BET intellectual property ("BET Material"). You are respectfully directed to cease and desist from using all BET Material in any and all media immediately and further advised that BET expressly reserves its various rights and remedies as copyright and trademark owner in connection with willful infringement of our intellectual property.

Second Amended Complaint ("SAC"), DE 46, ¶ 35 and Ex. B, Mattocks, Exh. 15.

Plaintiff never responded to BET's letter ("the Letter").

**FB Migrates the Likes to BET's Successor Official FB Page for the Series**

Given that BET could no longer access the FB Page, BET had to designate a new official page for *The Game*. BET contacted Facebook to inquire about how best to address the situation and was advised that BET could request Facebook to "migrate" the Likes from the FB Page –

which had been the official BET-sponsored page for the Series prior to the lock-out by Mattocks – to a new official BET-sponsored page.[9]  FB e-mails; Carter-Jenkins Decl., ¶¶ 3, 4.

At BET's request, Facebook then performed a review of the FB Page to determine whether the Likes associated with the FB Page could be migrated to the new official BET-sponsored page.[10]  FB e-mails, pp. 13-14.  In conducting its review, Facebook considered whether the FB Page appeared to represent the brand owner (i.e., an official corporate-sponsored page).  FB e-mails, pp. 20-21.  Facebook retains sole discretion to migrate Likes from one Fan Page to another.  FB e-mails, pp. 13-14.  Facebook TOS, Fan Page ("All migrations are in our discretion and are final.").  Facebook determined the FB Page at issue met Facebook's criteria to migrate the Likes.[11]  Facebook advised BET how to request migrations via a special Facebook tool and indicated that, once requested, the migration would take "roughly" three business days. FB e-mails, pp. 6, 8, 26-27.

On August 27, 2012, BET requested that Facebook migrate the Likes.  Carter-Jenkins Decl., ¶ 5; FB e-mails, p. 28.  Facebook completed the migration on August 31, 2012, which resulted in the automatic removal of the FB Page.  Notably, BET requested only migration of the Likes, not removal of the FB Page.  *Id.*  On Facebook, the migration of Likes from one page to second page is accomplished by "merging" the first page into the second.  In the merger process, only Likes and "check-ins" are transferred to the second page.  Facebook deletes all of the content on the first page.  As Facebook explains:  "Merging Pages combines all your likes and check-ins, but all other content such as posts, photos and the username will be permanently deleted from the page you merge."  Hagen Report at p. 9; Lespinasse, 75/24-25, 76/2-7.  In migrating the Likes, FB followed its own policy that the "fan relationship" is between the fan and the brand and not between the fan and the account holder or administrator, because it is the brand the fan has "liked."  Hagen, p. 10; Torres, p. 38/4-12;  Lespinasse, pp. 71-73.

---

[9]  The successor official FB Page was a page that BET had created months prior.  BET originally created the page in order to ensure that others could not use that page name – in the same way that companies will purchase domain names composed of their brand names to prevent others from buying and using them. Lespinasse, pp. 62-70.  BET's current Official Facebook page for *The Game* is "owned" by, i.e. the Facebook account is maintained in the name of, J.P. Lespinasse, Social Media Director of BET.  Lespinasse Decl., ¶ 8.

[10]  At the same time, at BET's request, Facebook also considered whether three other fan pages could be merged with official BET-sponsored Facebook pages.  These three other fan pages did not relate to *The Game*; they had to do with other BET television shows.  FB e-mails, pp. 13-14.

[11]  With respect to the three other fan pages Facebook reviewed, Facebook determined that two were not appropriate for migration of the "likes" because they were neither affiliated with the brand owner nor corporately sponsored. See FB e-mails, pp. 21-22; Lespinasse Decl., ¶¶ 5, 6.

**Plaintiff Commences this Action**

Plaintiff filed this action on July 22, 2013, and on March 13, 2014, filed a Second Amended Complaint ("SAC") (DE 46), asserting the following claims: Count I, Tortious Interference (with Plaintiff's relationship with FB);  Count II, Tortious Interference (with Plaintiff's relationship with Twitter);  Count III, Breach of Contract (asserting BET's breach of the Letter Agreement); Count IV, Breach of Good Faith and Fair Dealing (asserting a notice and cure provision should be read into the Letter Agreement); and Count V, Conversion (asserting a property interest in the Likes on the FB Page and conversion of those Likes by BET).  BET moved to dismiss the SAC on March 28, 2014, and that motion is currently pending.  DE 55. During discovery, Plaintiff produced an expert report purporting to show damages of $4.5 million based on the alleged "fair market value" of the FB Page in August 2012.  That expert report is currently the subject of a *Daubert* motion.  DE 69.

