UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-61582-CIV-COHN/SELTZER

STACEY MATTOCKS, an individual,

      Plaintiff,

vs.

BLACK ENTERTAINMENT TELEVISION, LLC,
a District of Columbia limited liability company,

      Defendant.

_____/

## ORDER ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ORDER ON DEFENDANT'S MOTION FOR PROTECTIVE ORDER

THIS CAUSE is before the Court on Plaintiff's Amended Motion to Compel Production (DE 33) and Defendant's Objections and Motion for Protective Order as to Plaintiff's Rule 30(b)(6) Deposition Notice (DE 49). These matter were referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the United States District Court for the Southern District of Florida.

## BACKGROUND

Plaintiff Stacey Mattocks ("Mattocks" or "Plaintiff") brings this action against Black Entertainment Television LLC ("BET" or "Defendant"). In a Second Amended Complaint (DE 46), Plaintiff alleges that in 2008 she created a Facebook fan page (the "FB Page") for the television show "The Game"[1] ("the "Show"), which was originally shown on the CW Television Network ("CW"). In May 2009, CW cancelled the Show. Mattocks, however,

---

[1] "The Game is a show that "follows the lives of professional football players and their significant others as they navigate fame, family and friends. www.bet.com/shows/the-game.html." Motion to Dismiss at 1 n.1 (DE 55).

continued to promote the Show on the FB Page in the hope that another network would pick it up and return it to the air.  According to Plaintiff, her efforts generated substantial interest in the Show from Facebook users.  Second Am. Compl. ¶¶ 7-9 (DE 46).

In April 2010, allegedly due in large part to Plaintiff's FB Page (which at the time had 750,000 "Likes"),[2] BET picked up the Show and began to produce new episodes to begin airing in January 2011.  Id. ¶ 10.  In October 2010, BET allegedly recognized the impact Plaintiff's FB Page was having on the Show's popularity (which then had approximately 1.3 million "Likes"); BET asked Plaintiff whether she would post various links and promotional stories about the Show on the FB Page in advance of the January 11, 2011 premier.  In November 2010, BET agreed to pay Plaintiff $30 per hour to work as a social media "freelancer."  And on December 15, 2010, BET submitted to Plaintiff a proposed contract that would have paid her up to $85,000 per year.  Plaintiff refused to execute the contract because the money offered was unreasonably low, because the contract would have stripped her of all rights to the FB Page, and because the FB Page could have been terminated at any time by BET, with or without cause.  Nonetheless, BET allegedly "wined-and-dined" Plaintiff in the weeks leading up to the Show's premier, even flying her to Los Angles for promotional interviews, "red-carpet" treatment, and a screening of the Show's premier.  Id. ¶¶ 11, 13-15.

By the time of the Show's January 11, 2011 premier, the FB page had approximately 3.3 million "Likes."  According to Plaintiff, "the premier was the top ad-supported scripted series premier in cable history and was viewed by 7.7 million viewers.

---

[2] According to the Second Amended Complaint, a "'Like' on Facebook is equivalent to a customer's public endorsement of a product."  Second Am. Compl. f.n. 1 (DE 46).

2

The Show also generated the highest amount of social media buzz of all other prime-time televison shows." In newspaper and magazine articles, BET executives allegedly credited Plaintiff with playing a critical role in reviving interest in the Show and making it a "massive success with viewers." BET again asked whether Plaintiff would transfer ownership of her FB Page to BET; Plaintiff declined. Id. ¶¶ 16-18.

On February 8, 2011, Facebook disabled Plaintiff's Facebook account, including the FB Page. BET subsequently contacted Facebook to inform them that the FB Page should be restored, indicating a "mistake" had been made. The following day, Facebook restored Plaintiff's FB Page. Two days after the FB page had been disabled, on February 10, 2011, BET requested that Plaintiff provide it with "administrative access" to her FB page; this would permit BET to post articles, links, videos, and similar content to the FB Page, in the event Plaintiff's account was ever "mistakenly" disabled again. Id. ¶¶ 19-22. That request was accompanied by a Letter Agreement, which provided:

> This letter confirms our agreement that you will provide BET with administrative access to the Facebook Page for The Game and that BET will not change the administrative rights to the Page and exclude you from the Page. You also agree that BET may update the content of the Page from time to time, as determined by BET in its sole discretion.

