UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-61582-CIV-COHN/SELTZER

STACEY MATTOCKS,

     Plaintiff,

v.

BLACK ENTERTAINMENT
TELEVISION LLC,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment

[DE 70] ("Motion").  The Court has carefully reviewed the Motion and all related filings

and is otherwise fully advised in the premises.[1]

---

[1]  Also pending are several other motions:  Defendant's Motion to Dismiss
Second Amended Complaint [DE 55], Plaintiff's Motion to Exclude or Limit Testimony
and Opinions of Defendant's Expert Guy Hagen [DE 67], Plaintiff's Motion to Exclude or
Limit Testimony and Opinions of Defendant's Expert Aram Sinnreich [DE 68],
Defendant's Motion to Exclude the Report and Testimony of Fernando Torres [DE 69],
and Plaintiffs' Omnibus Motion to Strike Portions of Defendant's Reply in Support of
Motion to Exclude the Report and Testimony of Fernando Torres and Defendant's
Reply in Support of Motion for Summary Judgment, or in the Alternative, Motion for
Leave to File Sur-Replies [DE 91].  Defendant's Motion to Dismiss generally raises the
same arguments presented in the Motion for Summary Judgment.  But the Court finds it
more appropriate to decide these issues based on the summary-judgment record rather
than on the pleadings alone.  Further, because Defendant is entitled to summary
judgment without regard to the disputed expert testimony, the Court need not resolve
the parties' expert-related motions.  Accordingly, all motions other than the Motion for
Summary Judgment will be denied as moot.

I.      **Background**

A.      **Facts**[2]

From 2006 to 2009, the CW Network ("CWN") broadcasted the television series

The Game, a dramatic comedy about the lives of professional football players and their

wives and girlfriends (the "Series").  See DE 71 at 1, ¶ 1 (Def.'s Statement of Material

Facts); DE 83 at 1, ¶ 1 (Pl.'s Resp. to Def.'s Statement of Material Facts).  After CWN

cancelled the Series in 2009, Defendant Black Entertainment Television LLC ("BET")

acquired syndication rights to televise seasons one through three of the Series.

See DE 71 at 1, ¶¶ 1-2; DE 83 at 1, ¶¶ 1-2.  BET began airing re-runs of the Series in

2010.  See DE 71 at 1, ¶ 2; DE 83 at 1, ¶ 2.  In March of that year, BET acquired an

exclusive license to produce new episodes of the Series, premiering in January 2011.

See DE 71 at 1, ¶ 3; DE 83 at 1, ¶ 3.  BET has since televised at least three new

seasons of the Series.  See id.

Facebook is an "online social network where members develop personalized

web profiles to interact and share information with other members."  Lane v. Facebook,

Inc., 696 F.3d 811, 816 (9th Cir. 2012).  The shared information "varies considerably,

and it can include news headlines, photographs, videos, personal stories, and activity

updates."  Id.  Typically, members "publish information they want to share to their

personal profile, and the information is thereby broadcasted to the members' online

'friends' (i.e., other members in their online network)."  Id.

---

[2]  In her Response to Defendant's Statement of Material Facts [DE 83],
Plaintiff disputes certain facts in that Statement without citing any supporting evidence.
See S.D. Fla. L.R. 56.1(a)(2), (b).  To the extent those facts are consistent with the
record, they are deemed admitted.  See id.

Facebook "Fan" Pages are created with a specific focus—such as a corporate brand, place, organization, or public figure—allowing fans of that subject to express support for or interest in the topic.  See DE 70-11 at 1 ("Facebook Pages Terms"). Unlike Facebook members' personal profiles, Fan Pages can be viewed by anyone who visits them.  See id.; DE 71 at 2, ¶ 5; DE 83 at 1, ¶ 5.  Facebook treats officially sponsored Fan Pages differently than unofficial Fan Pages.  See DE 71 at 2, ¶ 6; DE 83 at 1, ¶ 6.  According to Facebook's Terms of Service,

> A.  A Page for a brand, entity (place or organization), or public figure may be administered only by an authorized representative of that brand, entity (place or organization) or public figure (an "official Page").
>
> B.  Any user may create a Page to express support for or interest in a brand, entity (place or organization), or public figure, provided that it does not mislead others into thinking it is an official Page, or violate someone's rights.  If your Page is not the official Page of a brand, entity (place or organization) or public figure, you must:
>
>> i.  not speak in the voice of, or post content as though it was coming from, the authorized representative of the Page's subject matter; and
>>
>> ii.  make clear that the Page is not the official Page of the brand, entity (place or organization) or public figure.