<u>ARGUMENT</u>

Summary judgment is appropriate "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party properly supports its motion for summary judgment, the non-moving party must establish a genuine issue of material fact in order to preclude a grant of summary judgment. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48.  Applying this standard, it is clear that BET is entitled to summary judgment on all of Plaintiff's claims.

**BET IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON ALL OF PLAINTIFF'S CLAIMS**

Based on the undisputed facts, BET is entitled to summary judgment as to liability on all of Plaintiff's claims.  BET is also entitled to summary judgment because Plaintiff cannot show that she has suffered any damages as a result of BET's alleged actions.

**A.     BET is Entitled to Summary Judgment on Plaintiff's Tortious Interference Claims (Counts I and II).**

Plaintiff attempts to characterize BET's remedial efforts after her material breach of the Letter Agreement as "tortious interference" with her contracts with FB and Twitter.  *See* SAC,

DE 46, ¶¶ 56, 61.  The tortious interference claims fail as a matter of law because Plaintiff cannot establish an essential element of those claims – that BET acted without justification.

To establish a cause of action for tortious interference with a contract or business relationship, Plaintiff must demonstrate

> (1) the existence of a contract or business relationship; (2) BET's knowledge of the contract or business relationship; (3) an intentional and unjustified interference with the contract or relationship by BET; and (4) damage to the plaintiff as a result of the breach of the contract or relationship.

*Hamilton v. Suntrust Mortg. Inc.,* --- F.Supp.2d ---, 2014 WL 1285868 (S.D. Fla. March 28, 2014) (emphasis supplied).[12]  Plaintiff cannot establish the third element for two reasons.

First, "[a]s a matter of law, '[t]here can be no claim [for tortious interference with a business relationship] where the action complained of is undertaken to safeguard or promote one's financial or economic interest.'"  *Gunder's Auto Center v. State Farm Mut. Auto. Ins. Co.* 422 Fed. App'x 819, 822 (11th Cir. 2011) (quoting *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So.2d 281, 293 (Fla. Dist. Ct. App. 2007) (second alteration in original)); *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1339-40 (S.D. Fla. 2007).  Here, it is undisputed that BET acted to protect its business and financial interests.  Second, there can be no tortious interference claim unless the defendant is a "stranger" to the contract or business relationship, meaning that the defendant has no "beneficial or economic interest in, or control over, that relationship."  *Treco Intern. S.A. v. Kromka*, 706 F.Supp.2d 1283, 1289 (S.D. Fla. 2010) (emphasis and citation omitted); *see also Romika-USA*, 514 F. Supp. 2d at 1338-39; *W.D. Sales and Brokerage LLC v. Barnhill's Buffet of Tenn., Inc.*, 362 Fed. App'x. 143 (11th Cir. 2010).  Here, it is undisputed that Mattocks was working as a BET consultant in operating the FB Page and Twitter account to promote *The Game*, and that BET had a beneficial or economic interest, or control over, the content posted to the FB Page and Twitter account.

Florida law recognizes the principle that actions taken to safeguard or protect one's financial interests are privileged.  For example, in *Horizons Rehabilitation, Inc. v. Health Care And Retirement Corp.*, 810 So. 2d 958, 964 (Fla. 5th DCA 2002), the Court entered summary

---

[12] "Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship."  *Cent. States, S.E. & S.W. v. Fla. Soc'y of Pathologists*, 824 So.2d 935, 940 (Fla. 5th DCA 2002).

judgment for the defendant on a tortious interference claim, finding his actions justified:  "Under Florida law, a party is privileged to act, and his actions are non-actionable, if the actions are taken to safeguard or promote the party's own financial interests."  *See also Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1222 (Fla. 3d DCA 1980) ("No cause of action for intentional interference exists which is the consequence of a rightful action."); Restatement (Second) of Torts § 773, Asserting a Bona Fide Claim (Illustration 1 and Reporter's Note) (a party's honest belief that he has the interest is sufficient).