Id. ¶ 23. On February 12, 2011, Plaintiff executed the Letter Agreement allegedly because she feared that "her account could be randomly disabled in the future" and "to ensure the FB Page would always remain active and available to the Show's fans." Id. ¶ 24. Shortly thereafter Plaintiff granted BET administrative access. Id. ¶ 25.

In March 2011, Plaintiff created a Twitter account dedicated to the Show. Through this account, Plaintiff posted all of the Facebook links as an additional way to promote

BET.  According to Plaintiff, her Twitter account "rapidly amassed fans of the Show."  Id. ¶ 26.

By June 2011, Plaintiff's FB Page had approximately 5 million "Likes."  Id. ¶ 27.  But in December 2011, BET created its own Facebook page for the Show, allegedly in an attempt to compete with Plaintiff's FB Page.  According to Plaintiff, BET's Facebook page was unable to generate a substantial following.  Id. ¶ 28.  In January 2012, BET verbally offered to acquire all rights in Plaintiff's FB Page and Twitter account for the Show for $15,000; Plaintiff countered with an offer of $1.2 million, a figure allegedly based on the value of certain other businesses' Facebook pages.  At that time, Plaintiff's FB Page had in excess of 5.9 million "Likes."  In March 2012, BET rejected Plaintiff's counter-offer.  Id. ¶¶ 29-30.

On June 18, 2012, BET presented Plaintiff with a proposed contract, whereby Plaintiff would serve as a Social Media Specialist for BET's scripted programming.  Under the terms of the contract, Plaintiff was to "write posts, filter content, engage with fans, etc. on all social media platforms."  The contract also required Plaintiff to relinquish all rights to the FB Page and Twitter account to BET.  In exchange, BET would pay Plaintiff $4,166.66 per month; however, that compensation was limited to a maximum of $50,000 during the 3-year term of the contract.  Three days later, Plaintiff expressed concern over the compensation, the ownership of intellectual property, and the proposed job duties. Plaintiff informed BET that until such time as the parties could reach an agreement, she would "demote" BET's administrative access to the FB Page.  Thereafter, Plaintiff changed BET's administrative access status from "manager" (level 1) to "moderator" (level 3 of 5 levels).  Plaintiff, however, did not "revoke" BET's administrative access; BET allegedly

4

could still "respond to and delete user comments, send messages to followers, and create advertisements."  Id. ¶¶ 32-34.

On August 27, 2012, BET (by letter) "purportedly" terminated the Letter Agreement (effective immediately), "stating that [Plaintiff's] 'actions to restrict and, at times, completely block BET's access to the Facebook Page that you created for The Game materially breaches the Letter Agreement between us, dated February 12, 2011 which granted BET rights to The Game FB Page."  Additionally, BET "purportedly" rescinded any intellectual property rights it previously granted to Plaintiff and ordered her to cease and desist from using such property rights.   Within a few days, Facebook allegedly removed Plaintiff's Facebook  Page and suspended her Twitter account without notice to Plaintiff, allegedly upon the instruction of BET.  At the time, the FB Page had approximately 6.7 million "Likes."  Id. ¶¶ 35-40.  By August 31, 2012, BET's Facebook page for the Show, which previously had approximately 900 "Likes,"  "suddenly had amassed an alleged 6.2 million 'Likes.'"  Id. ¶ 41.

According to Plaintiff, she had generated several "revenue streams" from her Facebook Page, her Twitter account, and her personal website (that was dedicated to the Show and other shows on BET).  When BET had her Facebook Page and Twitter account suspended, Plaintiff's income from these sources ceased.  Id. ¶¶ 42-52.