DE 70-11 at 1.

Facebook users can "like" a Facebook Page (including a Fan Page), or specific postings on a Page, by clicking a "like" button supplied by Facebook.  See DE 71 at 2, ¶ 7; DE 83 at 1, ¶ 7.  As one appellate court has explained,

> "Liking" on Facebook is a way for Facebook users to share information with each other.  The "like" button, which is represented by a thumbs-up icon, and the word "like" appear next to different types of Facebook content.  Liking something on Facebook "is an easy way to let someone

3

know that you enjoy it." <u>What does it mean to "Like" something?</u>, Facebook, http://www.facebook.com/help/ 452446998120360 (last visited Sept. 17, 2013).  Liking a Facebook Page "means you are connecting to that Page. When you connect to a Page, it will appear in your timeline and you will appear on the Page as a person who likes that Page.  The Page will also be able to post content into your News Feed." <u>What's the difference between liking an item a friend posts and liking a Page?</u>, Facebook, http://www. facebook.com/help/452446998120360 (last visited Sept. 17, 2013).

<u>Bland v. Roberts</u>, 730 F.3d 368, 385 (4th Cir. 2013).  Any Facebook user who "likes" a

specific Page or posted content remains in control of his or her "like" at all times and is

free to "unlike" the Page or content by clicking an "unlike" button provided by Facebook.

<u>See</u> DE 71 at 3, ¶ 8; DE 83 at 2, ¶ 8.

  In 2008, when the Series was airing on CWN, Plaintiff Stacey Mattocks created a

Facebook Page focusing on the Series (the "FB Page").  <u>See</u> DE 71 at 3, ¶ 9; DE 83 at

2, ¶ 9.  Due to Facebook's policies, Mattocks could not, and did not, post any BET-

owned or third-party-owned content from the Series.  <u>See</u> DE 71 at 3, ¶ 10; DE 83 at 2,

¶ 10.  Nor could Mattocks hold her FB Page out to the public as the "official" Series Fan

Page sponsored or operated by BET.  <u>See id.</u>

  Around October 2010, BET contacted Mattocks after learning that she had

created a Fan Page for the Series.  <u>See</u> DE 71 at 3, ¶ 12; DE 83 at 2, ¶ 12.  In January

2011, BET hired Mattocks to perform part-time work for the company, paying her thirty

dollars an hour.  <u>See</u> DE 71 at 3-4, ¶¶ 13, 19; DE 83 at 2-3, ¶¶ 13, 19.  Mattocks's

duties included managing the FB Page.  <u>See</u> DE 71 at 3, ¶ 14; DE 83 at 2, ¶ 14.

  Thereafter, BET prominently displayed its trademarks and logos in the top

header of the FB Page, encouraged BET's viewers to "like" the Page, and provided

Mattocks with exclusive content, including links to video clips and photographs, to post on the Page.  See DE 71 at 3-4, ¶ 15; DE 83 at 2, ¶ 15.  BET regularly instructed Mattocks to post, or not to post, certain information on the Page.  See DE 70-13 at 30-40 (Mattocks Dep., Exs. 42, 48-51, 53); DE 83-16 at 1-3, DE 83-25 at 1-3 (Lespinasse Dep., Exs. 16, 25).  Mattocks posted most of the content on the FB Page, but BET employees also occasionally posted material.  See DE 71 at 4, ¶ 16; DE 83 at 2-3, ¶ 16.  Too, Mattocks helped BET protect its intellectual property by notifying the company when she discovered third parties streaming episodes of the Series without permission.  See DE 71 at 4, ¶ 24; DE 83 at 4, ¶ 24.  While Mattocks worked for BET, the number of "likes" on the FB Page grew from around two million to over six million.  See DE 71 at 4, ¶ 20; DE 83 at 3, ¶ 20.