Plaintiff's decision to restrict BET's access to the FB Page placed BET in an untenable position of not being able to control or protect its brand or intellectual property.  Moore, p. 65/9-16.  BET lost control over all of the existing branding and content on the FB Page and lost the ability to, among other things:  (i) delete third party materials posted without the intellectual property owner's permission, (ii) delete materials posted in violation of BET third party contractual obligations, (iii) update or modify false information about the Series, or (iv) delete materials promoting competitive shows or competitively sensitive information.  Moore, p. 46; Mattocks, Exhs. 48, 49, 50, 51 53.  BET could not, under the circumstances, simply allow Plaintiff to continue to control BET's official FB Page.  As explained by BET's Executive Vice President of Digital Media and Head of Strategy and Business Development:

> So when it became clear that we no longer controlled the official Facebook page and that Stacey was not adhering to the full suite of activities that were consistent with the way we wanted our brand and our intellectual property represented, it was clear that we actually had a problem and that she needed to cease you know operating the then Facebook page.

Moore, p. 65/9-16.

Mattocks does not dispute the foregoing, and instead asserts that BET could still have asked her to post materials (which she may or may not have complied with).  Mattocks, p. 85/1-18.  That assertion is immaterial.  Mattocks' actions deprived BET of control over its intellectual property and brand on Facebook and Twitter, and under Florida law, BET's actions to protect its business interests negate an essential element of Plaintiff's tortious interference claims.

It is undisputed that BET took reasonable action to protect its own brand and intellectual property.  BET revoked any rights Mattocks may have had and directed her "to cease and desist from using <u>all BET Material in any and all media immediately</u>," SAC, ¶¶ 35, 36.  BET also reestablished control over the official Facebook fan page for *The Game* by requesting that

Facebook migrate the "Likes" from the page that Mattocks improperly sought to control to another fan page for *The Game* established by BET.  Lespinasse Decl., ¶ 7; Carter-Jenkins Decl., ¶ 5; FB e-mails, p. 28.  In addition, BET requested that Twitter disable the account that Mattocks was using to promote *The Game* in her capacity as a BET consultant.  Lespinasse, pp. 87/14-25, 88/12-16.  All of these actions were taken to protect BET's legitimate business interests.  Accordingly, Plaintiff's claims for tortious interference fail as a matter of law.  *See, e.g., Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC***,**  No. 09-61490, 2011 WL 2174012 *15 (S.D. Fla. June 2, 2011) (granting summary judgment on tortious interference claim; <u>plaintiff's complaint lodged with Google that resulted in defendant being prevented by Google from advertising using plaintiff's intellectual property was justified</u>)*;  Liebherr-Mining Equipment Colmar SAS v. Castec, Inc.*, No 11-22887, 2013 WL 85179 *7 (S.D. Fla. Jan 7, 2013) (entering summary judgment on tortious interference claim finding actions were privileged);  *Ice Portal, Inc. v. VFM Leonardo, Inc.,* No. 09-60230, 2010 WL 2351463 *7-*11 (S.D. Fla. 2010) (entering summary judgment on tortious interference claim based on justification);  *Barco Holdings***,** 967 So. 2d at 293 (tortious interference requires a showing of both an intent to damage the business relationship <u>and a lack of justification to take the action which caused the damage,</u> entering summary judgment for defendant).

  Plaintiff's tortious interference claims fail for the additional reason that BET was not a stranger to Plaintiff's business relationships with Facebook and Twitter.  It is undisputed that Plaintiff was working as a BET consultant in promoting *The Game* on the FB Page and Twitter account at issue and that BET had sole authority to authorize the posting of BET's copyrighted content to the FB Page and Twitter account.  Mattocks, pp. 173, 21-25, 174/1-3, 185-186/1.  It is also undisputed that under the Letter Agreement, BET had administrative access to the FB Page and had the right to update the content posted to the page at its sole discretion.  Mattocks, Exh. 14.  Given these undisputed facts, BET's actions were justified.  Under Florida law, BET had a "beneficial or economic interest in, or control over" the content posted to the FB Page and Twitter account, including a "supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed."  *Hamilton*, --- F.Supp.2d ---, 2014 WL 1285868*,* at *6 (citations omitted).  Accordingly, BET is entitled to summary judgment on Plaintiff's tortious interference claims.  *Romika-USA, Inc*., 514 F. Supp. 2d at 1338-39 (holding

that defendant was not a stranger to the business relationship at issue; granting summary judgment to defendant on tortious interference claim).

**B.      BET is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim (Count III).**

Plaintiff's breach of contract claim fails for two independent reasons.  *First*, the alleged breach does not violate the plain terms of the Letter Agreement.  *Second*, even assuming a breach, summary judgment is warranted due to Plaintiff's undisputed prior breach.