Plaintiff's Second Amended Complaint asserts state law claims for tortious interference,  breach of contract, breach of good faith and fair dealing, and conversion. Plaintiff seeks consequential damages, punitive damages, interest, a court order requiring Facebook to restore Plaintiff's rights to the Facebook and Twitter accounts, and any other

relief the Court deems just and proper.[3]

### PLAINTIFF'S AMENDED MOTION TO COMPEL PRODUCTION

During discovery, Plaintiff served on Defendant a First Request for Production of Documents;  Defendant responded thereto and objected to certain requests.  Plaintiff now moves the Court to compel Defendant to produce documents responsive to Request No. 7, which seeks "[d]ocuments sufficient to demonstrate the revenue received from The Game, including, but not limited to, advertising revenue, from the beginning of time until the present."  Defendant objected to the Request on the grounds that it seeks irrelevant documents and is not calculated to lead to admissible evidence, is overly broad, and burdensome.  Additionally, Defendant objected on the ground that the Request seeks "highly proprietary, competitively sensitive information."

In its Verified Response to Plaintiff's Amended Motion to Compel Production (DE 48), Defendant argues that it should not be required to produce documents pertaining to the Show's revenue because such documents are "highly confidential and include proprietary and commercially sensitive information."  Response at 2 (DE 48).

There exists no absolute privilege that "immunizes trade secrets and other confidential information from discovery."  Empire of Carolina, Inc. v. Mackle, 108 F.R.D. 323, 326 (S.D. Fla. 1985)(Marcus, J.).  A party seeking to shield its trade secrets or other commercial information "must first establish that the information to be protected is indeed confidential and then demonstrate that its disclosure might be harmful."  Id.  The burden

---

[3]  Defendant has moved to dismiss the Second Amended Complaint (DE 55); that motion remains pending before the District Judge.

then shifts to the party seeking disclosure to establish that discovery of the confidential information is relevant and necessary to the action.  Once these requirements are met, the court must balance "the need for protection of the [confidential information] against the claim of injury resulting from disclosure." Id.; see also Shire Dev. LLC v. Mylan Pharmaceuticals Inc., No. 8:12-cv-1190-T-30AEP, 2013 WL 6858319, at *4 (M.D. Fla. Dec. 30, 2013) (same) (quoting Empire of Carolina).

According to Defendant, it takes numerous measures to keep its internal financial and private sales information confidential.  These measures include:

> (I) restricting access to such confidential information to a limited number of BET's employees; (ii) training and requiring all BET employees with access to this information to strictly maintain the confidentiality of such information pursuant to Viacom's Global Business Practice Statement; and (iii) requiring outside compliance professionals (e.g., auditors) to execute a confidentiality agreement when BET is required to disclose the information as required by law.

Verified Response at 3 (DE 48).

The Court finds that Defendant has demonstrated that the documents sought by Request No. 7 – reflecting revenue received from the Show – are confidential.  See Sommer v. Aronow, No. 95-Civ-9230-LMM, 1996 WL 399820, at *3 (S.D.N.Y. July 16, 1996) ("[T]he profits (or losses) of a business are generally of a confidential nature.") (quoting Corbett v. Free Press Ass'n, 50 F.R.D. 179, 180 (D. Vt. 1970)).  But to shield its confidential commercial information, Defendant must also demonstrate that its disclosure would be harmful.  See Empire of Carolina, 108 F.R.D. at 326 (a party seeking to avoid disclosure of confidential information "bears a heavy burden of demonstrating that disclosure would work a clearly defined and serious injury") (quoting Citicorp v. Interbank

Card Ass'n, 478 F. Supp. 756, 765 (S.D.N.Y. 1979)).

Defendant here contends that disclosure "would be harmful to BET's business because it would not only give BET's competitors visibility into BET's business practices with respect to its primary source of revenue, but it would impact BET's relationship with its various advertisers."  Response at 4 (DE 48).  Defendant provides examples:  "[I]f Advertiser A learned that Advertiser B was paying a lower rate, then Advertiser A could choose to stop doing business with BET if BET did not offer them a lower rate.  And [i]f competitor networks learned what rates BET was charging specific advertisers, then those networks would have a distinct advantage in stealing premium business away from BET."  Id.  "The discovery rules are not intended to forfeit a party's ability to compete effectively in the market by opening up [commercially sensitive or proprietary information] to competitors."  Duracell, Inc. v. SW Consultants, 126 F.R.D. 576, 578 (N.D. Ga. 1989).  The Court, therefore, concludes that the disclosure of the information for which Defendant seeks protection would place Defendant at a competitive disadvantage in the marketplace.