In February 2011, BET and Mattocks entered into a Letter Agreement.  See DE 70-13 at 12 (Mattocks Dep., Ex. 14).  BET agreed not to exclude Mattocks from the Page by changing her administrative rights.  See id.  In exchange, Mattocks granted BET administrative access to the FB Page and agreed that BET could "update the content on the Page from time to time as determined by BET in its sole discretion."  Id.  Mattocks admits that these terms entitled BET to "full access" to the Page "in every respect."  DE 70-1 at 13 (Mattocks Dep. at 92).

After signing the Letter Agreement, the parties discussed the possibility of BET employing Mattocks full-time.  See DE 71 at 5, ¶ 27; DE 83 at 4-5, ¶ 27.  During the course of these discussions, in June 2012, Mattocks informed BET that she would "restrict BET's administrative access" to the FB Page "[u]ntil such time as we can reach an amicable and mutually beneficial resolution" concerning her employment.  DE 70-13 at 17 (Mattocks Dep., Ex. 26).  The same day, Mattocks demoted BET's administrative

5

access to the Page.  See DE 71 at 5, ¶ 28; DE 83 at 5, ¶ 28.  Mattocks concedes that,

because of this demotion, BET was no longer free to post content on the Page:

> Q:    Prior to demoting BET, they were able to post on their
> own without going through you in any way; isn't that
> true?
>
> A:    That is correct.
>
> Q:    And after you demoted them, they were unable to
> post on their own without going through you; isn't that
> true?
>
> A:    That is correct.

DE 70-1 at 12 (Mattocks Dep. at 86-87).

Following its loss of full access to the FB Page, on August 27, 2012, BET asked

Facebook to "migrate" fans of the Page to another official Series Page created by BET.

See DE 70-8 (Decl. of Tia Carter-Jenkins & attached e-mails); DE 70-9 (Decl. of Jean

Pierre Lespinasse & attached e-mails).  That same day, BET sent Mattocks a letter

stating in relevant part:

> We regret to inform you that your actions to restrict and,
> at times, completely block BET's access to the Facebook
> Page that you created for The Game (the "Game FB Page")
> materially breaches the [L]etter [A]greement . . . between us,
> dated February 12, 2011 which granted BET rights to the
> Game FB Page.  Accordingly, the Letter Agreement is
> hereby terminated effective immediately.
>
> Further, BET hereby rescinds any and all rights that may
> have been previously granted to you directly, implicitly or
> otherwise, to use BET intellectual property ("BET Material").
> You are respectfully directed to cease and desist from using
> all BET Material in any and all media immediately and
> further advised that BET expressly reserves its various rights
> and remedies as copyright and trademark owner in
> connection with willful infringement of our intellectual property.

DE 70-13 at 14 (Mattocks Dep., Ex. 15).

In response to BET's migration request, Facebook reviewed the FB Page to determine whether it appeared to officially represent the brand owner, BET.  See id.; DE 71 at 6, ¶ 35; DE 83 at 6, ¶ 35.  Based on this review, Facebook granted BET's request and migrated the "likes" associated with the FB Page to the other BET-sponsored page.  See id.  Facebook also shut down the FB Page.  See DE 71 at 7, ¶ 41; DE 83 at 7, ¶ 41.  BET separately asked Twitter, another social-networking service, to disable the account that Mattocks was using to promote the Series for BET. See DE 71 at 7, ¶ 40; DE 83 at 7, ¶ 40.  That request too was granted.  See DE 83-11 at 23 (Lespinasse Dep. at 87-88).