**1.      BET did not breach the terms of the parties' Letter Agreement.**

In order to prevail on her breach of contract claim, Plaintiff must establish that BET breached the parties' Letter Agreement.  *See Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.,* 941 So. 2d 396, 398 (Fla. 4th DCA 2006) (the elements of a breach of contract action are: (1) a valid contract; (2) a breach; and (3) damages).  Here, plaintiff alleges that BET breached the Letter Agreement by requesting that Facebook remove the FB Page without providing Mattocks any notice, thereby excluding Mattocks from the FB Page.  SAC, DE 46, ¶¶ 69, 70.[13]

Nothing in the Letter Agreement precluded BET from taking the action it did to protect its intellectual property and brand.  To the contrary, with respect to BET's obligations, the Letter Agreement provides only that "**BET will not change the administrative rights to the Page to exclude you [Plaintiff] from the Page.**"  DE 46-1 (emphasis added).  Here, there is no evidence that BET ever changed Plaintiff's administrative rights to the FB Page, much less that BET changed such rights in order to exclude Plaintiff from the FB Page.  It is undisputed that BET did not change Plaintiff's administrative rights to the FB Page in any way.  FB e-mails, p. 28.

Furthermore, there is no evidence that BET ever requested Facebook to remove the FB Page (with or without notice to Plaintiff).  As discussed above, BET requested that Facebook migrate the "Likes" from the FB Page to the successor official fan page for *The Game*.  Facebook reviewed the matter and elected in its sole discretion to authorize the migration of the "Likes" by merging the FB Page into the new official fan page.[14]  Facebook's merger process resulted in the automatic deletion of all content from the FB Page.  Hagen Report at p. 9; Lespinasse, 75/24-25, 76/2-7.

---

[13] These allegations were made by Plaintiff "upon information and belief."  DE 46, ¶ 69.

[14] The Facebook Terms of Service, Pages Terms, provides, "All migrations are at our discretion and are final." *Facebook Pages Terms*, Section II.B., *available at* https://www.facebook.com/page_guidelines.php.

Even if Plaintiff could proffer evidence that BET requested removal of the FB Page, such evidence would be immaterial to Plaintiff's breach of contract claim. As Plaintiff conceded in opposing BET's Motion to Dismiss the SAC, the Letter Agreement is completely silent with respect to the parties' respective rights to request removal of the FB Page. DE 60, at 10 ("While the Letter Agreement provided that BET would not change the administrative rights to exclude Mattocks from the FB Page, there was no language addressing the possibility of the complete removal of the FB Page" (emphasis supplied)). In light of the foregoing, Plaintiff cannot point to any provision of the Letter Agreement that BET breached, and Plaintiff's breach of contract claim fails as a matter of law.

### 2. Plaintiff's Claim is Precluded By Her Prior Breach of the Letter Agreement.

Even assuming that Plaintiff could proffer evidence of a breach by BET, summary judgment in BET's favor would nonetheless be required given Plaintiff's undisputed prior breach of the Letter Agreement. "It is a fundamental principle of Florida contract law that a material breach by one party excuses the performance by the other." *Hamilton v. Suntrust Mortg. Inc.,* No. 13-60749, 2014 WL 1285859, * 7 (S.D. Fla. March 25, 2014); *see also Toyota Tsusho Am., Inc. v. Crittenden*, 732 So.2d 472, 477 (Fla. 5th DCA 1999) ("When a nonbreaching party to a contract is confronted with a breach by the other party, the nonbreaching party may stop performance, treating the breach as a discharge of its contractual liability.").

There is no genuine dispute that Plaintiff was in breach of the parties' Letter Agreement when BET requested that Facebook migrate the Likes from the FB Page to the new official fan page for *The Game*. Plaintiff 's own Complaint makes clear that she demoted BET's access to the FB Page before BET notified Plaintiff of the termination of the Letter Agreement and contacted Facebook requesting migration of the Likes. SAC ¶¶ 67-68.[15] Plaintiff admitted in her deposition that she demoted BET's access to the FB Page when she was not satisfied with the parties' negotiations, and that as a result of her action, BET was *unable* to "update content on the FB Page by responding to and deleting user comments, sending messages to followers, and creating advertisements." Mattocks pp. 62/19-25; 63/1-14; 86/ 23-25; 87/1-5; 160/19-25; 161/1. Plaintiff's action was in direct violation of BET's express rights under the Letter Agreement, which granted

---

[15] In addition, Plaintiff's Complaint makes clear that she demoted BET's access in order to exert leverage in her employment negotiations. DE 46, ¶¶ 33, 67.