The burden, therefore, shifts to Plaintiff to show that the discovery she seeks – revenues received from the Show – is relevant and necessary to the action.  Plaintiff argues that the documents sought by Request No. 7 are relevant to its damages claim.  More specifically, Plaintiff contends that "as a result of Plaintiff's generation of substantial fan interest in The Game, Defendant reaped the financial benefits of having what Plaintiff believes is one of Defendant's most successful television shows."  Motion at 3 (DE 33).  In support, Plaintiff submits the Declaration of Fernando Torres (DE  38-1).  Torres is an "intellectual property economist" with 30 years experience in "economics, financial analysis, and business management" who Plaintiff has retained as a damages expert.  Torres

8

specializes in the "strategic analysis, valuation, and expert witness assessment of the full range of intangible assets." Torres Decl. ¶¶ 1, 2.  According to Torres, "one of the central aspects of a reliable damages analysis is the quantification of the fair market value[4] of the property at issue," which property in this case is "Plaintiff's Facebook Page for The Game and the Facebook 'Likes' of same."  Id.  ¶ 6.  Torres attests that without an active market for properties, such as this one, "the generally accepted approach" is to "assess both sides of the negotiation and consider and quantify what each party would reasonably expect to gain from the agreement and derive the fair market value from the ensuing negotiation." Id. ¶ 7.  Additionally, Torres opines:

> In this case, the appropriate quantification of the fair market value of the property at issue reasonably invites consideration, among other variables, of its value to each party.  For the Plaintiff, the expected continued advertising and other derivative revenue from the Page.  For the Defendant, namely the expected impact on revenue (subscriptions, advertising, etc.) from incorporating the Page into the marketing and promotional strategy for the show and the network.  Fair market value will then be ascertainable from this double-sided analysis according to generally accepted economic principles. Without revenue information from both perspectives, the fair market value of the property at issue cannot be determined.

Id. ¶ 8.  Torres is "concerned that [he] may not be able to complete an accurate, reliable, and verifiable analysis without the requested revenue information from Defendant."  Id. ¶ 9.

Defendant counters that Plaintiff's "focus on the revenue generated by the exhibition of the Series [The Game], and the revenue generated by the exhibition of the Series on

---

[4]  Torres defines "fair market value" as the "[p]rice at which a willing seller and a willing buyer will trade."  Torres. Decl. ¶ 7 (quoting H.C. Black, Black's Law Dictionary, Rev. 4th Ed. (1968)).

BET is misplaced"; it contends that Plaintiff's alleged damages are not related to the financial success of the Show.  Response at 7 (DE 48).  More specifically, Defendant challenges the method by which by Plaintiff's expert Torres intends to measure Plaintiff's damages; it contends that "Plaintiff's attempt to articulate a connection between her purported damages, through the Declaration of Fernando Torres, fails as a matter of law."  Id. at 9.   According to Defendant, Torres' "double-sided analysis" is known as a "hypothetical negotiation," which is used in patent infringement actions, and to a lesser extent, in trademark and copyright infringement actions.  Defendant contends that the purpose of the "'hypothetical negotiation' is to "either substitute for disgorgement of profits (which unlike in this case are awardable as damages by statute in infringement actions) or to calculate a 'reasonable royalty,' which  again, in infringement actions, [is] the legal measure of damages."  Response at 10 (DE 48) (emphasis in original).  Defendant argues that because Plaintiff has not alleged that Defendant infringed any of Plaintiff's intellectual property rights, the "hypothetical negotiation" is not a proper measure of damages in this case.