### B.    Procedural History

On July 22, 2013, Mattocks brought this diversity action against BET.  See DE 1. In her current Second Amended Complaint, Mattocks alleges that BET wrongfully deprived her of certain rights by disabling the FB Page and her Twitter account. See DE 46.  Specifically, Mattocks claims that BET tortiously interfered with contractual relationships she had with Facebook and Twitter (Counts I and II), that BET breached the parties' Letter Agreement (Count III), that BET breached a duty of good faith and fair dealing toward Mattocks (Count IV), and that BET converted a business interest she held in the FB Page (Count V).  See id. at 8-13.  As a result, Mattocks contends, she lost potential income from other companies that pay her for redirecting users from several websites she maintains, including the FB Page.  See id. at 7-8; DE 71 at 7-8, ¶¶ 44-46; DE 83 at 7-8, ¶¶ 44-46.

On June 27, 2014, BET filed its Motion for Summary Judgment.  See DE 70. Mattocks filed a Response opposing the Motion, and BET replied.  See DE 84; DE 87.

In connection with their summary-judgment briefs, the parties have also filed factual statements and supporting evidence.

## II.   Discussion

### A.   Summary Judgment Standards

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must point out to the Court that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).  The non-moving party therefore "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

8

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must present affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577. If the evidence offered by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

The Court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006). The Court must also discern which issues are material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

**B.     Analysis of BET's Motion**

**1.     Tortious Interference**

Mattocks's tortious-interference claims are based on her account agreements with Facebook and Twitter. See 46-3 (Facebook Statement of Rights and Responsibilities); DE 46-4 (Twitter Terms of Service). Mattocks alleges that BET was aware of these agreements and that, by directing the services to disable the FB Page

and Twitter account "under false pretenses, BET intentionally and unjustifiable interfered with the contract[s]." DE 46 at 9. In its Motion, BET argues that Mattocks's tortious-interference claims fail as a matter of law.

"In Florida, the elements of tortious interference with a contractual relationship are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." U.S. Life Ins. Co. v. Logus Mfg. Corp., 845 F. Supp. 2d 1303, 1320 (S.D. Fla. 2012) (internal quotation marks omitted); see Mariscotti v. Merco Grp. at Akoya, Inc., 917 So. 2d 890, 892 (Fla. 3d DCA 2005).[3] Here, the parties' arguments focus on the fourth element—whether any justification or privilege supported BET's requests to terminate the FB Page and Mattock's Twitter account. For interference with a contract to be unjustified, "the interfering defendant must be a third party, a stranger to the business relationship." Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 386 (Fla. 4th DCA 1999). "A defendant is not a 'stranger' to a business relationship if the defendant 'has any beneficial or economic interest in, or control over, that relationship.'" Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc., 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (quoting Nimbus Tech., Inc. v. SunnData Prods., Inc., 484 F.3d 1305, 1309 (11th Cir. 2007)). Thus, a party cannot be liable for tortious interference "when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." Id. An exception to this rule exists "where malice is the sole basis for the interference"—that is, when the defendant is

---

[3] The parties agree, and the Court therefore assumes, that the substantive law of Florida governs all claims in this action.

"interfering <u>solely</u> out of spite, to do harm, or for some other bad motive." <u>Ernie Haire</u>
<u>Ford, Inc. v. Ford Motor Co.</u>, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001) (citations
omitted).  And "even where the defendant's motive is not purely malicious, a tortious
interference claim may succeed if improper methods were used." <u>KMS Rest. Corp. v.</u>
<u>Wendy's Int'l, Inc.</u>, 361 F.3d 1321, 1327 (11th Cir. 2004) (collecting Florida cases).

The record in this case shows conclusively that BET was not a "stranger" to
Mattocks's user agreements with Facebook and Twitter.  After BET hired her to work for
the company, Mattocks used the FB Page and Twitter account to officially promote the
Series for the network.  Further, BET exercised control over the material that Mattocks
posted.  Mattocks points to various facts that she claims demonstrate BET's intent to
take away her rights to the FB Page.  But the record establishes that BET's requests to
terminate the FB Page and Twitter account were motivated, at least in part, by Mattocks
revoking BET's full access to the FB Page.  That action affected BET's economic
interests by depriving the network of control over its intellectual property on the Page
and how the Series was officially promoted there.  While BET may also have had other
financial motives in disabling the Page and Twitter account, no record evidence shows
that BET took these steps for purely malicious reasons.  And though Mattocks claims
that BET removed the Page and account "under false pretenses," she has produced no
substantial evidence that Facebook's and Twitter's decisions to shut down the services
were ultimately based on anything other than the companies' policies protecting brand
owners' rights.  BET is therefore entitled to summary judgment on Mattocks's tortious-
interference claims.