BET administrative access to the FB Page and the right to update the content on the FB Page in BET's "sole discretion."  Mattocks, Exh. 14.

Plaintiff's alleged reasoning for breaching the agreement – that she was afraid that BET would "lock her out" of the FB Page (Mattocks, pp. 190/13-25, 191/6-21) – is irrelevant.[16]  Plaintiff was in material breach of the Letter Agreement in June 2012, and any and all actions BET took thereafter cannot as a matter of law constitute a breach of the Letter Agreement.  Accordingly, BET is entitled to summary judgment on Mattocks' breach of contract claim.

### C.    Plaintiff's "Good Faith and Fair Dealing" Claim Is Without Merit.

Plaintiff alleges that BET breached the implied covenant of good faith and fair dealing by failing to provide Plaintiff with "notice or opportunity to cure her alleged breaches."  (DE 46, ¶ 80).[17]  The parties' Letter Agreement contained no such notice-and-cure provision, and BET is entitled to summary judgment on Plaintiff's good faith and fair dealing claim both because the implied covenant does not relate to the performance of an actual term of the Letter Agreement and because the implied covenant may not be used to substantively rewrite the parties' contract.

Under Florida law, the duty of good faith and fair dealing is not an independent claim; instead, it must relate to an express term of the contract.  "Because the implied covenant is not a stated contractual term, to operate it attaches to the performance of a specific or express contractual provision."  *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 896 So. 2d

---

[16] In apparent anticipation of BET's defenses to any claim of breach, in her Second Amended Complaint, Plaintiff asserts the following "excuse":
"In June 2012, following an impasse between Mattocks and BET over Mattocks' potential employment, Mattocks **demoted** BET's Administrative Access status from "Manager" to "Moderator."  **Critically**, however, she did not revoke BET's Administrative Access and **BET could still update content on the FB Page by responding to and delete user comments, sending messages to followers, and creating advertisements**."  SAC ¶¶ 67, 76 (Emphasis added).  Ultimately, Plaintiff admitted these allegations were false, and that BET had been demoted to the lowest level and did not retain the ability to do any of the tasks which she had alleged as "critical."  *See* Mattocks, pp. 47-49, 59-65, Exhs. 9 and 10.

[17] To prevail on a claim for breach of good faith and fair dealing, Plaintiff must show that:  (1) the parties entered into a contract; (2) Plaintiff did all, or substantially all, of the significant things contractually required; (3) all conditions required for Defendant's performance had occurred; (4) Defendant's actions [or omissions] unfairly interfered with Plaintiff's receipt of the contract's benefits; (5) Defendant's conduct did not comport with Plaintiff's reasonable contractual expectations under a specific part of the contract; and (6) Plaintiff was harmed by Defendant's conduct.  *In re Standard Jury Instructions--Contract and Business Cases*, 116 So. 3d 284, 322 (Fla. 2013).  Plaintiff cannot plausibly contend that BET's assertion of its intellectual property rights over the FB Page did not comport with her reasonable contractual expectations.  The Facebook rules she agreed to provide that Facebook will disable accounts that violate others' intellectual property rights.  *See* Exhibit C to Second Amended Complaint, Protecting Other People's Rights, ¶¶ 1, 4.  Moreover, Plaintiff acknowledged her understanding that BET could withdraw permission to use its intellectual property at any time.  Mattocks, p. 106/6-10.

787, 792 (Fla. 2d DCA 2005) (emphasis supplied). Thus, "[t]here can be no cause of action for a breach of the implied covenant 'absent an allegation that an express term of the contract has been breached.'" *Id.* (quoting *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So.2d 1232 (Fla. 4th DCA 2001)). Here, Plaintiff cannot point to any express provision of the Letter Agreement that requires notice and an opportunity to cure. For this reason alone, Plaintiff's claim fails. *E.g.*, *Progressive Am. Ins. Co. v. Rural/Metro Corp. of Fla.*, 994 So.2d 1202, 1207-08 (Fla. App. 5 Dist. 2008) ("As in *Snow*, [defendant] "cannot use the implied duty of good faith to create a duty which does not otherwise exist.").