Defendant also takes issue with Torres' definition of fair market value as "the price at which a willing seller and a willing buyer will trade."  Torres Decl. ¶ 7.  Defendant argues that "Florida law is clear that fair market value is generally determined by  one of three ways:  the cost approach, the market approach based on comparable sales, and the income approach."  Id. at 11 (citing Am. Reliance Ins. Co. v. Perez, 689 So. 2d 290, 291 (Fla. 3d DCA 1997) and Holly Ridge Ltd. Partnership v. Prichett, 936 So.2d 694, 697 (Fla. 5th DCA 2006)).  It contends that "none of the generally accepted methods of determining

fair market value involves <u>the defendant's profits</u>." <u>Id.</u> (emphasis in original).[5]

With respect to Plaintiff's need for the documents sought, Defendant argues that to the extent Plaintiff is attempting to establish a correlation between The Game and the FB Page (which correlation Defendant denies) it has already provided Plaintiff with a less intrusive means to do so.  According to Defendant, it has produced to Plaintiff Nielsen ratings and is in the process of providing additional Nielsen information at Plaintiff's request.

In reply, Plaintiff summarizes her relevancy argument and her need for the revenue information sought:

> [B]ecause Plaintiff has asserted that she was largely responsible for Defendant bringing The Game back on the air and its continued success, she is entitled to see the revenue Defendant received as a result, in part, of her efforts.  As the documents produced by Defendant show, the Facebook Page has a substantial impact on The Game's ratings, especially during The Games first season on BET.  An increase in ratings has a direct correlation to increased revenue for Defendant, in large part because Defendant could charge advertisers higher rates.
>
> Additionally, Plaintiff's Expert, Fernando Torres, an intellectual property economist with nearly thirty years of experience, provided greater detail on the need for this information when he declared that Defendant's revenue information is relevant

---

[5]  Defendant also argues that its revenues are not relevant because it sells the majority of its advertising up to a year in advance pre-season at locked-in rates to mitigate the risk of paying more during the season if a series becomes popular and because it typically sells its advertising within a prescribed time range during the broadcast day, as opposed to selling advertising for a particular show.   According to Defendant, therefore, "its potential revenue from advertisers is locked in regardless of whether a particular show, including [The Game] was a hit."  Response at 9 (DE 48).  Defendant, however, does acknowledge that at least some advertising is purchased for a specific show title.  The Court believes that this argument goes more to whether responsive documents exist and to Defendant's ability to produce such documents than it does to relevancy.

and important for Plaintiff's damage[s] analysis in that it is important for the quantification of the fair market value of the property at issue; that is, Plaintiff's Facebook Page for The Game . . . . Specifically, using generally accepted economic principles, one of the ways Mr. Torres will calculate the Facebook Page's fair market value is by evaluating and analyzing the impact on revenue from Defendant's incorporation [of] the Facebook Page into the marketing and promotional strategy for The Game and BET.

Reply at 5-6 (DE 56).

With respect to Defendant's challenge to Torres' proposed method of measuring damages, Plaintiff first argues that it is premature. According to Plaintiff, if after Torres has completed his analysis Defendant believes that it is unsound, Defendant may then file a Daubert challenge. Additionally, Plaintiff argues that Defendant's argument that Torres' "double-sided" analysis is limited to damages in infringement actions is without merit. Plaintiff contends that the "double-sided" analysis may also be used to determine damages with respect to her conversion claim. According to Plaintiff, "it is well settled in Florida and other jurisdictions that the measure of damages in an action for conversion is the fair market value of the property at the time of conversion plus legal interest to the date of the verdict." Id. at 7 (quoting Gillette v. Stapleton, 336 So. 2d 1226, 1227 (Fla. 2d DCA 1976)). And with respect to Defendant's challenge to Torres' definition of fair market value because it does not include the "cost approach," the "market approach," or the "income approach," Plaintiff contends that "Defendant confuses the fair market value **standard of value** (i.e. the 'what' to measure) with the valuation **methodology** (the 'how' to measure). Plaintiff explains that in determining the fair market value of the intangible property here (the FB Page), Torres will utilize one or more of the three approaches.