### 2.      Breach of Contract

Mattocks contends that BET breached the Letter Agreement by "causing the removal of the FB Page" and thereby "excluding Mattocks from" the Page.  DE 46 at 11.  This act, Mattocks asserts, violates the Letter Agreement's provision that "BET will not change the administrative rights to the Page to exclude you from the Page."  Id. at 10.  BET responds that even if its removal of the Page breached this term of the agreement, Mattocks had already breached the agreement by demoting BET's access to the Page.

It is a fundamental principle of Florida contract law that a material breach by one party excuses performance by the other party.  See Indem. Ins. Corp. of DC. v. Caylao, 130 So. 3d 783, 786 (Fla. 1st DCA 2014) (citing 14 Steven Plitt et al., Couch on Insurance § 199.81 (3d ed. 2012)); see also Toyota Tsusho Am., Inc. v. Crittenden, 732 So. 2d 472, 477 (Fla. 5th DCA 1999) ("When a nonbreaching party to a contract is confronted with a breach by the other party, the nonbreaching party may stop performance, treating the breach as a discharge of its contractual liability.").  A "material breach" goes "to the essence of the contract," and not merely the "failure to perform some minor part" of the agreement.  Covelli Family, L.P. v. ABG5, L.L.C., 977 So. 2d 749, 752 (Fla. 4th DCA 2008) (internal quotation marks omitted).

Here, the Letter Agreement essentially contained two mutual promises.  BET agreed not to exclude Mattocks from the FB Page by changing her administrative rights.  See DE 70-13 at 12.  Mattocks granted BET full administrative access to the Page and agreed that BET could "update the content on the Page from time to time as determined by BET in its sole discretion."  Id.; see DE 70-1 at 13.  It is clear that both of these terms—the only ones in the Letter Agreement—were essential to the contract and therefore material.  After the Letter Agreement was executed, however, Mattocks

demoted BET's access to the Page, preventing the network from posting content.
See DE 70-1 at 12 DE 71 at 5, ¶ 28; DE 83 at 5, ¶ 28.  That action by Mattocks
materially breached the Letter Agreement, thereby excusing BET's performance of its
obligations under the contact.  Accordingly, Mattocks cannot maintain a breach-of-
contract claim based on BET's later removal of the FB Page.

### 3.    Breach of Good Faith and Fair Dealing

Mattocks further claims that, "[b]y causing the removal of the FB Page without
providing Mattocks notice or an opportunity to cure her alleged breaches, BET
breached its duty of good faith and fair dealing to Mattocks."  DE 46 at 12, ¶ 80.
"Florida contract law recognizes the implied covenant of good faith and fair dealing in
every contract."  Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d
1232, 1234 (Fla. 4th DCA 2001) (per curiam).  This covenant is "intended to protect the
reasonable expectations of the contracting parties in light of their express agreement."
Id. (internal quotation marks omitted).  Since the covenant is an implied one, it must
"attach[] to the performance of a specific or express contractual provision."  Snow v.
Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So. 2d 787, 792 (Fla. 2d DCA
2005).  Thus, "a claim for breach of the implied covenant of good faith and fair dealing
cannot be maintained under Florida law absent an allegation that an express term of
the contract has been breached."  Ins. Concepts & Design, 785 So. 2d at 1234;
see Snow, 896 So. 2d at 792 (explaining that "the duty of good faith performance does
not exist until a plaintiff can establish a term of the contract the other party was
obligated to perform and did not").  This rule exists because "[a]llowing a claim for
breach of the implied covenant of good faith and fair dealing where no enforceable

executory contractual obligation remains would add an obligation to the contract that was not negotiated by the parties." Ins. Concepts & Design, 785 So. 2d at 1235.