Furthermore, Plaintiff's attempt to rewrite the Agreement to include a notice-and-cure provision is also unavailing. The law is clear that Plaintiff may not rely on the implied covenant of good faith and fair dealing to create an obligation that does not otherwise exist. *See, e.g., In re Standard Jury Instructions--Contract and Business Cases*, 116 So. 3d 284, 324 (Fla. 2013). Moreover, notice and cure provisions are substantive contractual terms negotiated by the parties; they are not implied by the covenant of good faith and fair dealing. *See, e.g., Point Productions A.G. v. Sony Music Entertainment, Inc.,* No. 93 CIV. 4001 NRB, 2000 WL 1006236 *3 n.9 (S.D.N.Y. July 20, 2000) ("Although both notice and cure provisions are unambiguous, we also take note of evidence proffered by Point that it specifically negotiated for such contractual protections, prior to executing the Agreement."); *Global Horizons, Inc. v. Department of Labor and Industrie*s, No. 38211–3–II.2010 WL 3639917 *5 (Wash. App. Sept. 21, 2010) ("Global aggressively negotiated for a notice and cure provision."); *ALJ Capital I, L.P. v. David J. Joseph Co.,* 841 N.Y.S.2d 217 (Table) *5 (N.Y. Supp. 2007) (" . . the prompt written notice and Cure Period provisions were specifically negotiated by the parties"). For these reasons, BET is entitled to summary judgment on this claim.

> **D.**    **BET Is Entitled to Summary Judgment on Plaintiff's Conversion Claim (Count V).**

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *Special Purpose v. Prime One*, 125 F. Supp. 2d 1093, 1099-1100 (S.D. Fla. 2000). Plaintiff asserts a property interest in the Likes that Facebook users registered on the FB Page, claiming that the Likes "constituted a business interest for [her]." SAC, DE 46, ¶ 85. Because Plaintiff has no property interest in Facebook users' Likes, her conversion claim must be dismissed.

As an initial matter, there is no legal precedent for Plaintiff's assertion of a property interest in Facebook users' Likes of a Facebook page or a Facebook post.  Indeed, Plaintiff concedes that her claim of ownership of Facebook Likes is an issue of first impression (DE 60, p. 15) and Plaintiff's damages expert concedes that without a Court ruling that Plaintiff owns the Likes, his valuation analysis is worthless.  Torres, p. 157/5-12. With no legal precedent to rely upon, this Court must attempt to divine how the Florida Supreme Court would decide the issue, and in so doing must take a conservative rather than innovative approach.  *See Attorney's Title Ins. Fund, Inc. v. Regions Bank,* 491 F. Supp. 2d 1087, 1093, n. 2 (S.D. Fla. 2007); *Cima v. WellPoint Health Networks, Inc.,* 556 F. Supp. 2d 901, 906 (S.D. Ill. 2008).  For the reasons detailed below, this Court should not be the first to hold that an administrator of a Facebook page has a property interest in the "Likes" that Facebook users register on that page.  Instead, this Court should grant summary judgment to BET on Plaintiff's conversion claim.

*First*, the "likes" are an expression of Facebook users' approval of BET's Series, not of their approval of Plaintiff.  In *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013), the Court explained that "liking a political candidate's campaign page communicates the user's approval of the candidate and supports the campaign by associating the user with it."  *Id.* at 386.  Similarly, here, "liking" an FB fan page for a television series indicates a user's approval of the series, not of the person administering the page.  Indeed, Plaintiff's own testimony makes clear that the Likes represent the public's interest in BET's Series, not in Plaintiff herself. [18]

> Q.  And it says that you get the most response on The Game Facebook page when you ask people, you post, "What did you think about tonight's episode?"
> A.  Correct.
> Q.  And that there are more likes the day of a new episode, correct?
> A.  Right.  Correct.
> Q.  And that's what gets people excited and a fever pitch, and that's when your likes go up, correct?
> A.  For the most part, yes.

Mattocks, p. 82/1-12.

*Second*, to the extent a Facebook Like is anyone's "property," it belongs to the particular Facebook user who posted that Like.  *See Bland*, 730 F.3d at 386 (Facebook "likes" constitute protected free speech by user).  A user can express approval of a Page via the "like" button but is

---

[18] Indeed, Plaintiff alleges: "A 'Like' on Facebook is equivalent to a customer's public endorsement of a product."
DE 46, p. 2, n. 1. (emphasis added)

free at any time to withdraw that Like.[19]  The only entity other than the user who can exercise control over the user's Like is Facebook.  It is Facebook that decides whether Likes should be migrated from one page to another under its guideline that Likes follow the brand.  Facebook TOS, Fan Pages; Hagen Report at 9.  Facebook is clear that "All migrations are at our discretion and are final."  FB TOS re: Page Terms, https://www.facebook.com/page_guidelines.php. Further, as Plaintiff's expert admitted, Facebook specifically monetizes the Facebook pages for its own financial benefit.[20]  Torres, p. 64/20-22.  The fact that FB can utilize the "likes" for its own commercial purposes – without any permission of the page owners – should be sufficient proof by itself that the Likes are not "owned" by Plaintiff.

 *Third*, while Plaintiff has suggested that Facebook Likes represent the intangible "good will of a business," that argument fails.  As the court noted in *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1144 (M.D. Fla. 2007), under Florida law:

> Courts have generally been hesitant to extend common law actions for conversion further than to claims for the misappropriation of a tangible chattel or the misappropriation of intangible rights which are identified or merged in a document or other tangible chattel.

Applying Chief Judge Fawcett's analysis here, the Likes associated with the FB Page are neither "tangible chattel" nor "intangible rights which are identified or merged in a document or other tangible chattel."  Instead, the Likes are merely information without any link to tangible property.

 Any reliance upon *In re Estate of Corbin,* 391 So. 2d 731, 733 (Fla. 3d DCA 1980) is unavailing.  In *Corbin*, the Court held – in an "unusual circumstance" involving malfeasance of a trustee – that claims for the conversion of a business "properly extended" to <u>a business's</u> goodwill.  *Id.* at 732-33.  Here, there is no business or other tangible property to which a claim of intangible goodwill could "extend*."  See Hajianpour v. Maleki*, 932 So. 2d 459 (Fla. 4th DCA 2006) (good will attaches to and is dependent upon an existing business entity).  For all of the foregoing reasons, Plaintiff lacks a legally cognizable interest in the Likes and BET is, accordingly, entitled to summary judgment on Plaintiff's conversion claim

---

[19] "How do I unlike something?," *available at* https://www.facebook.com/help/226926007324633?
[20] In fact, Facebook's terms of service permit Facebook to commercially exploit data about its users (the "likes") and advertisers can specifically target users and certain demographics and Facebook will search for Pages focused on brands that target the same requested demographics.  See Hagen Report at p. 8; Torres Depo, p.64.

## E.   BET is Entitled to Summary Judgment Because Plaintiff Cannot Show Damages.

BET is also entitled to summary judgment because Plaintiff cannot show that she has suffered damages as a result of BET's alleged actions.  Plaintiffs' sole damages theory – set forth in the Expert Report of Fernando Torres – is that Plaintiff is entitled to the fair market value of the FB Page as of August 2012, when the Likes registered on that page were migrated to a new official BET-sponsored Facebook Page.  DE 69-1.  Torres asserts that the fair market value of the FB Page at that time was $4.5 million.  *Id.* at 26.[21]  As explained in detail in BET's pending *Daubert* motion, Torres' opinion is impermissibly based on conjecture and on illogical and baseless methodology, requiring exclusion of the entire report.  DE 69.  Without that report, Plaintiff cannot show damages resulting from BET's alleged conduct, which is an essential element of each of her claims.  *See, e.g., TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.,* 491 F.3d 625, 636-37 (7th Cir. 2007) (granting summary judgment for defendant where damages claim was speculative); *Mercedes-Benz, U.S.A. LLC v. Coast Automotive Group, Ltd.,* No. 99-3121, 2006 WL 2830962, at *13 (D.N.J. Sept. 29, 2006) (granting summary judgment where damages could not be proven in light of expert's unreliability under *Daubert* and Rule 702).

As shown in BET's *Daubert* motion, Torres' opinion should be excluded for three independent reasons.  First, his methodology for calculating a fair market value of the FB Page is fatally flawed because Torres:  (a) impermissibly includes BET's purported profits from the FB Page in a damages calculation that is supposed to be based on Plaintiff's future revenue streams; (b) attempts to base his analysis on a hypothetical willing seller and willing buyer in the open market, but there is no open market for a Facebook Page; and (c) relies on a hypothetical negotiation between the parties, which is contrary to state law.  DE 69.

Second, Torres' calculations of Plaintiff's lost profits are speculative and contrary to the record in this case.  For example, Torres attempts to rely on income that Plaintiff derives from the website Sulia.com – a website that purportedly pays Plaintiff for each unique visitor to Sulia from any of Plaintiff's numerous social media accounts on Facebook, Twitter, and other sites.[22]

---

[21] Torres does not ascribe any damages to the removal of Plaintiff's Twitter account.  For that reason alone, BET is entitled to summary judgment on Plaintiff's tortious interference claim for the removal of her Twitter account (Count II).

[22]  Plaintiff would essentially post links on various social media and internet sites entreating visitors to "click through" to Sulia.com.  Plaintiff's relationship with Sulia was not specific to the FB Page and Plaintiff's Sulia

However, both Plaintiff and Sulia have admitted that it is impossible to determine what percentage of Sulia revenue – if any – is attributable to the FB Page as opposed to Plaintiff's many other social media accounts.  Mattocks, p. 21/18-25, p. 22/1-22, p. 23/ 5-13;  Sulia, p. 17/21-25; p. 18/2-3, 5, p. 21/8-12, p. 24/10-17. Contrary to the evidence and Plaintiff's own admissions, Torres assumed that all of Plaintiff's revenue from Sulia for 2011 and 2012 – $98,162 in total – was attributable to the FB Page.  In performing his calculations, Torres also made two additional wholly unwarranted yet critical assumptions:  first, that Plaintiff would have been permitted to utilize BET's intellectual property as an authorized representative of its brand for an additional five years, despite BET's undisputed right to revoke such permission at any time; and second, that *The Game* would have aired for an additional five years, even though Torres did not conduct any research on the average life span of a scripted television series like *The Game*, or even a television series of any genre.  Torres, 121/16-19.  *See, e.g., Fidelity Warranty Services, Inc. v. Firstate Ins. Holdings, Inc.,* 74 So. 3d 506, 514 (Fla. 4th DCA 2011) (income-based business valuation based upon projected future lost profits of five years too speculative where underlying agreement could be terminated on 90 days' notice—future income beyond 90 days too speculative).

Third, even assuming that BET's profits were relevant to a fair market value analysis, Torres' calculations of those profits are flawed is several respects.  Given that BET did not earn any direct revenue from the FB Page, Torres attempts to concoct "indirect" profits that BET may have earned from the promotional utility of the FB Page.  Specifically, Torres tries to credit the FB Page for an alleged "ratings bump" between the Series' last season on a prior network – the CW – and its first season on BET. Torres Report, DE 69-1, pp. 21, 22.  With absolutely no factual basis, Torres attributes 2/3 of the Series' purported ratings increase to the FB Page. Torres, pp. 161-164, 166-168; DE 69-1, p. 20.  Yet Torres conceded that the "Facebook page itself is not responsible for fluctuations in ratings," and that he failed to do any research or perform any analysis that would allow him to identify factors that led the Series to achieve higher ratings on BET than on CW.  Torres, p. 127/9-25.  Torres also employs a completely unsubstantiated advertising revenue calculation to determine the incremental revenue BET would have received from the FB Page. Torres Report, DE 69-1, pp. 20-23.

---

income reflected traffic driven to Sulia.com from *all* of Plaintiff's numerous other social media accounts (Mattocks, p. 21/18-25, p. 22/1-25, p. 23/1-13; Sulia, p. 17/21-25, p. 18/2-3,5, p. 21/8-12, p. 24/10-17).

In light of the foregoing, Plaintiff's damages theory is unreliable and fails as a matter of law. Plaintiff cannot show that BET's alleged actions caused her any damages, or what the amount of those damages are with reasonable certainty.  *See, e.g., Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 432 F. Supp. 2d 1319, 1340 (S.D. Fla. 2006) ("the party must prove <u>both</u> (1) that the defendant's action caused the damage, <u>and</u> (2) that there is some standard by which the amount of damages may be adequately determined"); *see also, Signal Technology, Inc. v. Pennsummit Tubular, LLC*, No. 09-60636, 2010 WL 3033720, *5 (S.D. Fla. Aug. 3, 2010) ("Future damages that may arise from the alleged wrongful conduct are unrecoverable if the fact of their accrual is speculative or their amount or nature unprovable.").

## <u>CONCLUSION</u>

For the foregoing reasons, BET requests the Court to grant summary judgment as to all claims, and to dismiss the instant action.

Respectfully submitted,

GRAY ROBINSON, P.A.
Attorneys for Defendant
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Karen.Stetson@gray-robinson.com
Phone: (305) 416-6880
Fax: (305) 416-6887

By: /s/ Karen Stetson
Karen Stetson
Florida Bar No: 742937
Jonathan L. Gaines
Florida Bar. No. 330361

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via ECF to the parties in the attached Service List on this 27th day of June, 2014.

By:      /s/Karen L. Stetson

## SERVICE LIST

TRIPP SCOTT, P.A.
*Counsel for Plaintiff*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500
Fax: 954.761.8475
Alexander D. Brown, Esq.
adb@trippscott.com
Peter G. Herman, Esq.
pgh@trippscott.com
Adam S. Goldman, Esq.
asg@trippscott.com