12

Finally, Plaintiff argues that "the income/economic approach essentially values property based on how much money can be derived from that property.  Therefore, Plaintiff can determine the value of the property (i.e. the Facebook Page), in part, on how much revenue Defendant could derive from it."  Id. at 8.  According to Plaintiff, "[o]ne way of measuring this value is by examining the revenue Defendant received from The Game, which would be the measure Defendant used in determining how much it was willing to spend on promoting The Game.  Plaintiff contends that the Nielsen ratings are an inadequate substitute for this analysis because they show only one side of the valuation equation.

After carefully considered the parties' respective arguments, this Court concludes that the confidential information sought – Defendant's revenues derived from The Game – is relevant for discovery purposes.[6]  Under Federal Rule of Civil Procedure 26(b), a party may discover "any non-privileged matter that is relevant to any party's claim or defense and upon a showing of good cause "any matter relevant to the subject matter involved in the action."  Fed. R. Civ. P. 26(b)(1).  Moreover, information need not be admissible at trial, provided the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  Id.  "Even afer the 2000 amendments to Rule 26, it is well established that courts must employ a liberal discovery standard in keeping with the spirit and purpose of the discovery rules."  Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc., No. 05-60860-Civ-Dimitrouleas/Torres, 2007 U.S. Dist. LEXIS 37134, at *5 (S.D. Fla. May 22, 2007) (citations omitted).  "Accordingly, discovery should ordinarily be allowed under the

---

[6]  The undersigned makes no ruling as to the admissibility of evidence.

concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action." Id. (citations omitted).  At the discovery stage, the Court cannot find that Defendant's revenues have no bearing on Plaintiff's damages claim.  Additionally, the Court finds that Plaintiff, through its damages expert Torres, has shown a need for the information.

Because Plaintiff has demonstrated that the confidential information sought – Defendant's revenues – is relevant and necessary to the action, the Court must now balance "the need for protection of the [confidential information] against the claim of injury resulting from disclosure."  Empire of Carolina, 108 F.R.D. at 326.  Although the Court has found that disclosure of Defendant's confidential information sought would place Plaintiff at a competitive disadvantage in the marketplace, Defendant is protected from the harm of disclosure by the parties' confidentiality agreement (which contains an "attorney's eyes' only provision").   See Protective Order Regarding Confidential Materials (DE 37). Accordingly, the Court will require Defendant to produce the information sought by Request No. 7 – "[d]ocuments sufficient to demonstrate the revenue received from The Game, including, but not limited to, advertising revenue. . . ."

Defendant, however, also objects to the temporal scope of Request No. 7 because it requests revenue documents "from the beginning of time until the present," even though "the relationship between Plaintiff and Defendant began in the fall of 2010 and ended in August 2012."  Response at 12 (DE 48).  Plaintiff replies that because she created the Facebook Page before Defendant's involvement with The Game, she is entitled to documents relating to all revenue generated from the show "from the moment Defendant earned revenue from same."  She explains that Request No. 7 uses the term "from the

beginning of time" because she does not know when Defendant began earning such revenue.  Accordingly to Plaintiff, the Request is seeking revenue documentation "from the first instance" in which Defendant  began earning such revenue, that is, since Defendant began airing episodes of the Game in 2010.  She explains that even before Defendant had any involvement with The Game, Plaintiff "had already amassed a significant following on her Facebook Page for The Game, which played an integral role in Defendant electing to pick up The Game and return it to the air.  Plaintiff's impact was also evidenced by the success of The Game with viewers, especially early on, due to the built-in audience Plaintiff had created before The Game even aired on BET."  Reply at 9 (DE 56).

With respect to the "end date" – "to the present" – Plaintiff states that she "will agree that Defendant need not produce any revenue information that was generated after December 31, 2012." Id. at 10.  Plaintiff, however,  also argues that she is entitled to  "any revenue generated, even if not received, prior to January 1, 2014" and that "because Defendant states that it sells the majority of its advertising a year in advance, Plaintiff should be entitled to the advertising revenue generated in 2013, since this revenue would reflect The Game's performance in 2012, when Plaintiff was still in control of her Facebook Page."[7]  Id.  The Court is somewhat confused by Plaintiff's seemingly contradictory statements.  Nonetheless, the Court finds that the appropriate temporal scope is from the time BET began airing The Game on January 11, 2011, through December 31, 2013.

DEFENDANT'S MOTION FOR PROTECTIVE ORDER AS TO RULE 30(b)(6) NOTICE

Plaintiff has served a notice to take a Rule 30(b)(6) deposition of Defendant's

---

[7]  The Court assumes that in arguing that she is entitled to the "revenue generated Plaintiff means documents relating to such revenue, not the actual revenue.

15

corporate representative(s), designating 17[8] topics for examination.  Defendant objected to certain of these topics and now moves the Court for a protective order; it requests that the Court not require it to produce a corporate representative to testify as to 2 of the topics (Topic 4 and Topic 11) and that the Court limit the temporal scope of 3 other topics (Topic 3, Topic 6, and Topic 17).   The Court will address, in turn, the topics at issue.

Defendant first objects to the temporal scope of Topic 3 – "BET's Facebook Page for The Game, including but not limited to, its creation[9] until the present" – and Topic 6 – "The "Likes" on BET's Facebook Page for The Game, including but not limited to their origination, from the beginning of the Facebook Page for The Game until [the] present." Defendant requests that the Court limit the testimony on these topics to a 6 month period – 2 months before and 4 months after the August 27, 2012 termination of the parties' relationship.  It contends that only this period is relevant to Plaintiff's claims, although it fails to explain why.  According to Defendant, Plaintiff agreed to limit her document requests (relating to these subjects) to this period, and Defendant expected Plaintiff to adhere to this agreement for purposes of a Rule 30(b)(6) deposition.  Defendant argues that to prepare its representative to testify as to these matters beyond the 6-month period would be "time consuming, wasteful, and should be precluded."  Reply at 3 (DE 58).

Plaintiff responds that she agreed to the shortened time period with respect to her document requests only to expedite Defendant's document production, but she reserved the right to "reassert the entire timeframe should the need arise."  She argues that

[8] Topics 6 and 7 are duplicates.

[9] Plaintiff alleges that Defendant created its own Facebook Page for "The Game" in December 2011.

testimony on these topics is relevant to her damages analysis.  According to Plaintiff, similarities and differences between how the parties' operated their respective Facebook Page "may reveal the value that contributed to Defendant and to The Game."  Response at 4 (DE 53).  And similarly, "the growth (or reduction) of 'Likes' on Defendant's Facebook Page for The Game has a direct correlation to the value of the Facebook Page for the Game, for which Plaintiff alleges she was primarily responsible.  A comparison of the manner and rate at which Defendant generated 'Likes' over an adequately sampled period after terminating Plaintiff's rights . . . may provide a basis for comparison to the manner and rate a which Plaintiff generated 'Likes,' which may in turn reflect the value Plaintiff contributed to Defendant and the Facebook Page for The Game."  Id. at 4-5.

The Court concludes that a period from the creation of BET's Facebook Page for The Game to one year after the parties' relationship ceased is appropriate.  Accordingly, Defendant shall produce a corporate representative to testify as to Topic 3 and Topic 6 from the creation of the BET's Facebook Page in December 2011 through August 2013.

Defendant next objects to producing a corporate representative to testify as to Topic 4 - "BET's Twitter Account for The Game, including but not limited to, its creation and management" – because the matter is not relevant to any of the claims herein.  All Plaintiff's allegations relate to her Twitter account;[10] no allegations exist as to BET's Twitter

---

[10]   The Second Amended Complaint (DE 46) alleges that in March 2011 Plaintiff created a Twitter account dedicated to The Game, which contained Facebook links "as an additional way to generate traffic for BET," and that on August 27, 2011, BET caused her Twitter account to be suspended.  ¶¶ 26, 40.  The Second Amended Complaint also asserts a claim for tortious interference (Count II), in which Plaintiff alleges that she and Facebook had a contractual relationship "by virtue of Twitter's Terms of Service" and that by directing Twitter to remove her Twitter account under false pretenses, Defendant interfered with that contract. ¶¶ 59, 61.

account.

Plaintiff counters that testimony as to Defendant's Twitter account is relevant for the same reasons that testimony as to Defendant's Facebook account is relevant.  She contends that such testimony regarding the similarities and differences of her and BET's Twitter accounts "may reveal the value that Plaintiff contributed to Defendant and to The Game."[11]  Response at 6 (DE 53).  Plaintiff alleges that Defendant transferred the "Likes" from her Facebook Book page to its own Facebook Page, thus making testimony as to Defendant's Facebook Page at least minimally relevant (for discovery purposes).  Plaintiff, however, makes no similar allegations (or any other allegations) as to Defendant's Twitter account.  Accordingly, Defendant is not required to produce a corporate representative to testify as to Topic 4.

Defendant also objects to Topic 11 - "The revenue generated from The Game , from the beginning of The Game's existence until the present."   The parties' have raised the same arguments as they did with respect to Plaintiff's motion to compel.  For the same reasons as the Court required Defendant to produce documents relating to its revenue, it will also require Defendant to produce a corporate representative to testify to Topic 11, with the same temporal scope – from the time BET began airing The Game on January 11, 2011, through December 31, 2013.

Defendant finally objects to the temporal scope of Topic 17 - "BET's social media

---

[11] Plaintiff additionally argues that testimony as to Defendant's Twitter account "may refute some of the alleged complaints that Defendant has attempted to lodge about Plaintiff's operation of her Twitter Account for The Game."  Response at 6 (DE 53).  Plaintiff, however, fails to identify these complaints or where or when Defendant "has attempted to lodge" them.  Without this information, the Court cannot find that Topic 4 is relevant on this basis.

18

marketing strategies for The Game."  Defendant acknowledges that "the manner in which BET used social media to promote the Series *The Game* <u>during the period of its relationship with Plaintiff</u> is a fair subject of discovery in this matter."  Motion at 7 (DE 49) (emphasis in original).  Defendant also represents that it has provided or will be providing Plaintiff with information as to its "use of Facebook to promote *The Game* for a four month period after the relationship with Plaintiff, [which ended on August 27, 2012]."  It requests that the Court limit the testimony of its corporate represent as to Topic 17 to this period.  Defendant contends that if not so limited, its corporate representative would be required to testify as to its current business planning and strategies, which have no bearing on Plaintiff's claims.

Plaintiff counters that "testimony regarding the importance and value placed by Defendant on its Facebook Page for The Game and Twitter Account in its current marketing and promotional efforts may be relevant to show the internal and external value of same, which Plaintiff maintains was generated in large part from her efforts."  Response at 6 (DE 53).  She further argues that testimony as to Topic 17 "may reflect how Defendant capitalizes on the 'Likes' on Defendant's Facebook Page for The Game, which Plaintiff alleges was wrongfully converted."  Id.

The Court concludes that Plaintiff is entitled to testimony on this Topic for some period after the parties' relationship ceased in August 2012.  The Court, however, believes that the four-month period urged by Defendant is too short and, therefore, limits the scope to a period ending August 31, 2013 – approximately one year after the relationship ceased.

<u>ORDER</u>

Based on the foregoing, it is hereby ORDERED as follows:

19

1.      Plaintiff's Amended Motion to Compel Production (DE 33) is GRANTED.

2.      On or before August 15, 2014, Defendant shall produce to Plaintiff all documents responsive to Request No. 7, as limited by the Court.

3.      Defendant's Motion for Protective Order as to Plaintiff's Rule 30(b)(6) Deposition Notice (DE 49) is GRANTED in part and DENIED in part.

4.      Defendant shall not be required to produce a corporate representative to testify as to Topic 4.

5.      Defendant shall produce a corporate representative to testify as to Topic 3 Topic 6, Topic 11, and Topic 17, as limited by the Court, on a date and time mutually convenient to the parties and counsel.  The deposition(s) shall be completed no later than August 22, 2014.

DONE AND ORDERED in Fort Lauderdale, Florida, this 7th of August 2014.

BARRY S. SELTZER
CHIEF UNITED STATES MAGISTRATE JUDGE

Copies to:

All counsel of record

20