As discussed above in Part II.B.2, any obligation on BET's part not to exclude Mattocks from the FB Page was excused when she materially breached the Letter Agreement by demoting BET's access to the Page. Nor does the Letter Agreement require BET to notify Mattocks of a breach and permit her to cure it. Mattocks cannot now impose this obligation—which the parties did not bargain for—through a claim for breach of good faith and fair dealing. See Progressive Am. Ins. Co. v. Rural/Metro Corp. of Fla., 994 So. 2d 1202, 1207-08 (Fla. 5th DCA 2008) (holding that party could not "use the implied duty of good faith to create a duty which does not otherwise exist").

### 4.    Conversion

Last, Mattocks claims that BET converted a business interest she had in the FB Page—namely, the "likes" that the Page had accumulated while she worked on it. See DE 46 at 13, ¶ 85. Mattocks asserts that the "substantial interest in the FB Page and the significant number of 'Likes' generated by Mattocks provided her with business opportunities" with the companies that pay her for redirecting visitors to their sites. Id. According to Mattocks, BET willfully deprived her of these opportunities when it asked Facebook to transfer the "likes" from the FB Page to the other official Series Page. See id. at 13, ¶¶ 86-88.

"Under Florida law, a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Fogade v. ENB Revocable Trust, 263 F.3d 1274, 1291 (11th Cir. 2001) (internal quotation marks omitted); see Mayo v. Allen, 973 So. 2d 1257, 1258 (Fla. 1st DCA 2008) (per curiam). To prove a conversion claim, a plaintiff must offer "facts sufficient to show ownership of the subject property

14

and facts that the other party wrongfully asserted dominion over that property."
Edwards v. Landsman, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011).

Based on the record, Mattocks cannot establish that she owns a property interest in the "likes" on the FB Page.  As explained in Part I.A, "liking" a Facebook Page simply means that the user is expressing his or her enjoyment or approval of the content.  At any time, moreover, the user is free to revoke the "like" by clicking an "unlike" button.  So if anyone can be deemed to own the "likes" on a Page, it is the individual users responsible for them.  Cf. Bland, 730 F.3d at 385-86 (holding that public employee's "like" of political-campaign page was a protected form of free speech and expression).  Given the tenuous relationship between "likes" on a Facebook Page and the creator of the Page, the "likes" cannot be converted in the same manner as goodwill or other intangible business interests.  See, e.g., Freeman v. Corbin (In re Estate of Corbin), 391 So. 2d 731, 732-33 (Fla. 3d DCA 1980).

Even if Mattocks could claim an ownership interest in the "likes" on the FB Page, she cannot demonstrate that BET's migration request was unauthorized or wrongful.  After Mattocks breached the Letter Agreement by limiting BET's access to the Page, BET asked Facebook to migrate the "likes" to the other official Series Page.  Facebook then reviewed the FB Page in accordance with its corporate-brand policies and determined that BET's request was valid.  More, as already explained, no substantial evidence shows that BET's request violated any other legal duty to Mattocks.

## III.   Conclusion

For the reasons discussed, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.   Defendant's Motion for Summary Judgment [DE 70] is **GRANTED**;

2.      The following motions are **DENIED AS MOOT**:  Defendant's Motion to Dismiss

Second Amended Complaint [DE 55], Plaintiff's Motion to Exclude or Limit

Testimony and Opinions of Defendant's Expert Guy Hagen [DE 67], Plaintiff's

Motion to Exclude or Limit Testimony and Opinions of Defendant's Expert Aram

Sinnreich [DE 68], Defendant's Motion to Exclude the Report and Testimony of

Fernando Torres [DE 69], and Plaintiffs' Omnibus Motion to Strike Portions of

Defendant's Reply in Support of Motion to Exclude the Report and Testimony of

Fernando Torres and Defendant's Reply in Support of Motion for Summary

Judgment, or in the Alternative, Motion for Leave to File Sur-Replies [DE 91];

and

3.      The Court will enter a separate Final Judgment consistent with this Order.

        **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, this 20th day of August, 2014.

JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF